IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

DONALD A. KING and DUSTIN           )
INMAN SOCIETY,                      )
                                    )
            Plaintiffs,             )
                                    )
      v.                            )      CASE NO. 2:22-CV-207-WKW
                                    )             [WO]
SOUTHERN POVERTY LAW                )
CENTER, INC.,                       )
                                    )
            Defendant.              )

## MEMORANDUM OPINION

In 2018, the Southern Poverty Law Center (SPLC) designated the Dustin Inman Society, Inc., (DIS) as an "anti-immigrant hate group," stating that its principal, Donald A. King (King), "focuses on vilifying all immigrants." (Doc. # 1 ¶¶ 25, 34.) Objecting to that designation, DIS and King bring this lawsuit against SPLC for defamation under state law. Plaintiffs contend that, although they advocate for the "enforcement of immigration laws," DIS is in no sense an anti-immigrant hate group. (Doc. # 1 ¶ 43.) Plaintiffs maintain that SPLC knew that DIS was not an anti-immigrant hate group or that, but for SPLC's reckless disregard for the truth, SPLC would have known that the designation was false. Plaintiffs contend that SPLC labeled DIS an anti-immigrant hate group to destroy Plaintiffs' reputation, to sabotage their efficacy in advocating before

legislative bodies to enforce immigration laws, and to increase SPLC's fundraising. (Doc. # 1 ¶¶ 53–54.)

Responding with a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, SPLC argues multiple grounds, including that the claims are time barred under the statute of limitations and that the Complaint fails to state a claim. (Doc. # 10.)  Plaintiffs oppose the motion on all grounds.  (Doc. # 18.)

In a prior Order, SPLC's motion to dismiss was denied, and a memorandum opinion was promised.  (Doc. # 20.)  This is the memorandum opinion explaining the reasons for the denial.

## I.  JURISDICTION AND VENUE

The court exercises subject matter jurisdiction under 28 U.S.C. § 1332(a). Personal jurisdiction and venue are not contested.

## II.  STANDARD OF REVIEW

When evaluating a motion to dismiss under Rule 12(b)(6), a court must take the facts alleged in the complaint as true and construe them in the light most favorable to the plaintiff.  *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1321–22 (11th Cir. 2012).  To survive Rule 12(b)(6) scrutiny, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "[F]acial plausibility" exists "when the plaintiff pleads factual content

that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  Determining facial plausibility "does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" of the alleged wrongdoing. *Twombly*, 550 U.S. at 545.  The necessity at the pleading stage for plausible allegations "reflects Rule 8(a)(2)'s threshold requirement that the 'plain statement' possess enough heft to show that the pleader is entitled to relief." *Id.* (cleaned up).  "And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Id.* at 556 (citation and internal quotation marks omitted).

When ruling on a Rule 12(b)(6) motion, a court may consider documents attached to a motion to dismiss without converting the motion into one for summary judgment if those documents "are referred to in the complaint, central to the plaintiff's claim, and of undisputed authenticity." *Hi-Tech Pharms., Inc. v. HBS Int'l Corp.*, 910 F.3d 1186, 1189 (11th Cir. 2018).  Also, "[a] court may take judicial notice of its own records . . . ." *United States v. Rey*, 811 F.2d 1453, 1457 n.5 (11th Cir. 1987); *see also Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007) (observing that "sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss"

include "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice").

## III. BACKGROUND

The background is divided into two parts.  Part A addresses the allegations, claims, and defenses at issue.  Part B focuses on the proceedings in a related, but closed, action—*King v. Southern Poverty Law Center, Inc.*, No. 2:20-CV-120-ECM (M.D. Ala. Feb. 20, 2020) (*King I*).

## A.    **The Present Lawsuit**

DIS is a non-profit Georgia corporation "with a stated mission and goal of promoting the enforcement of immigration laws in the United States." (Doc. # 1 ¶¶ 2, 11.)[1]  Mr. King, a Georgia citizen, chartered DIS in 2005 and is the "public face" of the organization today.  (Doc. # 1 ¶¶ 1, 12, 13.)  DIS "has maintained the same or substantially similar activities in the seventeen years it has operated." (Doc. # 1 ¶ 12.) On behalf of DIS, Mr. King has "advocated for enforcement of immigration laws in the United States" before the U.S. House Representatives, the Georgia General Assembly, and many other legislative panels.  (Doc. # 1 ¶¶ 13, 53.)  "Legislative advocacy has been the primary activity of Plaintiff DIS since its founding and remains so today." (Doc. # 1 ¶ 19.)  Mr. King has stated publicly on DIS's website that "[o]ur

---

[1] Unless the citation is to a particular paragraph within a document, all citations use the pagination as designated by the CM/ECF filing system.

constant reminder has always been that we cannot honor real immigrants who join the American family according to our rules and the rich tradition of immigration if we do not enforce our immigration laws."  (Doc. # ¶ 41 (internal quotation marks omitted).) As for DIS's governance, DIS has a board of advisors comprising "a diverse group of Americans with a variety of racial and immigration backgrounds."  (Doc. # 1 ¶ 30.)

SPLC is a non-profit Alabama corporation, self-described as "the premier U.S. non-profit organization monitoring the activities of domestic hate groups and other extremists . . . ."  (Doc. # 1 ¶¶ 37, 3.)  SPLC publicly "claims it has specialized knowledge of the groups it monitors" and "the ability to conduct in depth investigations" and "offer[] expertise" on what it calls "hate groups."  (Doc. # 1 ¶ 38.) On its website, SPLC represents that it "currently track[s] more than 1,600 extremist groups operating across the country" and that it "publish[es] investigative reports, train[s] law enforcement officers and share[s] key intelligence, and offer[s] expert analysis to the media and public."  (Doc. # 1 ¶ 37 & n.5.)  A "former longtime staffer" of SPLC has said that the "hate-group list" "remains a valuable resource for journalists and a masterstroke of [Morris] Dees's marketing talents."  (Doc. # 1 ¶ 52.)

The products of SPLC's investigative activities are published on its website. SPLC publishes an annual journal, titled "Intelligence Report," maintains a "Hate Map," and produces web pages with profiles about the designated hate groups.  (*See, e.g.*, Doc. # 1 ¶ 62; Doc. # 10-1 ¶ 3 & Exs. 2, 3, 5.)  The Hate Map, which is an

interactive map of the United States, depicts the approximate locations of the organizations that SPLC designates as hate groups, including anti-immigrant hate groups.  (Doc. # 1 ¶¶ 9, 10, 25.)  SPLC defines an "anti-immigrant hate group" as:

> the most extreme of the hundreds of nativist groups that have proliferated since the late 1990s, when anti-immigration xenophobia began to rise to levels not seen in the United States since the 1920s. Most white hate groups are also anti-immigrant, but anti-immigrant hate groups target only that population[,] usually arguing that immigrants are unable to assimilate, have a lower intellectual capacity than white people, bring disease[,] or are inherently more criminal.  Although many groups legitimately criticize American immigration policies, anti-immigrant hate groups go much further by pushing racist propaganda and ideas about non-white immigrants.

(Doc. # 1 ¶ 27.)

More than a decade ago, SPLC announced that DIS did not meet its definition of an anti-immigrant hate group.  In 2011, an SPLC representative, Heidi Beirich, explained to the Associated Press why SPLC had not labeled DIS a hate group:  Mr. King's "tactics have generally not been to get up in the face of actual immigrants and threaten them[.] . . .  Because he is fighting, working on his legislation through the political process, that is not something we can quibble with, whether we like the law or not."  (Doc. # 1 ¶ 17.)  But in 2018 SPLC changed course, and, for the first time, designated DIS as an anti-immigrant hate group in its annual Intelligence Report and included DIS on its interactive Hate Map.  (Doc. # 1 ¶¶ 14, 25.)  After 2018, SPLC continued to classify DIS as an "anti-immigrant hate group" in its Intelligence Reports

published in 2019, 2020, and 2021 and in its corresponding Hate Maps.  (Doc. # 1 ¶¶ 26, 31.)  Also, at some point prior to February 2020, the SPLC first published a web page profile on DIS.  (Doc. # 10-1 ¶ 5 (citing hyperlinks for accessing the web page profile on DIS as originally published and as currently published); Doc. # 10-1 ¶ 3).) That web page profile pronounces that DIS, led by Mr. King, "poses as an organization concerned about immigration issues, yet focuses on vilifying all immigrants."  (Doc. # 1 ¶ 34; Doc. # 10-1 ¶ 5.)

Why did SPLC change its position in 2018 about DIS's status as a hate group? The Complaint alleges that Plaintiffs have made "no substantive change . . . in their approach to supporting enforcement of immigration laws and opposing illegal immigration."  (Doc. # 1 ¶ 23.)  The Complaint also emphasizes that SPLC has not publicly stated that DIS and Mr. King "ha[ve] engaged in activity different from the activities they were engaged in at the time of [SPLC's] July 2011 statement" to the Associated Press that DIS was not a qualifying hate group.  (Doc. # 1 ¶ 20; *see also* Doc. # 1 ¶ 17.)  SPLC also "did not change the criteria for the 'hate group' designation from 2011 to 2018."  (Doc. # 1 ¶ 21.)

According to the Complaint, the only explanation SPLC has articulated for designating DIS as a hate group in 2018 appeared in the *Atlanta Journal-Constitution* in October 2017:

> Heidi Beirich, who directs the SPLC's efforts tracking hate groups and extremists, said she was going to take a new look at the Dustin Inman

Society after learning from the AJC about its ties to US Inc.  "Hearing about this US Inc. connection, I think we at the SPLC have to take a serious look at King's outfit as possibly a hate group," Beirich said, "because there is no one more extreme than John Tanton and his crew on immigration in the United States."

(Doc. # 1 ¶ 15.)   However, Plaintiffs contend "[n]othing about the[ir] alleged association with US Inc causes" DIS to satisfy the SPLC's own definition of a "hate group." (Doc. # 1 ¶ 16.)

