IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
MONTGOMERY DIVISION

DONALD A. KING, et al.,　　　　　)
　　　　　　　　　　　　　　　　 )
　　　　Plaintiffs,　　　　　　　 )
　　　　　　　　　　　　　　　　 )
v.　　　　　　　　　　　　　　　 )　　　Case No. 2:22-cv-00207-CLM-JTA
　　　　　　　　　　　　　　　　 )
THE SOUTHERN POVERTY　　　　　  )
LAW CENTER, INC.,　　　　　　　  )
　　　　　　　　　　　　　　　　 )
　　　　Defendant.　　　　　　　 )

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT SOUTHERN POVERTY LAW CENTER, INC.'S
## MOTION FOR SUMMARY JUDGMENT

Chad R. Bowman (*pro hac vice*)
Maxwell S. Mishkin (*pro hac vice*)
Lauren P. Russell (*pro hac vice*)
BALLARD SPAHR LLP
1909 K Street NW, 12th Floor
Washington, DC 20006
Telephone: 202-661-2200
Facsimile: 202-661-2299
Email: bowmanchad@ballardspahr.com
Email: mishkinm@ballardspahr.com
Email: russelll@ballardspahr.com

Robert D. Segall
[ASB-7354-E68R]
Shannon L. Holliday
[ASB-5440-Y77S]
COPELAND FRANCO SCREWS &
GILL, P.A.
Post Office Box 347
Montgomery, AL 36101-0347
Telephone: 334-834-1180
Facsimile: 334-834-3172
Email: segall@copelandfranco.com
Email: holliday@copelandfranco.com

*Attorneys for Defendant Southern Poverty Law Center, Inc.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

PRELIMINARY STATEMENT ...........................................................1

STATEMENT OF UNDISPUTED MATERIAL FACTS ("SUMF")..................3

    The Parties.......................................................................3

    Dr. John Tanton and the Tanton Network...............................4

    Plaintiffs' Immigration Activities ........................................5

    SPLC's Hate Group Designation Process ...............................6

    SPLC's Awareness of DIS as a "Nativist Extremist" Group.......8

    The Hate Group Designation ..............................................8

    The Extremist Profile .....................................................11

    The Hate Group Re-Designations.......................................14

PROCEDURAL HISTORY ...........................................................15

STANDARD OF REVIEW..............................................................16

ARGUMENT.............................................................................17

I.     GEORGIA LAW GOVERNS PLAINTIFFS' CLAIMS..........................17

II.    ANY DEFAMATION CLAIMS BASED ON THE
       DESIGNATION AND THE EXTREMIST PROFILE ARE
       TIME-BARRED................................................................18

III.   THE DESIGNATIONS ARE NOT "OF AND CONCERNING"
       KING...........................................................................20

IV.   DISCOVERY HAS CONFIRMED THAT THE HATE GROUP
       DESIGNATIONS ARE PROTECTED EXPRESSIONS OF
       OPINION .....................................................................22

i

     A.     SPLC's Hate Group Designations Are Based on Expertise and Judgment, Not an Empirically Disprovable Formula ............... 23

     B.     The Hate Group Designations Are Also Non-Actionable Because They Are Opinions Based on Fully Disclosed Facts .......... 25

     C.     The Vilification Statement Is Protected as Rhetorical Hyperbole ................................................................................ 26

     D.     Plaintiff Concedes His Dispute Is Over Preferred Labels, Which Are Not The Proper Subject of Libel Litigation ................. 28

V.     PLAINTIFFS FAIL TO CARRY THEIR BURDEN TO IDENTIFY CLEAR AND CONVINCING EVIDENCE OF ACTUAL MALICE .............................................................................. 30

     A.     The Speech-Protective Actual Malice Standard Sets a High Burden for Public Figure Plaintiffs on Summary Judgment ............ 30

     B.     Plaintiff Has Established *No Evidence* of Actual Malice, Much Less Clear and Convincing Evidence .................................. 32

CONCLUSION ............................................................................................ 35

# TABLE OF AUTHORITIES

**Cases**                                                                  **Page(s)**

*Abramson v. Pataki*,
  278 F.3d 93 (2d Cir. 2002) ........................................................21

*Adelson v. Harris*,
  973 F. Supp. 2d 467 (S.D.N.Y. 2013) ......................................26

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ................................................. 16, 17, 31

*Armscorp of America, Inc. v. Daugherty*,
  380 S.E.2d 729 (Ga. Ct. App. 1989) .........................................21

*Berisha v. Lawson*,
  973 F.3d 1304 (11th Cir. 2020) ...........................................31, 32

*Blanchard v. Walker*,
  2022 WL 3230426 (M.D. Ala. Aug. 10, 2022) ..........................18

*Bose Corp. v. Consumers Union*,
  466 U.S. 485 (1984) .................................................................32

*Buckley v. Littell*,
  539 F.2d 882 (2d Cir. 1976) ................................................24, 29

*Canatella v. Van De Kamp*,
  486 F.3d 1128 (9th Cir. 2007) ..................................................20

*Cohen v. California*,
  403 U.S. 15 (1971) ..............................................................28, 29

*Colonial Life & Accident Ins. Co. v. Hartford Fire Ins. Co.*,
  358 F.3d 1306 (11th Cir. 2004) .................................................17

*Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*,
  406 F. Supp. 3d 1258 (M.D. Ala. 2019) ....................... 23, 24, 28

*Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*,
  6 F.4th 1247 (11th Cir. 2021) ........................................... *passim*

*Counterman v. Colorado*,
  600 U.S. 66 (2023)......................................................................................30

*Cox Enters., Inc. v. Bakin*,
  426 S.E.2d 651 (Ga. Ct. App. 1992)......................................................20, 21

*Dongguk Univ. v. Yale Univ.*,
  734 F.3d 113 (2d Cir. 2013)......................................................................32

*Dunn v. Air Line Pilots Ass'n*,
  193 F.3d 1185 (11th Cir. 1999) ...................................................................2

*Garrison v. Louisiana*,
  379 U.S. 64 (1964)........................................................................................2

*Gertz v. Robert Welch, Inc.*,
  418 U.S. 323 (1974) ..................................................................................22

*Greenbelt Co-op. Publ'g Ass'n v. Bresler*,
  398 U.S. 6 (1970)........................................................................................27

*Guilford Transp. Indus., Inc. v. Wilner*,
  760 A.2d 580 (D.C. 2000) ........................................................................29

*Hamze v. Cummings*,
  652 F. App'x 876 (11th Cir. 2016)............................................................25

*Horsley v. Rivera*,
  292 F.3d 695 (11th Cir. 2002)..............................................................27, 28

*Hunt v. Liberty Lobby*,
  720 F.2d 631 (11th Cir. 1983)....................................................................32

*Jackson v. United Steel, Paper & Forestry, Rubber, Mfg., Energy,
  Allied Indus. & Serv. Workers Int'l Union*,
  2009 WL 10704261 (N.D. Ala. Feb. 23, 2009)..........................................29

*Jaillett v. Ga. Television Co.*,
  520 S.E.2d 721 (Ga. Ct. App. 1999)......................................................25, 26

*Jankovic v. Int'l Crisis Grp.*,
  494 F.3d 1080 (D.C. Cir. 2007)..................................................................21

*King v. SPLC*,
594 F. Supp. 3d 1272 (M.D. Ala. 2022) ..................................................... 15

*King v. SPLC*,
2023 WL 3061825 (M.D. Ala. Apr. 24, 2023) ..................................... *passim*

*Landmark Education Corp. v. Conde Nast Publication, Inc.*,
1994 WL 836356 (N.Y. Sup. Ct. July 7, 1994) .......................................... 24

*Luckie v. INS*,
1986 WL 16129 (6th Cir. Aug. 25, 1986) .................................................. 34

*McCandliss v. Cox Enters.*,
593 S.E.2d 856 (Ga. Ct. App. 2004) ......................................................... 18

*McLaughlin v. Ocwen Loan Servicing, LLC*,
2018 WL 3126752 (N.D. Ala. June 26, 2018) ........................................... 17

*Michel v. NYP Holdings, Inc.*,
816 F.3d 686 (11th Cir. 2016) .................................................................... 31