Plaintiffs allege that there is an unspoken explanation for SPLC's decision in 2018 to designate DIS as a hate group.  SPLC's classification of DIS as an "anti-immigrant hate group" occurred within a month of SPLC's registering lobbyists to advocate "against a pro-enforcement bill pending in the Georgia General Assembly," an immigration bill supported by Mr. King, on behalf of DIS.  (Doc. # 1 ¶¶ 24–25.) Plaintiffs contend that SPLC's repeated designations of DIS as a "hate group" is part of SPLC's "legislative lobbying strategy." (Doc. # 1 ¶ 53.)  Namely, "[b]y destroying the reputation of Plaintiff DIS by maliciously defaming it, Defendant SPLC is more likely to be successful in its lobbying efforts before the Georgia General Assembly." (Doc. # 1 ¶ 53; *see also* Doc. # 1 ¶ 55.)  SPLC's designation of DIS as a hate group also allows SPLC to "claim that the number of hate groups has increased" and to request more money from donors "to pursue its mission." (Doc. # 1 ¶ 54.)

Plaintiffs allege that the following circumstances show that SPLC knew that its designation of DIS as an anti-immigrant hate group was false or probably false.  First,

SPLC is aware of Mr. King's documented history of opposing only "illegal immigration" through the "enforcement of immigration laws" and of not opposing legal immigration.  (Doc. # 1 ¶ 43; *see also* Doc. # 1 ¶ 41.)  Second, SPLC knew at the time of the defamatory publications that Mr. King's "sister is a legal immigrant to the United States, that the Board of Plaintiff DIS is racially diverse and includes legal immigrants, and that the consistent unwavering position of Plaintiff King and Plaintiff DIS has been to oppose illegal immigration."  (Doc. # 1 ¶ 35.)  Third, SPLC did not conduct a "meaningful fact finding or investigation" prior to designating DIS as an anti-immigrant hate group.  (Doc. # 1 ¶ 44.)  Plaintiffs point to SPLC's false assertions that DIS was incorporated in 2003, that DIS previously was known as the American Resistance Foundation, that Mr. King has worked on immigration issues since the 1990s, and that Mr. King worked for the Georgia Coalition of Immigration Reduction in the 1990s.  (Doc. # 1 ¶¶ 45–48.)  According to the Complaint, these assertions are false because DIS was not incorporated in 2003, DIS never was known as the American Resistance Foundation, Mr. King did not become interested in immigration issues until 2003, and Mr. King did not work for the Georgia Coalition of Immigration Reduction in the 1990s.  (Doc. # 1 ¶¶ 45–48.)  Plaintiffs allege that these false assertions show SPLC's "reckless disregard for the truth" in labeling DIS a "hate group."  (Doc. # 1 ¶ 49.)  Fourth, Plaintiffs have a publicly available email list and a regularly updated blog on DIS's website, which "make it clear that Defendant SPLC's designation of

Plaintiff DIS as a 'hate group' does not meet [SPLC's] own definition" of a hate group. (Doc. # 1 ¶ 43.)  Fifth, SPLC knows that Mr. King, on behalf of DIS, has publicly "articulated a position that is opposed to illegal immigration and in favor of enforcement immigration laws," and it knows that Mr. King "has never espoused 'anti-immigrant' positions."  (Doc. # 1 ¶ 43.)

After publication of the anti-immigrant hate group designation, Plaintiffs requested a retraction, but SPLC ignored the request.  (Doc. # 1 ¶¶ 77–78.)  Seeking legal recourse, Plaintiffs originally sued SPLC in an Alabama state court for SPLC's allegedly defamatory publications identifying DIS as an anti-immigrant hate group based on Mr. King's leadership.  SPLC removed the action to this court.  That action—*King I*—was dismissed under Federal Rule of Civil Procedure 12(b)(6) in March 2022. The dismissal was without prejudice.  *King I*, ECF No. 19.

The next month, on April 27, 2022, Plaintiffs brought this action.  The complaint asserts four counts.  In Counts One and Two, Plaintiffs allege that SPLC defamed DIS, first, by classifying DIS as an "anti-immigrant hate group" in its annual Intelligence Reports published in 2018, 2019, 2020, and 2021 (Count One) and, second, by classifying DIS as a "hate group" in its annual Intelligence Reports and Hate Maps published in 2019, 2020, and 2021 (Count Two).  (Doc. # 1 ¶¶ 56–65.)  In Count Three, Plaintiffs allege that SPLC defamed Mr. King by claiming that he "leads an 'anti-immigrant hate group.'"  (Doc. # 1 ¶ 68.)  Count Three's allegations state that the SPLC

10

published the defamatory statements labeling Mr. King as leading an "anti-immigrant hate group" in its annual Intelligence Reports published in February of 2018 and 2019 and on its interactive Hate Map published in March of 2018, 2019, 2020, and 2021. (Doc. # 1 ¶¶ 67, 70.)  In Count Four, Plaintiffs allege that SPLC defamed Mr. King by publishing statements that Mr. King "leads an 'anti-immigrant hate group,'" which "poses as an organization concerned about immigration issues" but that "focuses on vilifying all immigrants."  (Doc. # 1 ¶¶ 72, 73.)  Count Four's allegations state that the SPLC published these statements in its Intelligence Report in February of 2019 and on its interactive Hate Maps in March of 2018, 2019, 2020, and 2021.  (Doc. # 1 ¶¶ 72, 75.)

Counts Three and Four appear to incorrectly attribute the sources of the publications to the Intelligence Reports and the Hate Maps.  Other allegations in the Complaint, as well as the exhibits to SPLC's motion to dismiss, elucidate that the statement that Mr. King leads an "anti-immigrant hate group" that "vilif[ies] all immigrants" is published on SPLC's web page profile on DIS, and is not published in the Intelligence Reports or on the Hate Maps.  Namely, the Facts section of the Complaint incorporates SPLC's web page profile on DIS.  (*See* Doc. # 1 ¶ 42 n.10 (citing https://www.splcenter.org/fighting-hate/extremist-files/group/dustin-inman-society ); *see also* Doc. # 1 ¶ 34).)  That web page profile on DIS sets out the reasons for SPLC's decision to characterize DIS as an anti-immigrant hate group.  The report

leads off with this subheading:  "The Dustin Inman Society, led by D.A. King, poses as an organization concerned about immigration issues, yet focuses on vilifying all immigrants."  (Doc. # 1 ¶ 42 n.10; *see also* Doc. # 10-3 at 1 (a printed copy of SPLC's web page profile stating that "[t]he Dustin Inman Society, led by D.A. King, poses as an organization concerned about immigration issues, yet focuses on vilifying all immigrants" and that DIS "is a Georgia-based anti-immigrant hate group founded and led by activist D.A. King").)

In sum, the Complaint's four claims, construed liberally, encompass four categories of defamatory statements: (1) SPLC's statements designating DIS as an "anti-immigrant hate group"; (2) SPLC's statements designating DIS as a "hate group"; (3) SPLC's statements designating Mr. King as the leader of an "anti-immigrant hate group"; and (4) SPLC's statements designating Mr. King as the leader of an "anti-immigrant hate group" that "vilif[ies] all immigrants."  (Doc. # 1 ¶¶ 57, 58, 62, 63, 72, 73.)  These allegedly defamatory statements occurred in three SPLC publications:  The Intelligence Report, the Hate Map, and the SPLC web page profile on DIS.

**B.**   ___*King I*___

To reiterate, this is not Plaintiffs' first lawsuit alleging that SPLC defamed DIS and Mr. King by designating DIS as an anti-immigrant hate group based on Mr. King's actions.  The *King I* complaint included the allegedly defamatory statements in the Intelligence Reports and Hate Maps published in 2018, 2019, and 2020 and the

allegedly defamatory statements published on SPLC's web page profile on DIS that Mr. King leads an anti-immigrant hate group that vilifies all immigrants. *See King I*, ECF No. 3. The claims in *King I* mirror the claims in this case; however, the Complaint in this case adds claims about allegedly defamatory statements in the Intelligence Report and Hate Map published in 2021. Because the parties rely on *King I* to support certain arguments, it is necessary to discuss *King I*.

In *King I*, SPLC filed a Rule 12(b)(6) motion on multiple grounds. The district court agreed with one ground, finding that Plaintiffs did not adequately plead actual malice. Actual malice is required by the First Amendment when state defamation law applies to public figures, and Plaintiffs conceded in *King I*, as they do in this case (Doc. # 18 at 29), that they fall into the public figure category. Under this standard, a public-figure plaintiff must show that the defendant "made the alleged defamatory statement with 'actual malice'—'with knowledge that it was false or with reckless disregard of whether it was false or not.'" *Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*, 6 F.4th 1247, 1252 (11th Cir. 2021), *cert. denied sub nom. Coral Ridge Ministries Media, Inc. v. SPLC*, 142 S. Ct. 2453 (2022) (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964)).

The *King I* court framed the issue as whether Plaintiffs had "plausibly allege[d] enough to demonstrate a reasonable likelihood that SPLC *knew or suspected* that its

13

designation [of DIS as an anti-immigrant hate group] was false." ECF No. 19 at 8. In

a well-reasoned opinion on the sparse facts, the court found that Plaintiffs had not:

> First, the Plaintiffs' contention that SPLC *affirmatively* declined to label DIS a hate group (rather than, say, neglected to do so) is not in the complaint. The complaint only states that SPLC "had not labeled" DIS a hate group "as late as October, 2017[,]" but otherwise does not ascribe to SPLC any affirmative choice in declining to do so. (Doc. 3, para. 14). But even if the Plaintiffs *had* alleged that SPLC had previously declined to name DIS a hate group and then reversed itself, the Plaintiffs do not make clear why that, in and of itself, would add up to actual malice. The Plaintiffs do not point to anything that otherwise restricts SPLC from changing its mind or reweighing its own criteria. [Internal footnote omitted.] Even if SPLC declined to name DIS a hate group in the past, the decision to do so now does not speak to whether SPLC knew or suspected that the designation was false.

> Further, while DIS's board may be composed of immigrants as Plaintiffs allege, the Plaintiffs do not allege that SPLC knew that fact. Instead, the Plaintiffs appear to take umbrage with the fact that the SPLC did not check the composition of DIS's board before it published its designation. [Internal footnote, stating: "The Plaintiffs also argue that because King has an adoptive, immigrant sister, he and DIS cannot therefore hate all immigrants, and so SPLC defamed them by saying they did. Such a fact is not alleged in the complaint, nor is any indication that SPLC knew that fact or made that resulting inference. It cannot, therefore, support a conclusion that SPLC subjectively knew its anti-immigrant hate group designation was false."] But "a failure to investigate, standing on its own, does not indicate the presence of actual malice." *Michel*, 816 F.3d at 703 (citing *Harte-Hanks*, 491 U.S. at 692). Instead, "there must be some showing that the defendant purposefully avoided further investigation with the intent to avoid the truth." *Id.* (citations omitted). The Plaintiffs here make no such showing.