*Milkovich v. Lorain J. Co.*,
497 U.S. 1 (1990) ................................................................. 2, 22, 23, 24

*Monge v. Madison Cnty. Record, Inc.*,
802 F. Supp. 2d 1327 (N.D. Ga. 2011) ...................................................... 25

*Morgan v. Tice*,
862 F.2d 1495 (11th Cir. 1989) ................................................................. 35

*N. Atlanta Golf Operations, LLC v. Ward*,
870 S.E.2d 814 (Ga. Ct. App. 2022) ......................................................... 18

*New York Times v. Sullivan*,
376 U.S. 254 (1964) ................................................................. 20, 21, 31, 32

*Nationwide Bi-Weekly Admin. v. Belo Corp.*,
512 F.3d 137 (5th Cir. 2007) ............................................................... 18, 19

*Old Dominion Branch No. 496 v. Austin*,
418 U.S. 264 (1974) ................................................................................... 27

*In re Phila. Newspapers*,
690 F.3d 161 (3d Cir. 2012)..............................................................19, 20

*Pippen v. NBCUniversal Media, LLC*,
734 F.3d 610 (7th Cir. 2013)..................................................................19

*Poff v. Hayes*,
763 So. 2d 234 (Ala. 2000)......................................................................18

*Rosa & Raymond Parks Inst. for Self Dev. v. Target Corp.*,
812 F.3d 824 (11th Cir. 2016)..................................................................18

*Sandals Resorts Int'l Ltd. v. Google, Inc.*,
925 N.Y.S.2d 407 (N.Y. App. Div. 2011)...................................................26

*Scott v. News-Herald*,
496 N.E.2d 699 (Ohio 1986)....................................................................23

*Siegel v. Shell Oil Co.*,
612 F.3d 932 (7th Cir. 2010)....................................................................17

*Silvester v. ABC*,
839 F.2d 1491 (11th Cir. 1988).........................................................30, 31

*Standing Comm. on Discipline v. Yagman*,
55 F.3d 1430 (9th Cir. 1995)....................................................................29

*Time, Inc. v. McLaney*,
406 F.2d 565 (5th Cir. 1969)....................................................................17

*Tobinick v. Novella*,
848 F.3d 935 (11th Cir. 2017)..................................................................16

*Turner v. Wells*,
879 F.3d 1254 (11th Cir. 2018).........................................................25, 26

*Ward v. Zelikovsky*,
643 A.2d 972 (N.J. 1994).......................................................................29, 30

*Yeager v. Bowlin*,
693 F.3d 1076 (9th Cir. 2012)..................................................................20

**Statutes**

Ala. Code § 6-2-38................................................................. 18

**Other Authorities**

1 Robert D. Sack, *Sack on Defamation* § 2:4-6 (5th ed. 2017) ......................... 30

Restatement (Second) of Conflict of Laws § 150........................................... 18

## **PRELIMINARY STATEMENT**

This is a lawsuit about language in the context of a public discussion. Plaintiff Donald A. King believed that he and Plaintiff Dustin Inman Society ("DIS"), the organization he founded and led for two decades, were part of the "pro-enforcement" side of the debate over federal and state immigration policies. *See* ECF 114-1 at 43 (165:17-25). King believed that Defendant Southern Poverty Law Center, Inc. ("SPLC") was part of the "anti-enforcement" side of that debate. *Id.* at 14 (48:16-19). King therefore viewed SPLC as his "political enemy" and was—in his own words—"proud to have the right enemies." *Id.* at 13 (45:10-46:2).

SPLC had a different perspective. In SPLC's opinion, King's views and goals were "anti-immigrant" and DIS was an "anti-immigrant hate group." SPLC was not unique in this regard. As King acknowledged, "[p]retty much everybody on the anti-enforcement side" of the immigration debate characterized him as "anti-immigrant or anti-immigration." *Id.* at 32 (118:1-10). Yet King and DIS sued SPLC for defamation over its designating DIS as an anti-immigrant hate group.

Following the close of discovery, the evidentiary record is clear that SPLC is entitled to summary judgment for three separate and independent reasons:

**First**, defamation claims based on any SPLC statement published prior to April 27, 2020 are time-barred by the applicable statute of limitations, which leaves only a 2021 re-designation of DIS as an "anti-immigrant hate group" at issue.

1

**Second**, that re-designation, along with earlier designations and the time-barred statement challenged in an "Extremist Profile" of DIS, are not susceptible to empirical proof, and the First Amendment allows libel claims only based on *provably false* statements. *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 19-20 (1990). King has conceded "that the meaning of anti-immigrant isn't the same for everyone." ECF 114-1 at 39 (148:16-22). This is correct: whether a person is hateful or tolerant, pro-immigrant or anti-immigrant, or pro-enforcement or anti-enforcement, are all subjective evaluations not subject to empirical verification. Put another way, discovery has confirmed that the challenged statements are protected opinions.

**Third**, even if the challenged characterizations of DIS as an "anti-immigrant hate group" or as "vilifying all immigrants" were provable statements of fact, Plaintiffs have conceded that they are public figures for purposes of defamation law. As such, they would need to prove by *clear and convincing evidence* that SPLC published with constitutional "actual malice," *i.e.*, with knowledge of its falsity or a "high degree of awareness" of its "probable falsity." *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964); *Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*, 6 F.4th 1247, 1252 (11th Cir. 2021). This burden, intended to protect speech and criticism on matters of public concern, "presents a formidable obstacle at summary judgment." *Dunn v. Air Line Pilots Ass'n*, 193 F.3d 1185, 1192 (11th Cir. 1999). As two years of discovery in this case has shown, there is *no* evidence, much less

the requisite clear and convincing evidence, to establish that anyone involved in the challenged publications at SPLC doubted their statements about Plaintiffs.

## STATEMENT OF UNDISPUTED MATERIAL FACTS ("SUMF")

**The Parties**

1.     Defendant SPLC is a nonprofit civil rights organization with a stated mission of advancing the human rights of all people. *See, e.g.*, *About*, SPLC, https://www.splcenter.org/about/.   Among other activities, SPLC's Intelligence Project ("IP") has been tracking hate and antigovernment groups for three decades and publishes a "Hate Map" containing an annual census of groups it has designated as hate groups.  ECF 114-13 at 18-22.

2.     Plaintiff King "put down" his career as an insurance agent in Marietta, Georgia in 2003 to be an advocate, activist, and organizer on immigration issues. ECF 114-1 at 5 (13:12-15:2).  King initially founded the American Resistance Foundation because King believed that America was also "fighting an invasion," namely "an invasion of illegal immigrants." *Id.* at 15 (50:9-15, 51:5-14).

3.     Deciding that he "had chosen the wrong name," King "closed" that organization and opened the Dustin Inman Society. *Id.* ( 51:15-52:4).  DIS "is named after a metropolitan Atlanta youth" who died after a traffic accident where the driver at fault was "someone in the country illegally."  ECF 114-3 at 4 (9:17-25).

4.     King fully controlled DIS.  *See* ECF 114-1 at 11 (34:4-5, 36:14-15).

**John Tanton and the Tanton Network**

5.      In September 2003, the month that he decided to devote his professional life to the interests of his organization, King attended an event in Washington, D.C. hosted by the Federation for American Immigration Reform ("FAIR"). *Id.* at 26 (95:5-23). At that event, King met John Tanton. *Id.*

6.      SPLC has extensively researched Tanton and, in the early 2000s, found that he was behind a network of groups that "basically were the entire anti-immigrant movement in the United States at that time." ECF 114-7 at 39 (148:17-149:9).

7.      Tanton founded, funded, or otherwise played a role with numerous groups with a particular stance on immigration issues, including FAIR, which "lobbies on the Hill and advocates pro-enforcement doctrine"; the Center for Immigration Studies ("CIS"), which operates as "a think tank" on immigration issues; and Numbers USA, which "advocates for lower immigration numbers." ECF 114-1 at 27-28 (98:1-102:23). Tanton also founded U.S. Inc., to coordinate the work of these other immigration-focused groups. *Id.* at 28 (103:8-22).