> The Plaintiffs also allege in their complaint that SPLC took King's statements out of context and imputed the statements of others to him. But it does not include any facts beyond that conclusory assertion—it is silent as to *which* statements are out of context or were spoken by others, and

14

whether SPLC *knew* that fact.  Such a conclusion without any attendant support is insufficient to sustain a cause of action.

In their brief (but not in their complaint), the Plaintiffs assert that "there is no evidence that Plaintiff King or Plaintiff DIS has beliefs or practices that involve attacking or maligning all immigrants." (Doc. 14 at 26).  Maybe so.  But even if true, and even [] if such an assertion had been in the complaint, it does little to resuscitate the Plaintiffs' claims. There remains no assertion that SPLC *knew* that such evidence is lacking.

All told, the Plaintiffs plead no fact that would allow the Court "to infer that SPLC seriously doubted the accuracy of designating [DIS] a hate group."  *Coral Ridge*, 6 F.4th at 1253.   The Plaintiffs' barebones complaint asks the Court to ignore the protections of the First Amendment and to read actual malice into the pleadings where none has plausibly been alleged.  The Court declines to do so.  As such, the Plaintiffs' cause of action for defamation (as well as their requests for punitive damages and injunctive relief) cannot be sustained and are due to be dismissed.

*Id.*, ECF No. 19 at 8–10.

The district court concluded that Plaintiffs "ha[d] failed to state a claim for which relief may be granted," granted SPLC's motion to dismiss without prejudice, and entered final judgment on March 29, 2022.  *Id.*, ECF No. 19 at 11, ECF No. 20. Although the Order indicated that Plaintiffs would have an opportunity to amend the complaint, the Order did not grant Plaintiffs leave to amend within a specified time period or provide any terms for reopening or reinstating the case.  *Id.*, ECF No. 19, at 10–11.  Plaintiffs did not move to alter or amend the judgment in *King I*, *see* Fed. R. Civ. P. 59(e), nor did they appeal the final judgment.  Instead on April 27, 2022—29 days after the dismissal in *King I* but after the expiration of the statute of limitations on

the claims based on the allegedly defamatory statements at issue in *King I*—Plaintiffs

commenced this new action.

## IV.  DISCUSSION

SPLC challenges Plaintiffs' defamation claims on three grounds.  First, SPLC

contends that the two-year statute of limitations has run on claims based on allegedly

defamatory statements published more than two years prior to the filing of this action.

According to SPLC, the statute of limitations' bar encompasses all Mr. King's claims

and most of DIS's claims, and only DIS's post-*King I* claims for defamation arising

out of the 2021 publications of the Intelligence Report and Hate Map survive the time

bar.  Second, it argues that, even if those claims are not time barred, collateral estoppel

prevents Plaintiffs from reviving the defamation claims alleged in *King I*.  Third, SPLC

argues that Plaintiffs fail to state a claim for defamation arising out of the 2021

publications designating DIS as an anti-immigrant hate group.  SPLC relies principally

on the protections of the First Amendment, arguing that SPLC's characterization of

DIS as an anti-immigrant hate group is a protected opinion under the First Amendment

and that Plaintiffs have failed to plead actual malice.  Plaintiffs oppose the motion on

all grounds, as discussed below.

## A.    Statute of Limitations, Statutory Tolling, and Equitable Tolling

SPLC invokes the statute of limitations as a defense to pare down the claims at

issue.  (Doc. # 10 at 23–25.)  Plaintiff responds by relying on the federal supplemental

jurisdiction statute—28 U.S.C. § 1367(d)—and on state-law equitable tolling to save their claims.  (Doc. # 18 at 15–17.)

Resolving the parties' arguments requires consideration of a plethora of issues, some of them thorny:  (1) which state's laws govern the statute of limitations (answer: Alabama); (2) what is Alabama's statute of limitations and its accrual date for a defamation claim; (3) whether the Alabama Supreme Court would hold that in a defamation action based on an internet publication, the single-publication rule determines the accrual date for the statute of limitations; (4) which claims, if any, are barred by Alabama's two-year statute of limitations; (5) whether 28 U.S.C. § 1367(d) tolls the statute of limitations on the time-barred claims where original jurisdiction in *King I* was based on 28 U.S.C. § 1332(a); (6) whether Alabama's principles of equitable tolling suspend the running of the statute of limitations on the time-barred claims; and (7) whether collateral estoppel bars Plaintiffs' claims.  These matters are discussed in turn.

### 1. *Alabama law governs the statute of limitations.*

The logical starting point for analyzing the statute-of-limitations defense is to determine which state's laws govern the statute of limitations and tolling rules.  A district court sitting in diversity applies the choice-of-law rules of the forum state.  *Rosa & Raymond Parks Inst. for Self Dev. v. Target Corp.*, 812 F.3d 824, 829 (11th Cir. 2016).  Under Alabama's choice-of-law rules, courts apply "the procedural law of the

forum state . . . ."  *Id.*; *Middleton v. Caterpillar Indus.*, 979 So. 2d 53, 57 (Ala. 2007) ("Although *lex loci delicti* governs substantive law, *lex fori*—the law of the forum— governs procedural matters.").

Generally, statutes of limitations are "procedural matters."  *Precision Gear Co. v. Cont'l Motors, Inc.*, 135 So. 3d 953, 957 (Ala. 2013).  The parties have not argued that an exception to this general rule applies here,[2] and independent research has not uncovered an exception.  Hence, Alabama law on the statute of limitations will be applied.  Also, because under Alabama law the statute of limitations incorporates principles of equitable tolling, Alabama law will be relied upon for principles governing equitable tolling.  *See Wade v. Danek Med., Inc.*, 182 F.3d 281, 289 (4th Cir. 1999) (providing that where "a state statute of limitations applies . . . under *Erie* in a diversity action[,] the state's accompanying rule regarding equitable tolling should also

---

[2] For example, the Alabama Supreme Court has said:  "[W]e will apply another state's statute of limitations only when it is demonstrated that 'the limitation is so inextricably bound up in the statute creating the right that it is deemed a portion of the substantive right itself.'"  *Etheredge v. Genie Indus., Inc.*, 632 So. 2d 1324, 1327 (Ala. 1994) (citation omitted).  The Eleventh Circuit has explained that a statute of limitations is part of the substantive right, as described in *Etheredge*, "when it is 'built-in' to the statute conferring the substantive right."  *Ala. Aircraft Indus., Inc. v. Boeing Co.*, No. 20-11141, 2022 WL 433457, at *12 (11th Cir. Feb. 14, 2022).  Here, as discussed in Part IV. C., it is not necessary at this stage to decide whether Alabama or Georgia substantive law applies to Plaintiffs' defamation claims.  However, if Georgia substantive law applies, no argument has been made that Georgia's one-year statute of limitations for injuries to reputation, *see* Ga. Code Ann. § 9-3-33, is a substantive element, rather than a procedural component, of a defamation claim.  A cause of action for defamation under Georgia law "is not a right created by statute, and thus the criterion for applying another state's statute of limitations is not applicable to this cause of action."  *See Precision Gear Co.*, 135 So. 3d at 957 (applying this rationale to hold that Alabama's statute of limitations governed while Oklahoma's substantive law applied) (citation and internal quotation marks omitted).

apply"). Again, the parties have not argued that a different state's law should apply to the tolling issues, and Plaintiffs rely on Alabama law. (Doc. # 18 at 16.)

Hence, the affirmative defense of the statute of limitations can supply grounds for a claim's dismissal if it is "clear from the face of the complaint" (1) that the claim is time-barred, *Ex parte Abbott Lab'ys*, 342 So. 3d 186, 193 (Ala. 2021) (citation omitted), and (2) that "tolling provisions do not apply." *Travis v. Ziter*, 681 So. 2d 1348, 1351 (Ala. 1996) (citation omitted).

**2.      *Alabama's statute of limitations for a defamation claim is two years, and the claim accrues on the publication date of the allegedly defamatory statement.***

Under Alabama law, the statute of limitations on a defamation claim is two years. *See* Ala. Code § 6-2-38(k) ("All actions of libel or slander must be brought within two years."). The two-year "statute of limitations for actions alleging libel or slander prescribes a period that runs from the date of publication—that is the date on which the injury to the plaintiff's reputation occurs and the cause of action is completed." *Poff v. Hayes*, 763 So. 2d 234, 242 (Ala. 2000); *see also Harris v. Winter*, 379 So. 2d 588, 590 (Ala. 1980) ("It is the law of Alabama that a cause of action for libel accrues when the libelous matter is published." (citations omitted)).

As a general rule, "every distinct publication of libelous or slanderous material gives rise to a separate cause of action, even if the material communicated by each publication relates to the same matter as the previous publications." *Poff*, 763 So. 2d

19

at 242 (citation omitted).  An exception to this general rule is the single-publication rule, which is "generally applicable only to newspapers and similar media."  *Id.* at 242 n.5.  Under the single-publication rule, "repetition or republication of an identical libel and slander is not a new cause of action for which a separate suit may be maintained, but is merely an aggravation of the pre-existing cause, and in proper cases may tend to show actual malice."  *Id.* (cleaned up) (quoting *Age–Herald Publ'g Co. v. Huddleston*, 92 So. 193, 197 (Ala. 1921)).  In *Age-Herald Publishing Co.*, the Alabama Supreme Court said this:  "If the mailing of copies of libelous newspapers from the county of their primary publication into other counties amounts to a republication merely—and no other theory seems available—then the law is well settled that the repetition or republication of the identical libel is not a new cause of action for which a separate suit may be maintained, but is merely an aggravation of the pre-existing cause, and in proper cases may tend to show actual malice."  92 So. at 197 (collecting cases).  As *Poff* also elaborated, "[T]he exception enunciated in *Age–Herald Publ'g Co.* applies only to situations where subsequent acts of defamation are verbatim republications of previously made libelous or slanderous statements."  763 So. 2d at 242 n.5.  This case does not involve a newspaper, but the worldwide web; hence, the next issue is whether the Alabama Supreme Court would apply the single-publication rule to internet publications.  If it would, the statute of limitations for a claim alleging internet defamation would accrue on the date of the original internet publication.