8.      SPLC refers to these and other organizations as part of the "Tanton network." ECF 114-7 at 42 (160:13-161:20).

9.       U.S. Inc. also oversaw The Social Contract Press, which hired and published "dozens of white supremacists." ECF 114-7 at 40-41 (153:20-154:4). The Social Contract Press also published an English translation of a French novel that

became a bestseller and touchstone in neo-Nazi circle, *The Camp of the Saints. Id.* at 23-24, 42 (86:23-87:11, 159:9-160:12).  In the novel, dark-skinned immigrants "rape and kill their way through France." *Id.* at 24 (87:9-11); *see also John Tanton*, SPLC, https://www.splcenter.org/resources/extremist-files/john-tanton/.

10.    King and Tanton stayed in touch after their first meeting in 2003. Nearly every year, King traveled to Michigan to visit Tanton, whom King considered a friend, "personal hero" and "great man."  ECF 114-1 at 26 (96:1-97:22).

11.    In May 2008, U.S. Inc. began paying King approximately $7,700 per month, a regular payment that continued until May 2022. *Id.* at 28 (104:12-105:24). That was approximately $90,000 per year, or roughly $1.3 million over that fourteen-year period.  Beginning in June 2022, after U.S. Inc. wound down its operations, King received his monthly payment of roughly $7,700 from Numbers USA instead of U.S. Inc. *Id.* at 29 (109:12-21).

12.    Despite receiving some $90,000 annually for more than 15 years from Tanton-affiliated groups, which represented "essentially all" of his income, *see* ECF 114-2 at 19 (66:1-5), King described himself as "self-funded" when communicating with the public and Georgia lawmakers, *see id.* at 21-22 (76:19-79:7).

**Plaintiffs' Immigration Activities**

13.    With the Tanton network's financial support, Plaintiffs sought "to end illegal immigration, illegal employment, [and] the illegal administration and

granting of Public Benefits and services through the equal application of existing laws." ECF 114-11 at 3. This work included writing articles on immigration issues, *see* ECF 114-1 at 6 (15:23-25), giving speeches, *see id.* at 7 (18:5-8), appearing on television, *see id.* (21:19-21), and lobbying lawmakers, *see id.* at 8 (24:15-25:13).

14.    King characterized himself and DIS as "anti-illegal immigrant" or "pro-enforcement" of immigration laws. *Id.* at 43 (165:17-25).

15.    Despite King's preference about the characterization of his positions, newspapers and media outlets routinely described King as "anti-immigrant" or "anti-immigration." *Id.* at 31 (117:13-24). Indeed, "pretty much everybody" on what King called "the anti-enforcement side" of the immigration debate called him "anti-immigrant." *Id.* at 31-32 (117:25-118:10). [1]

**SPLC's Hate Group Designation Process**

16.    SPLC annually publishes a list of "hate groups" identified as active the previous year. ECF 21 ¶¶ 9-10.

17.    SPLC uses the term "hate group" to denote "an organization that – based on its official statements or principles, the statements of its leaders, or its

---

[1] In 2008, for example, a columnist writing in the Atlanta Journal Constitution described King as a "xenophobe" with a "bigoted message" who "insists he supports legal immigration" yet "rails against cultural range." *Id.* at 32 (120:9-17). Also in 2008, the Anti-Defamation League published a report titled *Immigrants Targeted: Extremist Rhetoric Moves into the Mainstream*, which described King as "founder and leader of the Marietta, Georgia based Dustin Inman Society (DIS), a group that focuses entirely on opposing immigration of Hispanics to the United States." *Id.* at 34 (126:7-18). In 2016, another Atlanta Journal Constitution columnist described King as "a well-known anti-immigrant extremist." *Id.* at 36 (135:19-136:1).

activities – has beliefs or practices that attack or malign an entire class of people, typically for their immutable characteristics." ECF 114-6 at 18 (63:18-25); ECF 114-10. This meaning has not changed since 2017. *Id*. at 27 (101:20-25).

18.    While SPLC divides hate groups into different categories based on ideology, including White Supremacist and Anti-Immigrant, the criteria and designation process for all categories is the same. *Id*. at 23-24 (83:20-86:1). SPLC does not designate individuals as "hate groups." *Id*. at 26 (94:19).

19.    In designating hate groups, SPLC employees gather and review evidence about each group to determine if the totality of information warrants, in SPLC's evaluation, a hate group designation. *Id*. at 23 (82:18-25), ECF 114-7 at 33-34 (125:24-126:6).

20.    Researchers at SPLC monitor "a variety of groups and collect[] information on them." ECF 114-6 at 12 (41:5-9). When employees determine the evidence indicates an organization should be considered a hate group, a research analyst prepares a memo proposal, or "activation report," that includes evidence and analysis to support a nomination. An IP supervisor or supervisors then review and decide whether to designate the group. *Id*. at 32 (118:11-17); ECF 114-13 at 23-24. In 2017, the IP Director and Research Director were involved decisions for hate group designations. ECF 114-6 at 22 (80:8-17).

**SPLC's Awareness of DIS as a "Nativist Extremist" Group**

21.     SPLC listed DIS as a "Nativist Extremist" group, meaning it "target[s] individual immigrants rather than immigration policies," *see* ECF 114-10, from 2009 until its hate group designation in 2018. *Id.* at 42 (161:16-17); ECF 114-10 at 9; ECF 21 ¶ 14. Plaintiffs never disputed this listing. ECF 114-1 at 30 (111:12-112:1).

22.     In 2011, then-Director of IP Heidi Beirich gave a news interview about D.A. King and his immigration lobbying work. Beirich was quoted as stating that SPLC "lists [King] as a 'nativist' and has expressed concern about his tendency to call illegal immigrants 'invaders' and his contact with other more extreme activists." She said that SPLC had not designated DIS a "hate group" at that time because "[h]is tactics have generally not been to get up in the face of actual immigrants and threaten them. . . . Because he is fighting, working on his legislation through the political process, that is not something we can quibble with, whether we like the law or not." ECF 1 ¶ 17; ECF 21 ¶ 17; ECF 114-10 at 3.

**The Hate Group Designation**

23.     On October 18, 2017, an Atlanta Journal-Constitution reporter contacted SPLC for comment regarding a planned article about King and DIS. Ex. N - CONF. 0142-146.[2] In the email, the reporter noted that DIS "is soliciting donations

---

[2] Confidential deposition exhibits have been filed under seal in paper form pursuant to ECF 110, and are cited herein by their "Ex. N - CONF." page numbers.

through U.S. Inc.," one of Tanton's organizations, and linked to the DIS website. Ex. N - CONF. 0145. The reporter asked, "What is your reaction to these findings? And do you have any more information about the Dustin Inman Society, U.S. Inc. and John Tanton that I should be aware of?" *Id.*

24.    Beirich had not previously known of DIS's solicitation of donations through U.S. Inc. ECF 114-7 at 23 (85:5-25); *see also* ECF 114-6 at 10 (30:1-12).

25.    SPLC, especially Beirich, wrote "extensively about John Tanton's role in creating the modern anti-immigrant movement, his deep ties to white nationalists, his eugenics beliefs, his racism as disclosed in public documents and private letters that he had stored at the University of Michigan . . . , [and] his creating fundraising networks to create grasstops organizations to push anti-immigrant positions." ECF 114-7 at 24, 39-44 (86:14-87:15, 148:14-168:24); ECF 114-6 at 7 (21:23-27:1).

26.    In Beirich's view, "[n]obody has done more to build the fervor against immigrants, racist fervor against immigrants in modern times than John Tanton." ECF 114-7 at 24 (87:12-15). If DIS was soliciting funds through a Tanton group, it meant DIS "was working very closely with white supremacists," which would have raised "red flags" in Beirich's mind. *Id.* at 24, 44 (88:2-4, 168:10-24).

27.    Beirich told the reporter that she "was going to take a new look at the Dustin Inman Society after learning from the AJC about its ties to US Inc." Ex. N -

CONF. 0004; Ex. N - CONF. 0142.  She later noted that SPLC "won't make a decision on whether to list them as a hate group for a while."  *Id.*

28.    SPLC Research Analyst Swathi Shanmugasundaram prepared an activation report for DIS in December 2017, which Senior Research Analyst Stephen Piggott transferred to Director of Research Alex Amend as a "proposal to move from NE to AI," *i.e.*, to change its designation from Nativist Extremist to Anti-Immigrant Hate Group.  ECF 114-6 at 31-32 (117:3-118:17); ECF Ex. N - CONF. 0007-0009.