**3.     As to the novel issue of whether the Alabama Supreme Court would apply the single-publication rule to internet publications, the court declines to predict at this stage how the Alabama Supreme Court would decide.**

To begin, as to the publication dates of the allegedly defamatory statements in SPLC's Intelligence Report and Hate Map, the allegations show that these two publications are reassessed and reposted annually.  (*See, e.g.*, Doc. # 1 ¶¶ 9–10, 25–26, 57, 60, 62, 65, 72.)  Hence, at a minimum, these annual publications of the Intelligence Report and Hate Map restart the clock for the defamation claims.  *Poff*, 763 So. 2d at 242.  SPLC concedes that the "hate-group-designation claims . . . based on the Intelligence Report and Hate Map published in the spring of 2021" are not time barred. (Doc. # 10 at 25.)  However, as to the publication dates of the allegedly defamatory statements on SPLC's web page profile on DIS, SPLC's arguments invoke the single-publication rule.  SPLC argues that, because it originally posted its web page profile on DIS "before [*King I*] was filed" (Doc. # 10-1 ¶ 3), and because SPLC has not edited this web page profile since its original posting, the statute of limitations accrued on the date the web page profile on DIS was first posted on the internet.[3]  (*See* Doc. # 10 at 24–25 & n.5; Doc. # 10-1 ¶ 5.)  SPLC contends that, because the original posting of

---

[3] The Complaint includes an active hyperlink to SPLC's web page profile on DIS, which plausibly shows that SPLC's web page profile on DIS has remained accessible on SPLC's website since its original posting.  (*See* Doc. # 1 at 9 n.10 (citing https://www.splcenter.org/fighting-hate/extremist-files/group/dustin-inman-society).)

the web page profile on DIS occurred more than two years prior to the filing of this lawsuit, the allegedly defamatory statements published on that web page are time barred.  (*See* Doc. # 10 at 24–25 & n.5; Doc. # 10-1 ¶ 5.)  Plaintiffs do not offer a counterargument (because their arguments focus solely on tolling, as discussed below).

There are two impediments to the court's adoption of SPLC's arguments at this stage.  First, SPLC relies on the attestation of Shannon L. Holliday that SPLC's web page profile on DIS "has not changed or been altered since the filing of the initial litigation in 2020."  (Doc. # 10-1 ¶ 5.)  While the affidavit includes hyperlinks Holliday says are the web page profiles on DIS as posted in February 2020 and as posted "currently," (Doc. # 10-1 ¶ 5), adopting Holliday's attestation—that the web page prolife "has not changed or been altered since the filing of the initial litigation in 2020" (Doc. # 10-1 ¶ 5)—comes too close to comfort as constituting consideration of "matters outside the pleadings," Fed. R. Civ. P. 12(d).

Second, the parties have not cited a decision from the Alabama Supreme Court or from any Alabama court addressing whether the single-publication rule applies to postings of allegedly defamatory statements on the internet.  The court's independent research uncovered no published decision from any Alabama court.  Hence, this court's duty is to predict how the Alabama Supreme Court would decide the issue.  *See, e.g., State Farm Mut. Auto. Ins. Co. v. Duckworth*, 648 F.3d 1216, 1224 (11th Cir. 2011)

("Where, as here, we find no [state] Supreme Court decision directly on point, we must anticipate how the [state] Supreme Court would decide this case." (citation omitted)).

Other jurisdictions—both federal and state—have uniformly applied the single-publication rule to internet publications.  *See Pippen v. NBCUniversal Media*, *LLC*, 734 F.3d 610, 615 (7th Cir. 2013) (recognizing that "[e]very state court that has considered the question applies the single-publication rule to information online" (collecting cases) and concluding that, "if presented with the opportunity, the Supreme Court of Illinois would deem the single-publication rule applicable to the Internet"); *In re Philadelphia Newspapers, LLC*, 690 F.3d 161, 174 (3d Cir. 2012), *as corrected* (Oct. 25, 2012) ("We believe that Pennsylvania courts would extend the single publication rule to publicly accessible material on the Internet."); *Eramo v. Rolling Stone, LLC*, 209 F. Supp. 3d 862, 879 (W.D. Va. 2016) ("Jurisdictions that have adopted the single publication rule are 'nearly unanimous' in applying it to internet publications." (citation omitted)); *Atkinson v. McLaughlin*, 462 F. Supp. 2d 1038, 1051–52 & n.3 (D.N.D. 2006) ("[O]ther jurisdictions are nearly unanimous in holding that the single publication rule applies in defamation actions arising out of internet publications" (collecting cases)).

Courts have provided the following reasoning.  First, "excluding the Internet from the single-publication rule would eviscerate the statute of limitations and expose online publishers to potentially limitless liability." *Pippen*, 734 F.3d at 615.  Second,

"the single publication rule is more consistent with modern practices of mass production and widespread distribution of printed information than the multiple publication rule." *Churchill v. State*, 876 A.2d 311, 316 (N.J. Super. Ct. App. Div. 2005) (citation and internal quotation marks omitted). Third, "[t]he purposes behind the single-publication rule align with the Internet as a means of communication." *Salyer v. SPLC*, No. 3:09-CV-44-H, 2009 WL 1036907, at *3 (W.D. Ky. Apr. 17, 2009). Namely, "[t]he desires to avoid multiplicity of actions; to protect the defendant from excessive liability based on a single publication run; to allow the plaintiff to recover all of his damages at once; and to reduce the chilling effect that the common-law rule might have on the mass communication of ideas, are all applicable to Internet publications." *Id.* (citation and internal quotation marks omitted).

However, notwithstanding those courts' rationales, tethering the single-publication rule to an internet publication is not a smooth sail. One can surmise that beneath the surface there are shipwrecked reputations, careers, families, and civil rights of every description torpedoed by the single-publication rule as applied to the internet leviathan. The court has found no case where another court has sifted the factual sands of just what counts as "publication" as opposed to "posting" or whether "publication" has as a component the triggering of an inchoate harm by a simple click, when that click is entirely foreseeable. What is written—as it were—on the internet is not written

24

in sand or even on processed wood pulp; it is written in stone, and its injury arguably occurs each time a user clicks on the post.

As a matter of fact, and not of law, courts should establish a robust factual record on what constitutes "publication" and "republication," at least in the context of libel. That robust factual record is not established here on Rule 12(b)(6) review, and the parties' arguments have given this issue short shrift.  The court declines at this stage of the litigation to predict whether the Alabama Supreme Court would apply the single-publication rule to internet publications.  On better briefing and on the evidence, after discovery has progressed, the parties can raise the issue of whether the single-publication rule extends to the internet.

**4.      *The claims in question survive the statute of limitations defense on Rule 12(b)(6) review.***

Based on the foregoing analysis, for now, all claims proceed past SPLC's statute of limitations defense.  To be clear, the ruling is not that the statute of limitations defense does not bar the claims in question, but only that the Rule 12(b)(6) record is insufficient to make an informed decision on whether the defense is meritorious. However, it still is necessary to address and reject Plaintiffs' arguments because they invoke misplaced reliance on tolling principles.

5.    *28 U.S.C. § 1367(d)'s thirty-day tolling provision does not apply to this case.*

Relying on 28 U.S.C. § 1367(d), Plaintiffs argue that the limitations period on the state-law defamation claims was statutorily tolled for thirty days after the claims' dismissal in *King I*.  They contend that, because they refiled the present lawsuit within thirty days of the dismissal in *King I*, this lawsuit timely reasserts the *King I* claims. (*See* Doc. # 18 at 16–17.)  There is no support for this argument.

Contrary to Plaintiffs' argument, § 1367(d) does not provide a basis for statutory tolling.  Section 1367(d) tolls the limitations period for a claim brought under 28 U.S.C. § 1367(a) during the claim's pendency and for at least thirty days after its dismissal. Section 1367(a) supplies supplemental jurisdiction over related state-law claims "in any civil action of which the district courts have original jurisdiction."  § 1367(a).  By its terms, § 1367(a) is not a source of jurisdiction where the district court has "original jurisdiction" over the state-law claims.  Because the district court in *King I* had original jurisdiction (not supplemental jurisdiction) over the state-law defamation claims under 28 U.S.C. § 1332(a), consideration of § 1367(a) was unnecessary.  Significantly, the court in *King I* did not rely on § 1367(a) as the source of subject matter jurisdiction; it relied on 28 U.S.C. § 1332.  *See King I*, ECF No. 19 at 2.  In other words, supplemental jurisdiction was not at issue in *King I* because the court had original diversity

jurisdiction over the state-law claims.  Hence, the tolling provision of § 1367(d) is inapplicable.

**6.      *Alabama's principles of equitable tolling do not suspend the running of the statute of limitations on Plaintiffs' claims.***

The discussion in this section assumes, for argument only, that SPLC's statute of limitations defense ultimately is meritorious.  Under that assumption, Plaintiffs assert that equitable tolling avoids any bar raised by the two-year statute of limitations. Plaintiffs contend that, because in *King I*, they timely brought their defamation claims within the two-year statute of limitations and because they "quickly acted" to re-file this lawsuit after the *King I* court dismissed their case without prejudice, Alabama's principles of equitable tolling save their claims.  (Doc. # 18 at 16–17.)  Plaintiffs further assert that they should not be penalized for any delay because "[t]he intervening pandemic caused by the novel coronavirus undoubtedly qualifies as an extraordinary circumstance beyond the control of both King and DIS."  (Doc. # 18 at 16–17.) Plaintiffs' reliance on equitable tolling cannot prevail.  The bottom-line is that Plaintiffs' earlier suit against SPLC (*King I*) did not toll the statute of limitations during that lawsuit's pendency.