29.    As per standard procedures, Beirich as the IP Director approved the proposal, and DIS was added as an anti-immigrant hate group in internal SPLC lists that month.  ECF 114-7 at 28 (104:14-105:11); Ex. N - CONF. 0046.

30.    The activation report noted the US Inc. donations, stated that King spoke at and wrote articles for The Social Contract Press, and quoted racially charged rhetoric in King's social media posts.  Ex. N - CONF. 0008.

31.    Beirich testified that she saw the designation as an easy call:

> [M]ultiple relationships with The Social Contract, with VDARE, with FAIR, raising money through U.S. Inc., all of that is highly problematic.  All those groups have leaders who have made blatantly racist or white supremacist statements over the years. They've been thrown off of social media for what they've done. It's been that egregious in some case. So all of that would have mattered.  The statements here from D.A. King obviously vilify all immigrants.  That would have mattered.  So this is a totality-of-evidence situation where I believe, and we believed, in our opinion, at the SPLC, that this met the definition for a hate group.

ECF 114-7 at 31-32 (117:16-118:4).  These activities, in Beirich's view, "go beyond lobbying," thus warranting a hate group designation.  *Id*. at 31 (116:1-15).

32.    SPLC first named DIS an anti-immigrant hate group in the Spring 2018 edition of *Intelligence Report*.  ECF 114-6 at 14 (46:2-47:11); ECF 114-10 at 69.

33.    King became aware of the hate group designation almost immediately. ECF 114-2 at 7 (19:13-21:16); ECF 114-11 at 5.  His initial reaction was to exclaim, "I finally made it!"  ECF 114-2 at 7 (21:10-11).  Indeed, King bragged about the designation, recognizing that SPLC's characterization of DIS as a hate group was "a badge of honor" to fellow members of the "pro-enforcement" community.  *See id.* at 22 (79:80:4); ECF 114-11 at 6; ECF 114-4 at 20-21 (215:13-216:20).[3]

**The Extremist Profile**

34.    SPLC publishes profiles of some organizations it monitors, called "extremist profiles."  Profiles on designated hate groups provide "more in-depth information about the organization and why they would end up on the list," including "the history of the organization, the leadership, what the leaders have said, what the website said, what their activities are."  ECF 114-7 at 46 (174:10-18).  In preparing these profiles, SPLC employees research and draft the text to ensure the facts are

---

[3] Following DIS's designation as a hate group, the amount of King's monthly stipend from U.S. Inc. *increased*, and continued through the remainder of his life.  *See* ECF 114-5 at 7 (169:21-172:4); *see also* ECF 114-9 at 13-16 (45:21-49:23, 52:11-54:8); ECF 114-11 at 7-9.

accurate and the profiles meet SPLC's editorial standards. ECF 114-6 at 22 (79:11-80:25); ECF 114-7 at 17 (58:20-59:14).

35.     Following the designation of DIS as a hate group in February 2018, Shanmugasundaram began drafting an extremist profile of DIS. ECF 114-8 at 10 (30:14-31:13); Ex. N - CONF. 0054-0063. Throughout 2018, drafts went through internal review, beginning with her supervisors at the time, Piggott and Amend. Deputy IP Director Elizabeth Mendes and several others in SPLC's editorial and IP departments also assisted in editing, fact-checking and finalizing the profile. *See generally* ECF 114-8 at 12-21 (40:1-75:16); Ex. N - CONF. 0064-0131; *see also* ECF 114-6 at 30-31 (111:10-114:17).

36.     The profile of DIS (the "Extremist Profile") was published on the SPLC website on or around January 7, 2019. Ex. N - CONF. 0133; ECF 114-12 ¶ 3. King was aware of the publication almost immediately. ECF 114-3 at 30 (110:3-17).

37.     The 3,100-some word Extremist Profile provided background about DIS and its activities, associations, and the rhetoric of its leaders. *See generally* ECF 114-12 at 7-17. Sections labeled "In their own words" and "Social media" quoted statements by King and others associated with DIS. Those included, among other things, rhetoric about an invading "third world horde," the country "being invaded and colonized" by immigrants and having its "way of life" destroyed, King's blog entry on a white nationalist website that he needed "to take a shower" after attending

a march by "mostly Hispanic demonstrators" that made him feel "that I had left the country of my birth and been transported to some Mexican village, completely taken over by an angry, barely restrained mob," and King's "nearly uncontrollable" impulse "to reach out and personally deport these Third World invaders." *Id.*

38.    The Extremist Profile also documented connections between DIS and Tanton; Chris Simcox, the former leader of the Minuteman Civil Defense Corp., "a nationwide anti-immigrant vigilante organization known for its armed-citizen border patrols"; and Peter Brimelow, a white nationalist "dedicated to preserving our historical unity as Americans into the 21st century," *id.* at 11, who founded an anti-immigration website that was "a hub for white nationalists and antisemites who write on the issue of immigration." *Id.* The Extremist Profile also reported connections between DIS and other groups with anti-immigrant platforms. *Id.* at 10-17.

39.    Since publication, two non-substantive changes have been made to the Extremist Profile. On July 24, 2020, one word of the Extremist Profile was revised to hyphenate rather than spell out a racial slur in a quote, in conformity with a change in SPLC policy regarding quoting slurs. ECF 114-12 ¶¶ 4-5. On January 15, 2025, the profile was migrated to a new URL, without any textual revisions. *Id.* The substantive content of the Extremist Profile has not changed since January 2019. *Id.*

40.    In their lawsuit, Plaintiffs do not allege any facts within the Extremist Profile are defamatory. Their claim is based solely on the subheading, "The Dustin

Inman Society, led by D.A. King, poses as an organization concerned about immigration issues, yet focuses on vilifying all immigrants." *See* ECF No. 1 ¶ 42 n.10 (the "Vilification Statement"); *see also id.* ¶¶ 34, 73.

**The Hate Group Re-Designations**

41.    Each year, researchers at SPLC review each previously designated organization to determine whether it remains active and whether it has disavowed the rhetoric or activities that caused it to be listed as a hate group.  ECF 114-6 at 24 (87:12-88:9).  If the organization is still active, SPLC will re-designate it for the next year.  *Id.*; ECF 114-13 at 23-24; ECF 114-15 ¶ 7.

42.    As part of this process, research analysts consult SPLC databases and note if additional evidence or analysis support a re-designation for any hate groups being monitored.  ECF 114-6 at 26 (93:17-97):12; Ex. N - CONF. 0134-141.

43.    SPLC re-listed DIS as a hate group in the *Intelligence Reports* and Hate Maps published in February or March 2019-2021.  ECF 1 ¶¶ 57, 62, 67, 72.

44.    DIS was approved for re-designation in 2019 based on Shanmugasundaram's confirmation, under the supervision of Beirich, that DIS was still active.  Ex. N - CONF. 0136-137; ECF 114-7 at 5 (13:11-16).  Beirich testified she firmly believes DIS is an anti-immigrant hate group.  ECF 114-7 at 31 (117:16-118:4).

45.    Interim Research Director Keegan Hankes approved the re-designations of DIS as a hate group published in 2020 and 2021 based on a research analyst's analysis and report on DIS's activities for the previous years.  ECF 114-15 ¶¶ 7, 10; Ex. N - CONF. 0136.  Hankes never had any reason to doubt DIS met SPLC's definition of an anti-immigrant hate group.  ECF 114-15 ¶ 11.

## PROCEDURAL HISTORY

Plaintiffs sued SPLC for defamation in 2020, in a nearly identical case that Chief Judge Emily C. Marks dismissed for failure to state a claim.  *King v. SPLC*, 594 F. Supp. 3d 1272, 1279 (M.D. Ala. 2022) ("*King I*") (concluding that DIS and King "ask[] the Court to ignore the protections of the First Amendment," which "[t]he Court declines to do").  Plaintiffs then filed this lawsuit on April 27, 2022, with a revised complaint.  ECF 1.  Plaintiffs claim that SPLC's designation in 2018 and re-designations from 2019-2021 are false and defamatory.  The Complaint alleges that, in their view, Plaintiffs have "repeatedly articulated a position that is opposed to illegal immigration and in favor of enforcement of immigration laws and has never espoused 'anti-immigrant' positions."  ECF 1 ¶ 43.