First, Plaintiffs' focus on *King I*'s dismissal without prejudice is misguided based on the intersection of federal and state laws.  In federal court, "a dismissal without prejudice is tantamount to a dismissal with prejudice when the dismissal has

the effect of precluding a party from refiling his claim due to the running of the statute of limitations."[4] *Parrish v. Ford Motor Co.*, 299 F. App'x 856, 862 (11th Cir. 2008) (citing *Burden v. Yates*, 644 F.2d 503, 505 (5th Cir. Unit B 1981)); *see also Stein v. Reynolds Sec., Inc.*, 667 F.2d 33, 34 (11th Cir. 1982) ("The fact that dismissal of an earlier suit was without prejudice does not authorize a subsequent suit brought outside of the otherwise binding period of limitations." (citation omitted)); *see also* 54 C.J.S. Limitations of Actions § 347 (As a general rule, "when an action is dismissed without prejudice, the statute of limitations will bar a later suit if the statute runs in the interim." (collecting cases)).   Additionally, in a diversity suit like this one, state law governs whether time-barred claims can be renewed after the lawsuit has suffered a non-merits dismissal.   Where the applicable state's law has a savings statute (also called a renewal statute) that permits a plaintiff to refile an action previously dismissed for non-merit reasons, the statute of limitations will be tolled if the plaintiff refiles within the statutorily specified time period.   *See generally* 54 C.J.S. Limitations of Actions § 347. Unfortunately for Plaintiffs, Alabama law does not have a renewal statute.   *See, e.g., Freer v. Potter*, 413 So. 2d 1079, 1082 (Ala. 1982) (recognizing that Alabama does not

---

[4] At least one circuit has concluded that the statute of limitations "is tolled by the filing of a complaint which is later dismissed without prejudice if the order of dismissal grants leave to amend within a time certain," and the new complaint is filed within that time certain.   *Brennan v. Kulick*, 407 F.3d 603, 606–07 (3d Cir. 2005) (distinguishing between "final and conditional orders of dismissal") (citation omitted).   Here, the *King I* Order neither granted Plaintiffs leave to amend within a specified time period nor provided any terms for reopening or reinstating the case.   To the contrary, final judgment was entered.

have a "renewal statute allowing for the extension of the statute of limitations upon the dismissal of a suit"); *cf.* Ga. Code Ann. § 9–2–61 (Georgia's renewal statute).

Second, Plaintiffs do not satisfy the prerequisites for equitable tolling. In *Weaver v. Firestone*, 155 So. 3d 952, 957–58 (Ala. 2013), the Alabama Supreme Court set out the prerequisites:

> "[A] litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way" as to the filing of his action. In *Ex parte Ward*, 46 So. 3d 888 (Ala. 2007), this Court "[held] that equitable tolling is available in extraordinary circumstances that are beyond the petitioner's control and that are unavoidable even with the exercise of diligence." 46 So. 3d at 897.

*Id.* (internal citation omitted). As to the first element, Plaintiffs argue that they pursued their rights diligently because they "acted quickly, filing this Complaint within thirty (30) days of [*King I*'s] Order, recasting their factual allegations and pleading additional[,] more specific allegations." (Doc. # 18 at 16.) While Plaintiffs may have "acted quickly" in refiling this suit, Plaintiffs did not diligently pursue legal remedies available to them in *King I*. Equitable tolling descends from principles of equity, *Weaver*, 155 So. 3d at 957–58, and "[i]t is a longstanding maxim of Anglo–American law that relief in equity generally is inappropriate when the moving party has an adequate remedy at law." *Justice v. United States*, 6 F.3d 1474, 1480–81 (11th Cir. 1993) (citations omitted); *Younger v. Harris*, 401 U.S. 37, 43–44 (1971) (observing

that a "basic doctrine of equity jurisprudence" is that "courts of equity should not act . . . when the moving party has an adequate remedy at law").

Plaintiffs had adequate legal remedies to preserve their claims in *King I*, and the record in *King I* shows that they did not pursue these legal remedies. *See United States v. Rey*, 811 F.2d 1453, 1457 n.5 (11th Cir. 1987) ("A court may take judicial notice of its own records . . . ."). Plaintiffs could have moved to alter or amend the judgment under Rule 59(e). *See* Fed. R. Civ. P. 59(e). In that motion, they could have notified the district court that the dismissal without prejudice functioned as a dismissal with prejudice because the statute of limitations had expired on their state-law defamation claims, and they could have pointed out that Alabama law did not have a renewal statute.

Plaintiffs could have asked for permission to file an amended complaint in *King I* instead of dismissal without prejudice or for the court to reopen and reinstate their lawsuit. Plaintiffs also could have filed a motion under Rule 60(b) for relief from the judgment. *See* Fed. R. Civ. P. 60(b). Finally, Plaintiffs could have appealed *King I*'s final judgment dismissing the action without prejudice. *Justice*, 6 F.3d at 1481 ("The right to appeal generally is regarded an adequate legal remedy which forecloses equitable relief."). Because Plaintiffs did not avail themselves of their post-judgment remedies at law in *King I*, they did not pursue their rights diligently. *See Weaver*, 155 So. 3d at 957. Plaintiffs' failure to pursue their legal remedies prevents the application

of equitable tolling.  Equity will not intervene, even where the legal remedies are no longer available to a plaintiff.  *See also Comm'r v. Shapiro*, 424 U.S. 614, 634 (1976) ("If . . . the absence of a remedy at law at this time is due to respondent's failure to pursue that remedy, then equity will not intervene and the complaint should be dismissed.  The inadequacy of his legal remedy would then be due to his own choice not to pursue it.").

Also, neither the complaint nor the *King I* record reveals there was "some extraordinary circumstance" that "stood in [Plaintiffs'] way" from pursuing their legal remedies in *King I*.  *Weaver*, 155 So. 3d at 957 (citation and quotation marks omitted). Plaintiffs may have been perplexed as to how to move forward after the closure of their case in *King I*, but Plaintiffs have not alleged or shown that pursuit of legal relief in *King I* was "beyond [Plaintiffs'] control" and was "unavoidable even with the exercise of due diligence."  *Id.* at 958.  Plaintiffs have not met the second element required to equitably toll the statute of limitations.  Equitable tolling cannot save Plaintiffs' untimely defamation claims.

Plaintiffs make two alternative arguments tied to *King I*, but those ties easily unravel because they are based on erroneous understandings of the law.  First, Plaintiffs ask the court to "transfer this matter to the original civil action" in *King I*, but they cite no authority that would permit a transfer of a later-filed action to an earlier-filed action that is closed.  (Doc. # 18 at 17.)  This argument, although creative, lacks citation to

authority and would amount to a work-around for plaintiffs, who when faced with an adverse final judgment, did not avail themselves of available legal remedies, including the right to appeal.  *Cf. Blanchard v. Walker*, No. 2:20-CV-696-WKW, 2022 WL 4357449, at *1 (M.D. Ala. Sept. 20, 2022) (finding that the plaintiff's motion to consolidate his time-barred action with his earlier-filed closed action amounted to an impermissible attempt to circumvent the finality of the earlier judgment).

Second, Plaintiffs contend that they should not be penalized if the statute of limitations expired during the pendency of *King I*.  (*See* Doc. # 18 at 16 ("While there may be multiple reasons for the time required to rule on SPLC's original Motion to Dismiss, including a worldwide pandemic caused by the novel coronavirus, none of that delay was caused by either King or DIS.").)  The time that the motion was pending is something that was "beyond [Plaintiffs'] control," *Weaver*, 155 So. 3d at 958; however, exercising available legal remedies after the entry of judgment in *King I* was within Plaintiffs' control.  Plaintiffs' failure to pursue available legal remedies makes Plaintiffs' circumstances unextraordinary.  Hence, to the extent that Plaintiffs' claims are barred by the statute of limitations, Plaintiffs cannot rely on equitable tolling to suspend the running of the statute of limitations.

## B.   Collateral Estoppel

SPLC argues that the affirmative defense of collateral estoppel bars Plaintiffs from relitigating the actual malice allegations they made in *King I*.  (Doc. # 10 at 43;

Doc. # 19 at 18–20.)  After careful consideration of the arguments, the court finds it more prudent to defer the issue of the effect of collateral estoppel until summary judgment.  For example, the parties' briefing on the source of law is inadequate.  There is confusion among the briefing as to what law applies.  Across the briefs, the parties cite federal common law, Alabama law, and Georgia law.  (*See* Doc. # 10 at 43; Doc. # 18 at 33; Doc. # 19 at 18–20.)  No party addresses the holding in *CSX Transportation, Inc. v. Gen. Mills, Inc.*, 846 F.3d 1333, 1340 (11th Cir. 2017), "that federal common law borrows the state rule of collateral estoppel to determine the preclusive effect of a federal judgment where the court exercised diversity jurisdiction.").  And no party tackles an analysis of which state's law applies if federal common law applies.

**C.**    **Choice of Law**

SPLC argues that Alabama's choice-of-law rules dictate that Georgia law applies to Plaintiffs' defamation claims.  (Doc. # 10 at 24, 36–38.)  A district court sitting in diversity applies the choice-of-law rules of the forum state.  *Rosa & Raymond Parks Inst. for Self Dev.*, 812 F.3d at 829.  Under Alabama's choice-of-law rules, Alabama courts apply *lex loci delicti* to tort claims, meaning that "an Alabama court will determine the substantive rights of an injured party according to the law of the state where the injury occurred."  *Ex parte U.S. Bank Nat'l Ass'n*, 148 So. 3d 1060, 1069 (Ala. 2014) (citation and quotation marks omitted).  SPLC argues that any injury to Plaintiffs would have occurred in Georgia, the state where Plaintiffs are citizens and

where (according to the Complaint's allegations) they focus their activities.  Plaintiffs do not address this choice-of-law issue.

On this record, there is no meaningful opposition to SPLC's position that the state of Plaintiffs' citizenship and activities is the situs of their alleged injuries.  But, for two reasons, it is unnecessary at the motion-to-dismiss stage to decide whether Alabama or Georgia law applies.  First, it does not appear that there is an actual conflict between Alabama law and Georgia law on defamation.  *Compare Drill Parts & Serv. Co. v. Joy Mfg. Co.*, 619 So. 2d 1280, 1289 (Ala. 1993) (setting out the four elements of defamation under Alabama law) *with Am. C.L. Union, Inc. v. Zeh*, 864 S.E. 2d 422, 427 (Ga. 2021) (setting out the same four elements of defamation under Georgia law). If there is a conflict, it will be in the caselaw, and the parties have not pointed it out. Second, SPLC's arguments focus principally on the First Amendment's limitations in defamation cases involving public figures.  Because the First Amendment limitations apply regardless of whether Georgia or Alabama law applies, determining which state's law applies will be reserved for another day.