Plaintiffs also allege that the Extremist Profile was false and defamatory, but only challenge the Vilification Statement.  ECF 1 ¶¶ 34, 73.  This subheading summarized the body of the Extremist Profile, including public statements by King and his close working relationship with anti-immigrant and white supremacist

individuals and organizations. ECF 114-8 at 24 (89:13-23); ECF 114-7 at 31 (117:16-118:4).

SPLC moved to dismiss Plaintiffs' lawsuit. In denying the motion, Judge W. Keith Watkins deferred ruling on whether the statute of limitations for the 2018 designation and for the Extremist Profile had expired prior to suit. *King v. SPLC*, 2023 WL 3061825, at *9-10 (M.D. Ala. Apr. 24, 2023) ("*King II*"). Judge Watkins also declined at that stage to deem the hate group designation an opinion, concluding that there was "a reasonable expectation that discovery will reveal evidence that SPLC's designation of DIS as an anti-immigrant hate group is sufficiently factual to be susceptible of being proved true or false." *Id.* at *15 (cleaned up). Finally, Judge Watkins determined that Plaintiffs had plausibly alleged actual malice, at least to survive a motion on the pleadings. *Id.* at *21 ("Discovery may prove otherwise, but for now the allegations permit the inference.").

Fact discovery in this case closed on April 17, 2025. SPLC now moves for summary judgment in its favor and against Plaintiffs.

## STANDARD OF REVIEW

"Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Tobinick v. Novella*, 848 F.3d 935, 943 (11th Cir. 2017). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly

preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is therefore, as courts have noted, "a time to 'put up or shut up.'" *McLaughlin v. Ocwen Loan Servicing, LLC*, 2018 WL 3126752, at *5 (N.D. Ala. June 26, 2018) (quoting *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010)). That is true in any case, but it is an especially important principle in defamation suits. *See, e.g., Time, Inc. v. McLaney*, 406 F.2d 565, 566 (5th Cir. 1969) (prompt consideration of dispositive motions in defamation cases is necessary because "the failure to dismiss a libel suit might necessitate long and expensive trial proceedings, which, if not really warranted, would themselves offend [First Amendment] principles . . . because of the chilling effect of such litigation").

## ARGUMENT

## I.    GEORGIA LAW GOVERNS PLAINTIFFS' CLAIMS

Alabama courts apply the doctrine of *lex loci delicti* to tort claims, and that doctrine "requires the court to determine the substantive rights of an injured party according to the law of the state where the injury occurred." *Colonial Life & Accident Ins. Co. v. Hartford Fire Ins. Co.*, 358 F.3d 1306, 1308 (11th Cir. 2004) (cleaned up). Although Alabama courts have not specifically addressed the issue in the context of internet defamation, in the case of an "aggregate communication" such as one distributed over the internet, the primary place of injury in a defamation case is generally considered to be the domicile or primary place of business of the plaintiff

– here, as to both Plaintiffs, Georgia. *See, e.g.*, Restatement (Second) of Conflict of Laws § 150(2)-(3). Georgia law thus governs the substance of Plaintiffs' claims.

## II.  ANY DEFAMATION CLAIMS BASED ON THE DESIGNATION AND THE EXTREMIST PROFILE ARE TIME-BARRED

"When subject matter jurisdiction rests on diversity of citizenship, the law of the forum state provides the appropriate statute of limitations." *Blanchard v. Walker*, 2022 WL 3230426, at *1 (M.D. Ala. Aug. 10, 2022). Alabama's statute of limitations for defamation is two years. *See* Ala. Code § 6-2-38(k). Alabama applies "what is known as the single-publication rule to tort claims." *Rosa & Raymond Parks Inst. for Self Dev. v. Target Corp.*, 812 F.3d 824, 829 n.12 (11th Cir. 2016) (citing Alabama case law). Under the single-publication rule, the "repetition or republication of an identical libel and slander is not a new cause of action for which a separate suit may be maintained." *Poff v. Hayes*, 763 So. 2d 234, 242 n.5 (Ala. 2000) (cleaned up). The statute of limitations thus begins to run on defamation claims with the first publication of a statement.[4]

Although the Alabama Supreme Court has not had the opportunity to address whether the single-publication rule would apply to online publications, "[e]very court to consider the issue" since a seminal 2000 case has held "that the single

---

[4] Georgia courts have also adopted the single-publication rule and long ago settled that this rule applies to "actions for libel based on statements made on the Internet." *N. Atlanta Golf Operations, LLC v. Ward*, 870 S.E.2d 814, 821-22 (Ga. Ct. App. 2022) (citing *McCandliss v. Cox Enters.*, 593 S.E.2d 856, 858-59 (Ga. Ct. App. 2004) (affirming dismissal because statute of limitations had expired based on when social media posts were first published).

publication rule applies to information widely available on the Internet." *Nationwide Bi-Weekly Admin. v. Belo Corp.*, 512 F.3d 137, 144 (5th Cir. 2007) (citing cases and holding the Texas Supreme Court would likely adopt the rule given the "near unanimity of the large number of courts to apply the single publication rule to Internet publications"); *see In re Phila. Newspapers*, 690 F.3d 161, 174 (3d Cir. 2012) (stating the same and applying the rule to an online publication because the Pennsylvania Supreme Court would likely adopt it); *see also Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610, 615 (7th Cir. 2013) (applying rule to website publications under presumption that Illinois would recognize it, as holding otherwise would "eviscerate the statute of limitations and expose online publishers to potentially limitless liability"). While Judge Watkins declined to reach the issue on a motion to dismiss, he acknowledged that courts "have uniformly applied the single-publication rule to internet publications." *King II*, 2023 WL 3061825, at *9.

As a result, all claims except those based on the 2021 anti-immigrant hate group designation in the *Intelligence Report* and 2020 Hate Map are time-barred. *See* ECF 1 ¶¶ 57, 62, 67 & 72 (challenging the *Intelligence Reports* and Hate Maps SPLC published in February and/or March 2018, 2019, 2020 and 2021). The Extremist Profile was also published prior to April 27, 2020 and therefore is outside the statute of limitations. *See* ECF 114-12 ¶ 3. The removal of a racial slur on July 24, 2020 and the migration of the Extremist Profile to a new URL on January 15,

2025 were not substantive changes that would amount to a republication triggering a new cause of action. *Id.* ¶¶ 4-5. As courts have observed, "[w]ebsites are constantly linked and updated," and "[i]f each link or technical change were an act of republication, the statute of limitations would be retriggered endlessly and its effectiveness essentially eliminated." *See In re Phila. Newspapers*, 690 F.3d at 175; *Canatella v. Van De Kamp*, 486 F.3d 1128, 1135 (9th Cir. 2007) (no republication where statements reposted at a new URL on same website); *see also Yeager v. Bowlin*, 693 F.3d 1076, 1082 (9th Cir. 2012) (noting that "under California law, a statement on a website is not republished unless the statement itself is substantively altered or added to, or the website is directed to a new audience").

Plaintiffs may therefore challenge only the 2021 re-designation in this case.

## III. THE DESIGNATIONS ARE NOT "OF AND CONCERNING" KING

Because the only statement that is not time-barred here is the characterization of *DIS* as an "anti-immigrant hate group," King cannot maintain a viable defamation claim. Under the First Amendment, "[t]o sustain an action for libel the allegedly defamatory words must refer to some ascertained or ascertainable person, and that person must be the plaintiff." *Cox Enters., Inc. v. Bakin*, 426 S.E.2d 651, 653 (Ga. Ct. App. 1992) (cleaned up); *see also New York Times v. Sullivan*, 376 U.S. 254, 288 (1964) (statements must be "of and concerning" plaintiff). Moreover, where, as here, the alleged defamation involves a matter of public concern, the First

Amendment requires the plaintiff to demonstrate that he or she was "clearly identifiable" as the challenged statement's subject. *Abramson v. Pataki*, 278 F.3d 93, 102 (2d Cir. 2002) (citing *Sullivan*, 376 U.S. at 288-89).