## C.    <u>The Merits of the Defamation Claims</u>

The analysis now turns to the merits of Plaintiffs' defamation claims. The Complaint alleges three categories of defamatory statements: the "anti-immigrant hate group" designation, the "hate group" designation, and the statement that Mr. King "vilifies all immigrants."    Because of their similarity, the allegedly defamatory

statement that Mr. King vilifies all immigrants, for purposes of Rule 12(b)(6) review, is subsumed within the discussion of the anti-immigrant hate group designation. For all three, SPLC challenges the sufficiency of the pleadings on First Amendment grounds.

Because Plaintiffs "readily concede that they are public figures for the purpose of defamation law," (Doc. # 18 at 29), additional federal-law limitations "deriv[ing] from the First Amendment" govern their defamation claims. *Berisha v. Lawson*, 973 F.3d 1304, 1314 n.6 (11th Cir. 2020). The additional public-figure First Amendment limitations are three. First, to state a claim, the allegedly defamatory statement must be "'sufficiently factual to be susceptible of being proved true or false.'" *Coral Ridge*, 6 F.4th at 1252 (quoting *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 21 (1990)). "Second, the statement must be actually false." *Id.* (citing *Milkovich*, 497 U.S. at 16). "[T]hird, a public-figure plaintiff must prove that the defendant made the alleged defamatory statement with 'actual malice.'" *Id.* (quoting *N.Y. Times*, 376 U.S. at 279–80).

SPLC argues that its characterization of DIS as an anti-immigrant hate group, and a hate group more generally, is protected by the First Amendment from a defamation claim and that the allegations fail on these First Amendment requirements. The court analyzes whether Plaintiffs have plausibly pleaded the constitutional requirements for their defamation claims.

### 1.   *Anti-immigrant Hate Group Designation*

As to the anti-immigrant hate group designation, SPLC argues that Plaintiffs fail to state a defamation claim (1) because the anti-immigrant hate group designation is not provable as false, and (2) because Plaintiffs have not sufficiently alleged that SPLC published the designation with actual malice.  (Doc. # 10 at 28–36, 39–42.)  For the following reasons, the court finds, at least at this early stage and embracing the plausibility standard, that Plaintiffs have sufficiently alleged both constitutional requirements.  Importantly, the following analysis is for the *anti-immigrant hate group* designation, and the related statement that Mr. King "vilifies all immigrants," not the broader "hate group" designation.

### a.   Provable as False

SPLC argues that labeling DIS as an anti-immigrant hate group is "an expression of opinion protected under the First Amendment" because the term "anti-immigrant hate group" "is not capable of being empirically proven true or false."  (Doc. # 10 at 28–36); (*see also* Doc. # 10 at 10–11 (citing *Milkovich*, 497 U.S. at 19–20).)  SPLC argues that the designation is a "political opinion" on a "highly controversial matter[]" that is not provable as false.  (Doc. # 10 at 32–33.)  Plaintiffs counter that SPLC's classification of DIS as an anti-immigrant hate group on its online publications of the Hate Map and Intelligence Report is not "merely an opinion" but conveys to a

reasonable reader a fact reached after "some rigorous analysis." (Doc. # 18 at 17–18.) Plaintiffs have the better argument.

In *Milkovich*, the Supreme Court clarified that the First Amendment protects "rhetorical hyperbole" that "cannot reasonably be interpreted as stating actual facts about an individual." 497 U.S. at 20. However, on the other end of the spectrum, an opinion is actionable as defamation when the assertion "is sufficiently factual to be susceptible of being proved true or false." *Id.* at 21. Where the opinion is sufficiently factual, the First Amendment offers no protection. *Id.*

Whether an assertion is sufficiently factual requires consideration of "the circumstances in which the statement was expressed." *Horsley v. Rivera*, 292 F.3d 695, 702 (11th Cir. 2002). "[T]he tone of the speech and its medium of expression can often signal opinion or nonliteral assertions of fact, especially within the political arena." *Bennett v. Hendrix*, 325 F. App'x 727, 741 (11th Cir. 2009) (citing *Milkovich*, 497 U.S. at 21 (noting "the general tenor of an article" may negate a literal assertion)). Other considerations include "the type of language used, the meaning of the statement in context, whether the statement is verifiable, and the broader social circumstances in which the statement was made." *Milkovich*, 497 U.S. at 24 (Brennan, J., with whom Marshall, J. joined, dissenting).

Examining the circumstances, as set out in the Complaint and exhibits, the court concludes that a reasonable person could have believed that SPLC's designation of DIS

as an "anti-immigrant hate group" was factual and not a mere expression of rhetorical hyperbole.  This determination is based on the following observations.

First, SPLC does not advertise itself as a political pundit.  To the contrary, SPLC self-proclaims that it "is the premier U.S. non-profit organization monitoring the activities of domestic hate groups and other extremists" and that it possesses "key intelligence," "offer[s] expert analysis to the media and public," "publish[es] investigate reports," and "train[s] law enforcement officers."  (Doc. # 1 ¶ 37.)  SPLC no doubt has a well-established presence and prestige on the national stage for ferreting out "hate groups."  The allegations about SPLC's portrayal of its elite status in tracking and investigating hate groups and its specialized knowledge make it plausible that a reasonable reader would discern that, when SPLC designates a group an "anti-immigrant hate group," the designation is factually based after extensive investigation. Hyperbole is thus off the table in this analysis.

Second, the medium of expression—the online publications of the Intelligence Report and the Hate Map—and, relatedly, the tone of the published information about DIS, more closely resemble a fact-based periodical rather than an opinion column, particularly given SPLC's edict of its expertise.  For example, the 2021 Intelligence Report lists eighteen anti-immigrant hate groups, including DIS, and reports that the change in national administration has resulted in "the anti-immigrant movement's decades-long strategy of focusing on supporting and building up its network of state

and local allies," and that anti-immigrant hate groups have placed significant emphasis "on developing relationships with governors, state legislatures and sheriffs, especially in U.S. states bordering Mexico," an emphasis that SPLC reports "is necessary for the movement to maintain its influence on immigration policy." (Doc. # 10-6 (printout of SPLC's online publication of its 2021 Intelligence Report).) Similarly, the Hate Map includes annual statistical data on the number of hate groups, the states in which they are located, and the groups' ideologies. (Doc. # 1 at 13 n.13 (citing https://www.splcenter.org/hate-map).)

SPLC's annual reports are different in character from statements that the Supreme Court and Eleventh Circuit have found amounted to protected rhetorical hyperbole. *See Horsley*, 292 F.3d at 701–02 (collecting cases); *see, e.g.*, *id.* at 702 (after the murder of a physician who performed abortions, Geraldo Rivera's statement during a television interview with an anti-abortion activist that the activist was an "accomplice to murder" was rhetorical hyperbole because "no reasonable viewer would have concluded that Rivera was literally contending that [the activist] could be charged with a felony in connection with [the physician's] murder"); *see, e.g.*, *id.* at 701 (citing *Greenbelt Coop. Publ'g Ass'n v. Bresler*, 398 U.S. 6, 13–14 (1970), for *Greenbelt*'s holding that "the term 'blackmail,' in characterizing the negotiating position of a public figure who was seeking zoning variances while a city was attempting to acquire another tract from him, was not 'slander' when spoken in heated

public meetings of city council or 'libel' when reported in newspaper articles, inasmuch as it was impossible to believe that a listener or reader would think that a crime had been charged").  SPLC's statements were not made during a heated public debate, but rather were published, arguably after deliberation and investigation.  Construing the inferences in Plaintiffs' favor, a reasonable reader could conclude that SPLC was "literally contending" that DIS is a group that hates and vilifies all immigrants. *Horsley*, 292 F.3d at 702.  These circumstances are enough "to raise a reasonable expectation that discovery will reveal evidence," *Twombly*, 550 U.S. at 556, that SPLC's designation of DIS as an anti-immigrant hate group "is sufficiently factual to be susceptible of being proved true or false."[5]  *Milkovich*, 497 U.S. at 21

### b.    Actual Malice

In *New York Times*, the Supreme Court held that, when a public official brings a defamation suit, the First Amendment requires the plaintiff to show that the defendant, in publishing the defamatory statement, acted with actual malice.  376 U.S. 254, 279–80.  The Supreme Court later extended the *New York Times* actual-malice requirement to defamation lawsuits brought by public figures.  *See, e.g., Curtis Publ'g Co. v. Butts*, 388 U.S. 130 (1967).  Plaintiffs concede that they are public figures for purposes of defamation law.  (Doc. # 18 at 29.)

---

[5] For the same reasons, SPLC's parallel arguments that the anti-immigrant hate group designation is not provable as false under Georgia law also fail.  (Doc. # 10 at 36–39 (citation and internal quotation marks omitted).)

To satisfy the actual malice standard, a public figure must establish that a defamatory statement was made "with knowledge that it was false or with reckless disregard of whether it was false or not." *N.Y. Times*, 376 U.S. at 280. "Reckless disregard" is not gauged "by whether a reasonably prudent man would have published, or would have investigated before publishing." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). There must be sufficient allegations from which to infer that the defendant "made the false publication with a 'high degree of awareness of . . . probable falsity, *id.* (quoting *Garrison v. Louisiana*, 370 U.S. 64, 74 (1964)), or that the defendant "entertained serious doubts as to the veracity of the published account," *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 703 (11th Cir. 2016) (citing *St. Amant*, 390 U.S. at 731).

The high bar for alleging actual malice is aptly illustrated by what the Supreme Court has said actual malice is not. First, "reckless disregard" is not measured by an objective test; "the beliefs or actions of a reasonable person are irrelevant." *Michel*, 816 F.3d at 702–03 (citing *St. Amant*, 390 U.S. at 731). The test is subjective and asks "whether the defendant, instead of acting in good faith, actually entertained serious doubts as to the veracity of the published account, or was highly aware that the account was probably false." *Id.* at 703 (citing *St. Amant*, 390 U.S. at 731); *see also St. Amant*, 390 U.S. at 731 (rejecting "a rule that publishers must satisfy the standard of the reasonable man or the prudent publisher" and concluding that the test for measuring

"reckless disregard" is not "whether a reasonably prudent man would have published, or would have investigated before publishing").