The designation of DIS as an "anti-immigrant hate group" is not "of and concerning" King. It is, by its plain terms, about DIS. Indeed, SPLC does not even designate individuals as "hate groups." ECF 114-6 at 26 (94:19). That is legally significant because an allegedly false statement about an *entity* does not give rise to a claim by associated *individuals*. As the D.C. Circuit has explained, "defamation is personal," such that "[s]tatements which refer to individual members of an organization do not implicate the organization," and "*statements which refer to an organization do not implicate its members.*" *Jankovic v. Int'l Crisis Grp.*, 494 F.3d 1080, 1089 (D.C. Cir. 2007) (emphasis added); *see also Bakin*, 426 S.E.2d at 653.

In *Jankovic*, the D.C. Circuit rejected the contention that "the namesake of a corporation can be defamed when false misdeeds are attributed to his company." 494 F.3d at 1089-90. Similarly, in *Armscorp of America, Inc. v. Daugherty*, the Georgia Court of Appeals held that it did not matter if there might be evidence that readers associated the challenged statements with the plaintiff where the defamatory words themselves did not refer to that person. 380 S.E.2d 729, 730 (Ga. Ct. App. 1989). The same reasoning governs here: DIS's designation as a hate group applies to DIS, and the law does not allow King to treat it as of and concerning himself.

## IV.  DISCOVERY HAS CONFIRMED THAT THE HATE GROUP DESIGNATIONS ARE PROTECTED EXPRESSIONS OF OPINION

In *Gertz v. Robert Welch, Inc.*, the Supreme Court explained that "[h]owever pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas."  418 U.S. 323, 339-40 (1974).  For that reason, "a statement of opinion relating to matters of public concern which does *not* contain a provably false factual connotation will receive full constitutional protection."  *Milkovich*, 497 U.S. at 20-21 (emphasis added).

These powerful protections for expressions of opinion defeat any claim over the hate group designation.  To be sure, Judge Watkins declined to conclude at the pleadings stage that the hate group designations were an expression of opinion because, after "[e]xamining the circumstances, as set out in the Complaint and exhibits," those "circumstances are enough to raise a reasonable expectation that discovery will reveal evidence that SPLC's designation of DIS as an anti-immigrant hate group is sufficiently factual to be susceptible of being proved true or false."  *King II*, 2023 WL 3061825, at *14-15 (cleaned up).[5]  But the record now is clear: no such evidence exists.  Discovery has shown that SPLC bases the hate group designation on *subjective* expertise and judgment, not an *objective* or mathematical formula that is provable or disprovable.  Moreover, the evidence shows that *King*

---

[5] The Eleventh Circuit likewise declined to decide *at the motion to dismiss stage* whether SPLC's designation of another organization as a "hate group" was non-actionable opinion, holding the claim failed even if it were a statement of fact.  *Coral Ridge*, 6 F.4th at 1252 n.7.

*himself* understood the designation to be an unprovable opinion rather than an empirical statement of fact. In these circumstances, any defamation claim arising out of the hate group designation cannot survive summary judgment.

### A.    SPLC's Hate Group Designations Are Based on Expertise and Judgment, Not an Empirically Disprovable Formula

In *Milkovich*, the Supreme Court ruled that an opinion may be actionable as defamation *only* when the assertion "is sufficiently factual to be susceptible of being proved true or false." 497 U.S. at 21. There, the challenged assertion was that the speaker believed the plaintiff had lied under oath, and the Court concluded that such an assertion could be tested for its veracity in, for example, a perjury prosecution. *Id.* at 21-22. The Court contrasted this "objectively verifiable" allegation with a "subjective assertion" that "does not contain a provably false factual connotation," which instead "will receive full constitutional protection." *Id.* at 20, 22.

Here, the designation of DIS as an anti-immigrant hate group, is, in the words of the *Milkovich* Court, not "sufficiently factual to be susceptible of being proved true or false." 497 U.S. at 21. There is *no* methodology by which a factfinder could *prove* that DIS, as a factual matter, is *not* an anti-immigrant hate group.[6] Instead, the term "'hate group' has a highly debatable and ambiguous meaning" and "suffers from 'tremendous imprecision of . . . meaning and usage . . . in the realm of political

---

[6] Nor has SPLC accused DIS of violating any statute or other objectively established criteria. *Cf. id.* at 22 ("Unlike a subjective assertion the averred defamatory language is an articulation of an objectively verifiable event." (quoting *Scott v. News-Herald*, 496 N.E.2d 699, 707 (Ohio 1986))).

debate.'" *Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*, 406 F. Supp. 3d 1258, 1277-78 (M.D. Ala. 2019) (second ellipsis in original) (quoting *Buckley v. Littell*, 539 F.2d 882, 893 (2d Cir. 1976)).

While "SPLC put its own definition of the term [hate group] on its website," *see Coral Ridge*, 6 F.4th at 1252 n.7, merely defining a term does not transform it from a subjective assessment to an empirical result. That would require the definition to provide the challenged term with "a precise meaning which is readily understood as it was defined," such as in *Landmark Education Corp. v. Conde Nast Publication, Inc.*, where a New York state court allowed a defamation claim to proceed over use of the word "cult" because the challenged article included "defined qualities of cults" such that plaintiff's particular characteristics "can be matched against" those qualities to "establish the claimed truth or falsity." 1994 WL 836356, at *3 (N.Y. Sup. Ct. July 7, 1994). Here, by comparison, King has acknowledged that there is no precise meaning of "anti-immigrant" because, in his own words, "*the meaning of anti-immigrant isn't the same for everyone.*" ECF 114-1 at 39 (148:16-22) (emphasis added). King acknowledged in discovery that opinions differ on the meaning of the word "immigrant" itself, with some (like King) believing it applies only to persons lawfully present in the country, while "[a] lot of people want to consider immigrants however they come, legally or illegally, as simply immigrants." ECF 114-5 at 26 (245:18-246:1). Indeed, King even conceded that when people

"start calling illegal border crosssers immigrants," then "they can call groups like [DIS] anti-immigrant." ECF 114-1 at 42 (159:6-21).

SPLC's "anti-immigrant hate group" designation constitutes an opinion, informed by expertise and based on SPLC's interpretation and review of materials produced, and positions espoused, by DIS and King. *Milkovich*, 497 U.S. at 20-22; *Coral Ridge*, 406 F. Supp. 3d at 1277-78 (hate group designation is protected under *Milkovich* because it is not provable as false). SPLC's position is thus like many other statements deemed constitutionally protected opinions. *See, e.g.*, *Turner v. Wells*, 879 F.3d 1254, 1262-65 (11th Cir. 2018) (whether speech constituted "homophobic taunting" was not objectively verifiable and whether someone was "unprofessional" was likewise protected opinion); *Hamze v. Cummings*, 652 F. App'x 876, 881 (11th Cir. 2016) (quoting *Milkovich* and concluding that statement that plaintiff committed "brutal, senseless, roadrage killing" that showed "disregard for human life" was opinion that could not support defamation claim). Here, too, the constitution protects SPLC's subjective assessment of DIS.

## B. The Hate Group Designations Are Also Non-Actionable Because They Are Opinions Based on Fully Disclosed Facts

The First Amendment and state law further protect expressions of opinion where, as here, "their factual premises are revealed." *Monge v. Madison Cnty. Record, Inc.*, 802 F. Supp. 2d 1327, 1335 (N.D. Ga. 2011). Thus, "a statement of opinion is actionable only if it implies the allegation of *undisclosed* defamatory facts

25

as the basis for the opinion." *Jaillett v. Ga. Television Co.*, 520 S.E.2d 721, 726 (Ga. Ct. App. 1999) (cleaned up; emphasis in original). "If an opinion is based upon facts already disclosed in the communication, the expression of the opinion implies nothing other than the speaker's subjective interpretation of the facts." *Id.*

Under this standard, the characterization of DIS as an "anti-immigrant hate group" in the re-designations cannot give rise to a defamation claim because the facts upon which that characterization was based are fully disclosed, including through hyperlinks, in the Extremist Profile.[7] *See Turner*, 879 F.3d at 1262 (statements are "pure opinion" when "the defendant makes a comment or opinion based on facts which are set forth in the publication or which are otherwise known or available to the reader or listener as a member of the public" and "pure opinion[s] are protected from defamation actions by the First Amendment"). The doctrine of "pure opinion" or "opinion based on disclosed fact" thus provides an additional and independent basis to reject a defamation claim over the hate group designation.