Second, the Supreme Court has said that actual malice "should not be confused with the concept of malice as an evil intent or a motive arising from spite or ill will." *Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 500 (1991); *see also Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 667 n.7 (1989) ("The phrase 'actual malice' is unfortunately confusing in that it has nothing to do with bad motive or ill will." (citation omitted)).  Third, "the fact that the defendant published the defamatory material in order to increase its profits" does not "suffice to prove actual malice."  *Id.* at 667.  As the Court recognized in *Harte-Hanks*, "The allegedly defamatory statements at issue in the *New York Times* case were themselves published as part of a paid advertisement."  *Id.*  "If a profit motive could somehow strip communications of the otherwise available constitutional protection," the *New York Times* decision "would be little more than" an "empty vessel[]."  *Id.*

Fourth, "[t]he mere existence of a false statement does not, on its own, demonstrate [a defendant's] knowledge of its falsity."  *Edward Lewis Tobinick, MD v. Novella*, 848 F.3d 935, 946 (11th Cir. 2017).  "There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.  Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice."  *St. Amant*, 390 U.S. at 731.

Fifth, "[a]ctual malice requires more than a departure from reasonable journalistic standards." *Michel*, 816 F.3d at 703 (citation omitted); *see also Harte-Hanks*, 491 U.S. at 665 ("[A] public figure plaintiff must prove more than an extreme departure from professional standards" to show "actual malice."). "Thus, a failure to investigate, standing on its own, does not indicate the presence of actual malice." *Michel*, 816 F.3d at 703. "Rather, there must be some showing that the defendant purposefully avoided further investigation with the intent to avoid the truth." *Id.*

The foregoing illustrates how difficult it is for a public figure to establish actual malice. But the barrier is not impenetrable. In *Herbert v. Lando*, the Supreme Court rejected a rule in libel cases that would have prevented a plaintiff from inquiring into a defendant's editorial processes because it would have "substantially enhance[d] the burden of proving actual malice." 441 U.S. 153, 169 (1979). There was no precedent for imposing a "First Amendment restriction on the sources from which the plaintiff could obtain the necessary evidence to prove the critical elements of his cause of action. On the contrary, *New York Times* and its progeny made it essential to proving liability that the plaintiff focus on the conduct and state of mind of the defendant." *Id.* at 160. In *Herbert*, the Supreme Court recognized that, in a libel action, a plaintiff must be able to discover all state of mind evidence, both direct and indirect, "unless liability is to be completely foreclosed." *Id.* The Court reiterated that "[s]preading false information in and of itself carries no First Amendment credentials," *id.* at 171, and that an

"individual's interest in his reputation is also a basic concern" under the laws of defamation, *id.* at 169.  As in all recognized causes of action, a defamation plaintiff finds the courthouse doors open, subject to being closed, not vice versa.

Later, in *Harte-Hanks*, the Court recognized the evidentiary significance of state of mind evidence for proving actual malice.  491 U.S. at 668–69.  It concluded that evidence of a newspaper's motive and deviation from accepted journalistic standards aided a finding of a reckless disregard of truth or falsity.  *Id.*  The Court explained that, while the evidence could not alone support an actual malice finding, "it cannot be said that evidence concerning motive or care never bears any relation to the actual malice inquiry."  *Id.* at 668.  And, "[a]lthough failure to investigate will not alone support a finding of actual malice, the purposeful avoidance of the truth is in a different category."  *Id.* at 692 (internal citation omitted).  Purposeful avoidance of the truth can be "a product of a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity."  *Id.*

Finally, the allegations bearing on actual malice are considered cumulatively in the context of the publication as a whole.  *See id.* at 688 (holding that a "court must consider the factual record in full" to determine actual malice); *see also Hunt v. Liberty Lobby*, 720 F.2d 631, 646 (11th Cir. 1983) (considering the "sum total of the inferences of actual malice").

The Eleventh Circuit recently addressed the actual malice test in a different lawsuit brought against SPLC.  *See Coral Ridge*, 6 F.4th at 1247.  In *Coral Ridge*, the plaintiff—a Christian ministry corporation—landed on SPLC's Hate Map as a hate group that was identified as anti-LGBTQ.  *Id.* at 1251.  The plaintiff sued SPLC for defamation, and the district court dismissed for failure to state a claim.  *Id.*  On appeal, the Eleventh Circuit affirmed the Rule 12(b)(6) dismissal on the narrow ground that the plaintiff had "failed to adequately plead actual malice."  *Id.* at 1252.  It concluded, first, that the allegations did not "give rise to a reasonable inference that SPLC actually entertained serious doubts as to the veracity of its hate group definition and that definition's application to Coral Ridge."  *Id.* (quotation marks and citation omitted).  It explained:

> Coral Ridge does not plead any facts that would allow us to infer that SPLC doubted the veracity of its own definition of the term ["hate group"].  Moreover, the complaint states that SPLC publicly disseminates its own definition of a hate group on its website; given that, it is hard to see how SPLC's use of the term would be misleading.  Regardless of the commonly understood meaning of hate group, and regardless of whether SPLC's definition is the same, the complaint did not present any factual allegations that would allow us to infer that SPLC's subjective state of mind was sufficiently culpable.

*Id.* at 1252–53.  Second, the Eleventh Circuit concluded that the plaintiff did not sufficiently plead that "SPLC was highly aware that the definition [of hate group] and its application was probably false."  *Id.* at 1252 (quotation marks and citation omitted).  It explained that the "bare-bone allegations" that the plaintiff "'has never attacked or

45

maligned anyone on the basis of engaging in homosexual conduct' and that 'SPLC's conduct, in and of itself, would have created a high degree of awareness of the probable falsity of SPLC's declaration'" were "insufficient to show that SPLC doubted the truth of its designation."  *Id.* at 1253 (citing *Michel*, 816 F.3d at 703).

Third, the Eleventh Circuit noted that the plaintiff's allegations that SPLC "intended to harm its reputation" and to "'completely destroy'" it also could "not give rise to a reasonable inference that SPLC seriously doubted the accuracy of its designation" of the plaintiff as a hate group.  *Id.* at 1253 n.8.  These allegations were insufficient because "the actual malice standard is not about whether the speaker had evil intent or a motive arising from ill will; it is about whether the speaker subjectively doubts the truth of the publication."  *Id.* (citation omitted).

Here, *Coral Ridge* helps frame the issues, but the outcome is different.  The issues are whether Plaintiffs have alleged sufficient facts that give rise to a reasonable inference (1) that SPLC "actually entertained serious doubts as to the veracity" of its designations of DIS as an anti-immigrant hate group under its definition of that term or (2) that SPLC was "highly aware" that its designation of DIS as an anti-immigrant hate group was "probably false."  *Id.* at 1252 (citation omitted).  Plaintiffs have plausibly pleaded actual malice for their defamation claims.

As precedent dictates, the court must begin by casting aside those portions of the Complaint where DIS has "alleged in a purely conclusory manner that [SPLC] acted

46

'with actual malice' in publishing the Hate Map" and the Intelligence Report. *Coral Ridge*, 6 F.4th at 1252. Conclusory allegations "amount to threadbare recitals of the elements of a cause of action, which are insufficient to state a claim." *Id.* (citations omitted).

Hence, allegations, such as those that "SPLC acted with malice in publishing libelous material" (Doc. # 1 ¶¶ 59, 64), that SPLC "fail[ed] to conduct any meaningful fact finding" in its determination that DIS is a "hate group" (Doc. # 1 ¶ 44), or that SPLC "knew Plaintiff DIS did not meet its own definition of 'hate group' and maliciously published the designation anyway" (Doc. # 1 ¶ 50), are conclusory or precatory and set aside for the present analysis. These conclusory allegations may serve as introductory or summary facts, but that depends on whether they are left hanging in thin air or are braced with other facts.

Plaintiffs argue that other allegations provide a plausible basis for inferring SPLC's actual malice in characterizing DIS as an anti-immigrant hate group. They point to allegations showing favorable information SPLC knew about DIS but deliberately ignored in ranking DIS as an anti-immigrant hate group, inadequacies in SPLC's investigation, SPLC's motives as a political opponent of DIS on immigration laws, and a "nexus between the timing of SPLC's defamatory statements and its lobbying activities." (Doc. # 18 at 29–32; Doc. # 1 ¶¶ 35, 40–44.) They also point to SPLC's decision to classify DIS as an anti-immigrant hate group based on the same

information SPLC possessed seven years earlier when it affirmatively said that DIS did not meet its criteria as a hate group.  (Doc. # 18 at 30.)  While none of these allegations would suffice on their own to show actual malice, cumulatively, Plaintiffs' claims are plausible.

It is assumed, for present purposes, that SPLC did not doubt the veracity of its own definition of an anti-immigrant hate group.  (Doc. # 1 ¶ 27 (setting forth SPLC's definition of "anti-immigrant hate groups," which are groups that "target only" immigrants and that "usually argu[e] that immigrants are unable to assimilate, have a lower intellectual capacity than white people, bring disease[s] or are inherently more criminal").)  The definition focuses on a group's hate toward immigrants, but it does not define the term "immigrant."   However, the term "immigrant" has a defined meaning under federal law.  "The term 'immigrant' means every alien except an alien who is within one of the [enumerated statutory] classes of nonimmigrant aliens." 8 U.S.C. § 1101(a)(15).  "The term 'alien' means any person not a citizen or national of the United States."  *Id.* § 1101(a)(3).  So, an "immigrant" is "[a]ny person *lawfully* in the United States who is not a U.S. citizen, U.S. national, or person admitted under a nonimmigrant category as defined by the INA Section 101(a)(15)."  *See* https://www.dhs.gov/immigration-statistics/reporting-terminology-definitions     (last visited Apr. 18, 2023) (defining "immigrant") (emphasis added).  In short, under federal law, an immigrant is a person who has a lawful right to be in the United States.

48

It is reasonable to infer that SPLC's attorneys, who encompass some of the brightest legal minds in the country, know the federal definition of "immigrant."

A plausible inference is that, in categorizing DIS as an anti-immigrant hate group, SPLC pegged DIS as an entity that hates non-citizens (or nationals) who are lawfully in the United States and hates immigrants who have become citizens.  The Complaint's facts, which must be construed in the light most favorable to Plaintiffs, indicate that SPLC knew otherwise or purposefully avoided "knowledge of facts that might confirm the probable falsity" of its categorization of DIS as an anti-immigrant hate group.  *Harte-Hanks*, 491 U.S. at 692.