### C.    The Vilification Statement Is Protected as Rhetorical Hyperbole

The Vilification Statement – the only statement in the time-barred Extremist Profile that Plaintiffs dispute, *see* SUMF ¶ 40 – is non-actionable not only because

---

[7] Hyperlinked content is part of a publication's context in a libel action, including in determining when a statement constitutes an opinion based on disclosed facts. *See, e.g., Sandals Resorts Int'l Ltd. v. Google, Inc.*, 925 N.Y.S.2d 407, 416 (N.Y. App. Div. 2011) (challenged statement was "supported by links to the writer's sources"); *see also Adelson v. Harris*, 973 F. Supp. 2d 467, 484 (S.D.N.Y. 2013) ("The hyperlink is the twenty-first century equivalent of the footnote," which "instantaneously permits the reader to verify an electronic article's claims.").

it is a characterization of fully disclosed facts, as discussed above, but also because it expresses "rhetorical hyperbole." Under this doctrine, the Supreme Court has rejected defamation liability even when the same terms in other contexts might express literal facts but are used as characterizations rather than literally. For example, the Court has applied the doctrine to a description of a real estate developer as engaging in "blackmail," which in context the Court deemed "a vigorous epithet," and the characterization of workers crossing a picket line as "traitors," which the Court construed in context as "a lusty and imaginative expression of . . . contempt," even though in both cases the relevant plaintiffs argued that those terms accused them of criminal conduct. *Old Dominion Branch No. 496 v. Austin*, 418 U.S. 264, 284-86 (1974); *Greenbelt Co-op. Publ'g Ass'n v. Bresler*, 398 U.S. 6, 14 (1970).

Here, no reasonable reader of the Vilification Statement would understand SPLC's use of the phrase "all immigrants" to communicate the hyper-literal proposition that King has personally attacked every single immigrant nationwide (if not worldwide) without exception. To the contrary, a reasonable reader "would infer that" the Vilification Statement was a characterization of the type of rhetoric about immigrants disclosed in the Extremist Profile, which King admitted were his own words. ECF 114-3 at 30-32 (113:25-120:14). Thus, it "was more an expression of outrage than an accusation of fact." *Horsley v. Rivera*, 292 F.3d 695, 702-03 (11th Cir. 2002) (defendant's statements that plaintiff, an opponent of abortion, was an

"accomplice to murder" of a doctor who performed abortions and had "the blood of this doctor on [his] hands" were "absolutely protected as rhetorical hyperbole"). The Vilification Statement thus cannot support a defamation claim.

### D. Plaintiff Concedes His Dispute Is Over Preferred Labels, Which Are Not The Proper Subject of Libel Litigation

King's own testimony and evidence obtained during discovery reinforces that the hate group designation is a non-actionable expression of opinion. King viewed "organizations that are anti-enforcement on immigration" as DIS's "political enemies," including SPLC, which King described as "very actively anti-enforcement." ECF 114-1 at 14 (48:6-19). Yet King declared that it would be appropriate to characterize SPLC as "anti-enforcement" even if SPLC supported enforcing half of all immigration laws, *id.* at 38 (142:14-18), even as King objected to DIS being described as "anti-immigrant" because he claimed that DIS opposed only a portion of the immigrant population, namely those in the U.S. unlawfully.

The obvious discrepancy between the purported libelous nature of SPLC describing DIS as "anti-immigrant," on the one hand, and King describing SPLC as "anti-enforcement," on the other, illustrates why such subjective, fundamentally political descriptors cannot give rise to defamation claims under the First Amendment. The labels that organizations choose for themselves and attempt to apply to their opponents are part of the debate: just as "one man's vulgarity is another's lyric," *Cohen v. California*, 403 U.S. 15, 25 (1971), one person's "pro-

choice" organization is another's "pro-abortion" group; one person's "environmental" policies are another's "anti-business" views; one person's "anti-gun" policies are another's "pro-gun safety" perspective, and so forth. As is the case with rhetoric in any charged political disagreement, Plaintiffs are free to criticize SPLC or challenge its label, but "[t]his engagement should be in the court of public opinion, not a federal court." *Coral Ridge*, 406 F. Supp. 3d at 1280.

For this very reason, allegations of political extremism are classic examples of opinions believed to be correct by the speaker, but not objectively or empirically verifiable as true or false. As one court explained, in holding that "allegations of hostility to labor" constituted protected speech:

> To say that one is unfair to labor is not a statement of a fact, but of an opinion. Likewise to say of one: you are reactionary, you are undemocratic, you are a nationalist, you are an isolationist, you are a New Dealer, . . . , you are opposed to labor, you are a coddler of labor, is similarly to express an opinion.

*Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580, 598 (D.C. 2000) (cleaned up); *Buckley*, 539 F.2d at 893-95 (description of plaintiff as "fascist" is "loose" and "ambiguous" and cannot be regarded as statement of fact because of "tremendous imprecision" of the term).[8] Allowing opponents on contentious political topics to

---

[8] This principle is well established. *See, e.g.*, *Standing Comm. on Discipline v. Yagman*, 55 F.3d 1430, 1440 (9th Cir. 1995) (calling a judge "anti-Semitic" was a non-actionable opinion); *Jackson v. United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union*, 2009 WL 10704261, at *39 (N.D. Ala. Feb. 23, 2009) (statements that plaintiff was "racist" and "radical" were "non-fact-based name-calling and rhetoric that d[id] not sufficiently assert representations of actual facts") (collecting cases); *Ward v. Zelikovsky*, 643 A.2d 972, 983 (N.J.

sue each other over the rhetoric they use to label one another's positions is anathema to the "uninhibited, robust, and wide-open debate that the First Amendment is intended to protect." *Counterman v. Colorado*, 600 U.S. 66, 78 (2023). For this reason as well, the Court should grant summary judgment in favor of SPLC.

## V. PLAINTIFFS FAIL TO CARRY THEIR BURDEN TO IDENTIFY CLEAR AND CONVINCING EVIDENCE OF ACTUAL MALICE

To the extent claims based on designations or the Vilification Statement are deemed timely, and to the extent that any challenged statements are found by the Court to be provable statements of fact, summary judgment is still appropriate for a separate and independent reason as well: Plaintiffs cannot meet their burden to show clear and convincing record evidence of "actual malice" fault, as required by the First Amendment. *Coral Ridge*, 6 F.4th at 1252-53 (affirming dismissal where plaintiff failed to allege facts sufficient to establish plausible finding of actual malice in SPLC's designation of plaintiff as a hate group).

### A. The Speech-Protective Actual Malice Standard Sets a High Burden for Public Figure Plaintiffs on Summary Judgment

Plaintiffs concede their status as public figures. *King II*, 2023 WL 3061825, *15 ("Plaintiffs concede that they are public figures for purposes of defamation law."). As such, they "must present clear and convincing evidence that the

---

1994) (accusation that plaintiffs "hate[d] . . . Jews" non-actionable opinion); *see also* 1 Robert D. Sack, *Sack on Defamation* § 2:4-6 (5th ed. 2017).

defendants acted with actual malice to defeat defendants' summary judgment motion." *Silvester v. ABC*, 839 F.2d 1491, 1498 (11th Cir. 1988).

Constitutional "actual malice" is a term of art that does not mean personal spite or ill will, but rather that the defendant published a challenged statement with either knowledge that it was false or awareness of its probable falsity. *Berisha v. Lawson*, 973 F.3d 1304, 1312 (11th Cir. 2020). This "is a subjective test, which asks whether the publisher 'in fact entertained serious doubts as to the truth of his publication.'" *Id.* (quoting *Silvester*, 839 F.2d at 1498); *see also Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 703 (11th Cir. 2016) ("[W]e ask whether the defendant, instead of acting in good faith, actually entertained serious doubts as to the veracity of the published account, or was highly aware that the account was probably false."). The speech-protective standard purposefully provides "breathing space" for free debate on matters of public concern. *Sullivan*, 376 U.S. at 271-72.