As alleged, SPLC knew at the time of DIS's hate-group designations that Mr. King's adoptive sister is a legal immigrant, that the members of DIS's Board of Advisors include "legal immigrants," and that the "consistent unwavering position of [DIS] has been to oppose *illegal* immigration."  (Doc. # 1 ¶ 35; *see also* Doc. # 1 ¶ 42.) The composition of DIS's board—including immigrants—is relevant, contrary to SPLC's argument.  (Doc. # 10 at 45.)  These facts show the presence and inclusion, not exclusion, of immigrants in DIS's core governance.  The Complaint further alleges that SPLC "knew of numerous . . . examples in the public record," including DIS's blog on its website, a publicly available email list, and published opinion pieces,  where" Mr. King has conveyed DIS's position that DIS is "opposed to illegal immigration and in favor of enforcement of immigration laws," and these sources do not espouse an "anti-

immigration" position.  (Doc. # 1 ¶ 43 & n.11.)  At the very least, these allegations suggest that SPLC turned a blind eye to these facts.

Second, the allegations of motive, although not determinative of the actual malice inquiry, have enough heft to warrant further probing via discovery.  The Complaint alleges that in 2011, Beirich publicly proclaimed that DIS's activities focused on legislative advocacy and that DIS did not meet the SPLC's definition of "hate group." (Doc. # 1 ¶ 17).[6]  However, even though DIS has not changed its focus or activities in any material way since 2011 (Doc. # 1 ¶¶ 12, 19), Beirich decided to "take a new look" at DIS in 2017 (Doc. # 1 ¶ 15).  This "new look" occurred around the same time that SPLC was registering lobbyists to work against a pro-enforcement immigration bill pending in the Georgia General Assembly, a bill that DIS was advocating for passage.  (Doc. # 1 ¶ 24.)  The Complaint's theory is that Beirich designated DIS as a hate group in 2018, around the same time that SPLC registered lobbyists to fight against a Georgia immigration bill, "as a legislative lobbying strategy." (Doc. # 1 ¶¶ 24–25, 53.)  According to the allegations, by destroying DIS's reputation, SPLC would likely have more success in its lobbying efforts before the Georgia General Assembly for the defeat of the pro-enforcement bill.  (Doc. # 1 ¶ 53.)

---

[6] "When actual malice in making a defamatory statement is at issue, the critical question is the state of mind of those responsible for the publication." *Palin v. New York Times Co.*, 940 F.3d 804, 810 (2d Cir. 2019).  Here, because the Complaint identifies SPLC's employee, Heidi Beirich, as the one responsible for DIS's hate group designations (Doc. # 1 ¶¶ 15, 17–18), it presently is her state of mind that is relevant for assessing actual malice.

SPLC's designation of DIS as a hate group allowed SPLC to "claim that the number of hate groups has increased" and thus to ask for more money from donors "to pursue its mission." (Doc. # 1 ¶ 54.) A "plaintiff is entitled to prove the defendant's state of mind through circumstantial evidence." *Harte-Hanks*, 491 U.S. at 668 (citing *Herbert*, 441 U.S. at 160). The combined allegations concerning the timing of the hate-group designation and the lack of change in the way DIS ran its organization raise a plausible inference that SPLC designated DIS as a hate group as part of a lobbying strategy to disable a formidable adversary. This motive is circumstantially relevant to whether SPLC's designation of DIS as a hate group was published with reckless disregard as to its truth.

Second, the Complaint raises plausible questions as to the accuracy of Beirich's statement to the press that SPLC learned for the first time in 2017 about DIS's "ties to US Inc." and whether this was the impetus for SPLC's taking a new look at DIS as a possible hate group. (Doc. # 1 ¶ 15.) The association between DIS and US Inc. began in 2007 (as SPLC reported in 2018). (*See* Doc. # 1 ¶ 42 n.10 (citing https://www.splcenter.org/fighting-hate/extremist-files/group/dustin-inman-society).)

Against the backdrop of SPLC's self-touted "premiere" expertise in investigating hate groups and the myriad investigative tools available to SPLC (Doc. # 1 ¶ 37), the allegations raise a plausible inference that SPLC knew about US Inc. and DIS's relationship in 2011 when Beirich publicly proclaimed that DIS did not fit

51

SPLC's definition of a hate group (Doc. # 1 ¶ 17).   That plausible inference is strengthened when added to Plaintiffs' allegations that around the same time that SPLC first designated DIS as a hate group, SPLC "registered lobbyists to work against a pro-enforcement bill pending in the Georgia General Assembly," a bill that DIS was supporting.   (Doc. # 1 ¶ 24.)   When properly viewed in DIS's favor, a reasonable factfinder could conclude that Beirich's public statement in 2017 was not true.   (Doc. # 1 ¶ 15.)   The allegations are sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, namely that SPLC knew that it was false to assert that DIS was an anti-immigrant hate group.

Third, Plaintiffs allege that SPLC ignored "examples in the public record," such as DIS's statements on its website, where Mr. King has "repeatedly articulated a position that is opposed to illegal immigration," not to lawful immigration.   (Doc. # 1 ¶ 43.)   For example, take DIS's mission statement which Plaintiffs say has not changed since 2005:   "Our unequivocal mission is to end illegal immigration, illegal employment, the illegal administration and granting of Public Benefits and services through the equal application of existing laws."   (Doc. # 18 at 19; *see also* Doc. # 1 ¶ 11.)   None of those goals is included in SPLC's web page profile of DIS.   (Doc. # 1 ¶ 42 n.10; Doc. # 10-1 ¶ 5 (citing hyperlinks for accessing the web page profile on DIS).)   Hence, SPLC's postings do not include public information about DIS that is contrary to the profile's conclusion that DIS is an anti-immigrant hate group.   *See*

*Michel*, 816 F.3d at 703 ("[W]here the publisher includes information contrary to the general conclusions reached in an article, that showing tends to undermine the claims of malice." (citation omitted)).  That SPLC holds itself out as an expert on hate groups, yet ignored "examples in the public record" where Mr. King had "repeatedly articulated a position that is opposed to illegal immigration," not lawful immigration, (Doc. # 1 ¶¶ 43, 37), lends some support to DIS's position that SPLC designated DIS as anti-immigrant hate group with reckless disregard for whether it was true.

Fourth, while SPLC holds itself out as an expert on investigating hate groups, there are some allegations that plausibly suggest that SPLC did not conduct its usual rigorous investigation prior to changing its position and calling DIS an anti-immigrant hate group.  While they are not Plaintiffs' strongest allegations, the Complaint alleges that SPLC's web page profile on DIS contained some factual inaccuracies that were used to support SPLC's evidence for labeling DIS as an anti-immigrant hate group. (Doc. # 1 ¶¶ 44–49.)  The alleged inaccuracies relate to the date of DIS's incorporation, the date Mr. King "bec[a]me interested" in immigration issues, the former name of DIS, and the identity of one of Mr. King's former employers.  (Doc. # 1 ¶¶ 45–48.)

The cumulative allegations raise a plausible inference that, while SPLC had thoroughly investigated DIS over the years and concluded that it did not meet SPLC's definition of an anti-immigrant hate group, it had a "high degree of awareness" that its designation of DIS as a hate group was probably false, or at the very least, that SPLC

must have "entertained serious doubts as to the truth of [its] publication." *Harte-Hanks*, 491 U.S. at 667 (citation and internal quotation marks omitted). Discovery may prove otherwise, but for now the allegations permit the inference.

In the end, DIS meets its burden of pleading allegations, that, construed in the light most favorable to Plaintiffs, could enable a reasonable jury to conclude that SPLC either knew, or was reckless in not knowing, that its designation of DIS as an anti-immigrant hate group would carry a false, defamatory meaning.

### 2. *Hate Group Designation*

At this stage, for two reasons, the court declines to address whether SPLC's more general "hate group" designation is provable as false or whether it is sufficiently alleged to have been published with actual malice. (*See, e.g.*, Doc. # 1 ¶ 62.) First, the parties' arguments focus on the "anti-immigrant hate group" designation. (*See, e.g.*, Doc. # 10 at 15, 21–22; Doc. # 19 at 11; *see generally* Doc. # 18.) Second, while the phrase "hate group" plausibly is "reasonably capable of a defamatory meaning," in that it can injure reputations, *Harris v. Sch. Ann. Publ'g. Co.*, 466 So. 2d 963, 964 (Ala. 1985), there is a "debate about whether the term hate group is definable in such a way that it is provable as false."[7] *Coral Ridge*, 6 F.4th at 1252 n.7. On this record, because

---

[7] SPLC relies on the district court's opinion in *Coral Ridge*. In a thorough analysis on SPLC's Rule 12(b)(6) motion to dismiss, the district court found that SPLC's hate group designation of Coral Ridge was not "provable as false" and thus had First Amendment protection from a defamation claim. 406 F. Supp. 3d at 1275–78. On appeal, the Eleventh Circuit declined to address the district court's comprehensive analysis or to decide whether the term hate group as applied to Coral Ridge was "sufficiently factual as to be proven true or false." *Coral Ridge*, 6 F.4th at 1252 n.7. Instead, it

Plaintiffs have sufficiently alleged at least one of their defamation claims, the court finds that the best course of action is to defer resolution of the merits of the hate group designation until summary judgment under Federal Rule of Civil Procedure 12(i) (permitting deferral of a 12(b)(6) motion until trial). *See AcryliCon USA, LLC v. Silikal GmbH*, 985 F.3d 1350, 1364 (11th Cir. 2021) ("Rule 12(i) affords the district court discretion on how to proceed at this stage."). SPLC may raise any arguments as to the hate group designation claim, after discovery, at the summary judgment stage.

## V. CONCLUSION

Plaintiffs have "nudged" their defamation claims—premised on SPLC's designation of DIS as an "anti-immigrant hate group"—"across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. Other claims and issues are deferred until summary judgment, as discussed. The reasons set out in this opinion explain why the SPLC's motion to dismiss was denied.

DONE this 24th day of April, 2023.

/s/ W. Keith Watkins
UNITED STATES DISTRICT JUDGE

---

affirmed on a different ground (namely, the absence of allegations of actual malice), but noted that there was a "fair debate about whether the term hate group is definable in such a way that it is provable as false"—a matter of debate complicated by SPLC's posting of its own definition on its website. *Id.*