As a result, a public figure defamation plaintiff's burden at summary judgment is a heavy one. *Anderson*, 477 U.S. at 255-56 ("[T]he appropriate summary judgment question will be whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not."). The requirement for "clear and convincing" evidence goes "well beyond a preponderance of the evidence," to require a meaningful showing that "defendants published a defamatory statement

31

with actual knowledge of its falsity or with a high degree of awareness of its probable falsity." *Berisha*, 973 F.3d at 1312 (cleaned up).

Notably, "the state of mind required for actual malice would have to be brought home to the persons in the [defendant's] organization having responsibility for the publication of the [challenged publication]." *Sullivan*, 376 U.S. at 287. To meet this burden, "the plaintiff must identify the individual responsible for publication of a statement, and it is that individual the plaintiff must prove acted with actual malice." *Dongguk Univ. v. Yale Univ.*, 734 F.3d 113, 123 (2d Cir. 2013) (citing *Sullivan*, 376 U.S. at 287). Moreover, "[t]he test of actual malice . . . focuses on the defendant's state of mind *at the time of publication*." *Hunt v. Liberty Lobby*, 720 F.2d 631, 647 (11th Cir. 1983) (emphasis added); *see also Bose Corp. v. Consumers Union*, 466 U.S. 485, 512 (1984) (evidence must establish that defendant "realized the inaccuracy at the time of publication").

### B.   Plaintiff Has Established *No Evidence* of Actual Malice, Much Less Clear and Convincing Evidence

The undisputed evidence in the case tells a clear story of why SPLC designated DIS as a hate group in 2018, after monitoring the organization for years. Beirich learned from a newspaper reporter in 2017 that DIS was raising funds through a network of anti-immigration groups that she had studied, and whose founder explicitly endorsed a white supremacist basis for his advocacy. SUMF ¶¶ 23-26. This prompted her to assign a research analyst to review DIS's statements

and activities, a process that took weeks and ultimately led to a memorandum recommending the hate group designation. *Id.* ¶¶ 27-30, 32. The memorandum cited the rhetoric of King that mirrored that of hate groups and cited what Beirich described as his "deep relationship" with hate groups. Ex. N - CONF. 0008-0010; ECF 114-7 at 48-49 (184:6-186:24). Beirich, who approved the designation, SUMF ¶ 31, still believes the "totality-of-evidence" supported DIS's hate group designation, *id.* ¶ 31.

In following years, IP continued to designate DIS a hate group based on the disclosed background in the Extremist Profile and based on confirmation that DIS remained active. *Id.* ¶¶ 41-45. No record evidence reveals that *anyone* involved in *any* of these decisions *ever* doubted that DIS qualified as a hate group. *Id.*

In denying a motion to dismiss, Judge Watkins credited the Complaint's allegations, and allowed discovery. *King II*, 2023 WL 3061825, at *19. Two years later the record evidence does not support those allegations, much less add up to clear and convincing *evidence* that the individuals at SPLC responsible for the designation or the re-designations doubted those statements. For example, the Complaint alleges that SPLC must have known King was not "anti-immigrant" and that he did not disparage "all immigrants" because he has an adopted sister who is an immigrant and that members of the DIS Board of Advisors are immigrants. But the research analyst who prepared the Activation Report did *not* know this. ECF

114-8 at 27 (98:16-18) ("I think that I do not explore the immigration status of the people that I track."). Nor did she believe that it mattered in any event:

> I don't understand how having an immigrant on your board would negate the anti-immigration stance that the organization has taken. . . . I do not think if there were a member of the board that is an immigrant or was an immigrant, that would negate an organization's status, premise, intention, purpose, actions as being anti-immigrant.

*Id.* (99:16-19, 100:15-19). Indeed, the record evidence – and the Extremist Profile itself, including public statements by King, and his close working relationship with anti-immigrant and white supremacist individuals and organizations – sets forth the bases for the characterizations of DIS rhetoric and activities. *See id.* at 24 (89:13-23); ECF 114-7 at 31-32 (117:16-118:4).

Similarly, Plaintiffs alleged that SPLC *knew* the only definition of "immigrant" is a "legal immigrant," and therefore must have been aware of a factual distinction between "anti-immigrant," which Plaintiffs claim is false and defamatory, and "anti-illegal immigrant," which Plaintiffs claim is accurate. *King II*, 2023 WL 3061825, at *18-20. But this is not the common definition of "immigrant." *Luckie v. INS*, 1986 WL 16129, at *2 (6th Cir. Aug. 25, 1986) ("By common definition, an immigrant is one who intends to take up permanent residence in the United States."); *see also* "Immigrant," *Merriam-Webster*, https://www.merriam-webster.com/dictionary/immigrant ("a person who comes to a country to take up permanent residence"). Nor is there any evidence that the

34

individuals involved in any of the challenged publications intended or used "immigrant" in the manner alleged, to refer only to legal immigrants.[9] Indeed, the evidence is to the contrary. ECF 114-6 at 18 (65:3-13).

The challenged characterizations, "so far as anything in the record discloses, represented [defendant's] honest belief." *Morgan v. Tice*, 862 F.2d 1495, 1500 (11th Cir. 1989); *see also Coral Ridge*, 6 F.4th at 1253 (no actual malice as a matter of law absent plausible factual allegations that "SPLC seriously doubted the accuracy of designating [plaintiff] a hate group"). Plaintiffs have not identified clear and convincing evidence of actual malice, and summary judgment is warranted on this separate and independent basis.

## CONCLUSION

For the foregoing reasons, Defendant SPLC respectfully moves this Court for an order entering summary judgment in favor of SPLC and against Plaintiffs.

---

[9] Moreover, most of the rhetoric cited in the Extremist Profile is not limited to "illegal" immigrants, so even under Plaintiffs' preferred definition, it would not be obviously false to characterize DIS as "anti-immigrant." *See generally* ECF 114-12. The evidence demonstrates that those involved in the challenged publications believed Plaintiffs' rhetoric and actions demonstrate DIS "maligns all immigrants as a class of people," regardless of their legal status. ECF 114-6 at 19 (68:2-21) ("They malign immigrants as a class of people, and that's explained in -- with examples in the Extremist Profile such as talking about being resentful of immigrants who won't assimilate," DIS's mission statement for "English to be the common language that all immigrants, again, need to speak," and "comments about going to a rally and being near immigrants and feeling that Mr. King has to take a shower afterwards."); ECF 114-7 at 34 (129:12-20) ("[W]e're looking for someone who's demonizing the entire immigrant population with these kind of loose words that D.A. King uses."); ECF 114-8 at 24 (89:13-23) ("There were several words and language that D.A. King used that support that assertion" that DIS "focuses on vilifying all immigrants").

Dated: May 20, 2025                    Respectfully submitted,

                                       /s/ Chad R. Bowman
                                       Chad R. Bowman (*pro hac vice*)
                                       Maxwell S. Mishkin (*pro hac vice*)
                                       Lauren P. Russell (*pro hac vice*)
                                       BALLARD SPAHR LLP
                                       1909 K Street NW, 12th Floor
                                       Washington, DC 20006
                                       Telephone:  202-661-2200
                                       Facsimile:  202-661-2299
                                       Email:  bowmanchad@ballardspahr.com
                                       Email:  mishkinm@ballardspahr.com
                                       Email: russelll@ballardspahr.com

                                       Robert D. Segall  [ASB-7354-E68R]
                                       Shannon L. Holliday [ASB-5440-Y77S]
                                       COPELAND, FRANCO, SCREWS
                                       & GILL, P.A.
                                       Post Office Box 347
                                       Montgomery, AL  36101-0347
                                       Telephone:  334-834-1180
                                       Facsimile:  334-834-3172
                                       Email:  segall@copelandfranco.com
                                       Email:  holliday@copelandfranco.com

                                       **Attorneys for Defendant**
                                       **Southern Poverty Law Center, Inc.**

# CERTIFICATE OF SERVICE

I hereby certify that on May 20, 2025, I caused a copy of the foregoing Memorandum of Law in Support of SPLC's Motion for Summary Judgment to be filed using the Court's CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Chad R. Bowman*
Chad R. Bowman