# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

**THE ESTATE OF**
**DONALD A. KING, et al.,**
          Plaintiffs,

**v.**                                                  **2:22-cv-207-CLM-JTA**

**THE SOUTHERN POVERTY**
**LAW CENTER, INC.,**
          Defendant.

## <u>MEMORANDUM OPINION</u>

Each year, the Southern Poverty Law Center publishes a "Hate Map" that lists groups that it determines to be hate groups. Since 2018, SPLC has labeled the Dustin Inman Society ("DIS") as an "anti-immigrant hate group." Since 2019, SPLC has described DIS like this in its "Extremist Profile":

> The Dustin Inman Society, led by D.A. King, poses as an organization concerned about immigration issues, yet focuses on vilifying all immigrants.

DIS and its founder, D.A. King, have twice sued SPLC for the anti-immigrant hate group label and the profile statement above. The first lawsuit ended after the court granted SPLC's motion to dismiss Plaintiffs' complaint under Rule 12(b). Rather than ask the court to allow them to amend their complaint to cure the deficiencies, Plaintiffs filed this second lawsuit.

This time, the court denied SPLC's Rule 12 motion, withholding some issues for post-discovery, summary judgment briefing. (Docs. 20, 22). Discovery has ended, and SPLC asks for summary judgment on all counts. (Doc. 113). Because D.A. King died during discovery, Plaintiffs ask the court to substitute his estate as a plaintiff. (Doc. 119).

The court **GRANTS** the motion to substitute a party under Rule 25(a) and Ga. Code Ann. § 9-2-41. For the reasons explained within, the court also **GRANTS** SPLC's motion for summary judgment on all counts under Rule 56(a). The court will thus enter judgment for SPLC and close this case.

# I.

# BACKGROUND

The facts are nearly undisputed; Plaintiffs challenge only one piece of SPLC's 45 statements of undisputed fact and add only one piece of context as an additional fact.[1] (*See* doc. 123, pp. 10-11). As a result, other than the facts mentioned in footnote one, which the court views in Plaintiffs' favor, the court accepts and recounts SPLC's statement of the facts as the evidence the parties would prove at trial. *See* Fed. R. Civ. P. 56(e)(2). This agreement on the facts means the parties present questions of law, not fact.

## A. The Undisputed Facts

1. *The Hate Map*: SPLC is a nonprofit civil rights organization. Among other activities, SPLC's Intelligence Project tracks groups for possible designation as a "hate group." Each year, in February or March, SPLC updates on its website an interactive "Hate Map" that lists the groups SPLC presently deems a hate group:



---

[1] Plaintiffs challenge how often SPLC altered its "Extremist Profile" (SPLC's Fact # 39) and note that the Dustin Inman Society received donations from many sources, not just the Tanton Network.

The Hate Map allows the viewer to differentiate by hate group type. For example, if you filter the map to show only "Anti-Immigrant Hate Groups," the map shows only groups with that designation:



Clicking on a dot then reveals the designated group and its location:



On a different section of the website called "Extremist Files," SPLC publishes an "Extremist Profile" of the designated hate groups and the hate group categories. For example, here is the header and beginning of the "Anti-Immigrant Hate Group" profile:



2. *John Tanton & the Tanton Network*: In the Background section of the "Anti-Immigrant" profile, SPLC calls John Tanton the "chief architect" of the "anti-immigrant movement." SPLC also calls Tanton (now deceased) a "white nationalist and eugenics advocate whose tenacity set in motion a network of groups devoted to pushing nativist policies and ideas." SPLC calls these groups the "Tanton Network."[2]

In the early 2000s, SPLC determined that Tanton was behind many of the Network's groups, either as founder, funder, or key supporter. For example, Tanton was behind FAIR, which lobbied for pro-enforcement legislation on Capitol Hill. Tanton was behind the Center for Immigration Studies ("CIS"),

---

[2] In its supporting brief, SPLC says that its findings and public statements about John Tanton and the Tanton Network are true and undisputed. *See* (doc. 116, ¶¶ 5-15, 25-31, 38). Plaintiffs do not dispute any of the pleaded facts about John Tanton or Plaintiffs' ties to John Tanton; they only dispute the relevance of the ties. *See* (doc. 123, pp. 11). So the court assumes that every fact SPLC pleads about Tanton and his network—including Plaintiffs' ties to Tanton—is true. *See* Fed. R. Civ. P. 56(e)(2); (doc. 47, p. 18) (court's initial order, warning Plaintiffs that "[a]ll material facts set forth in the statement required of the moving party will be deemed to be admitted for summary judgment purposes unless controverted by the response of the party opposing summary judgment").

which operated as the Network's think tank. Tanton was also behind Numbers USA, which advocated for lower immigration numbers.

To coordinate the groups' efforts, Tanton founded U.S. Inc. Among other things, U.S. Inc. oversaw The Social Contract Press, which published writings by persons SPLC deems white supremacists. U.S. Inc. also accepted donations that it dispersed to groups within the Tanton Network.

3. *Plaintiffs*: D.A. King started advocating against illegal immigration in 2003. King called his first organization the "American Resistance Foundation." In 2013, King closed the American Resistance Foundation and opened the Dustin Inman Society ("DIS"), which he named after an Atlanta youth who was killed in an automobile accident involving an illegal immigrant. While DIS has a Board of Advisors, King fully controlled DIS from its inception until King died earlier this year. King's sister and several DIS advisory board members legally migrated to the United States.

From 2013 through 2017, SPLC did not designate DIS as a hate group. Instead, SPLC deemed DIS a "nativist extremist" group, meaning that SPLC found that DIS "target[ed] individual immigrants rather than immigration policies."[3] In 2011, SPLC's Intelligence Project's director, Heidi Berich, told a reporter that SPLC gave DIS the lesser designation because D.A. King was "working on his legislation through the political process" rather than "to get up in the face of actual immigrants and threaten them." Six years later, a reporter's call sparked a change in SPLC's position.

4. *The 2018 Designation*: On October 18, 2017, a reporter for the Atlanta Journal Constitution ("AJC") called SPLC, asking SPLC to comment on a story the AJC was writing about King and DIS. That call was followed by an email, in which the reporter noted (a) that DIS had filed 19 of 20 complaints to Georgia's Immigration Enforcement Review Board and (b) DIS was soliciting donations through U.S. Inc. (*i.e.*, the company founded by John Tanton). The latter information was news to SPLC; at the time, Berich did not know there was a link between DIS and Tanton. Having written extensively about Tanton over the years, Berich decided that "if DIS was soliciting funds through a

---

[3] Plaintiffs never disputed DIS's listing as a nativist extremist group, nor does it appear that Plaintiffs sued SPLC for declaring that DIS "target[ed] individual immigrants."

Tanton group, it meant DIS 'was working very closely with white supremacists.'" (Undisputed Fact #26, quoting Berich's deposition). So Berich told the reporter that SPLC "was going to take a new look at the Dustin Inman Society after learning from the AJC about its ties to U.S. Inc." (Undisputed Fact # 27, quoting the resulting AJC article).

Berich told her staff the same thing: "We are going to look at the group, given the new information from Jeremy [the AJC reporter] that they raise funds through U.S. Inc., but we won't make a decision on whether to list them as a hate group for a while." (Doc. 115-1, p. 143). So an SPLC Research Analyst, Swathi Shanmugasundaram, looked into DIS. Within two months, Shanmugasundaram prepared a report that proposed elevating DIS from a nativist extremist group to an anti-immigrant hate group. The report cited the following as support for the elevation to hate group status:

- DIS took donations "through Tanton's US Inc.";
- DIS actively campaigned "against immigrants in Georgia";
- King had filed 18 of 19 complaints to Georgia's Immigration Enforcement Review Board;
- King spoke at an event supporting the Social Contract Press;
- King wrote four articles for the Social Contract Press; and,
- King often commented about immigration on his own social media account and commented on or shared comments from other accounts, like Voice of Europe.

(Doc. 115-1, pp. 8-9).

As director of SPLC's Intelligence Project, Berich reviewed the report and approved the designation change the same month (*i.e.*, December 2017). In her view, the activities revealed in the report "go beyond lobbying" and thus warranted the upgrade to "hate group" status. When asked to explain what justified her decision during her deposition, Berich testified:

[M]ultiple relationships with The Social Contract, with VDARE, with FAIR, raising money through U.S. Inc., all of that is highly problematic. All those groups have leaders who have made blatantly racist or white supremacist statements over the years.

> They've been thrown off of social media for what they've done. It's been that egregious in some case. So all of that would have mattered. The statements here from D.A. King obviously vilify all immigrants. That would have mattered. So this is a totality-of-evidence situation where I believe, and we believed, in our opinion, at the SPLC, that this met the definition for a hate group.

(Doc. 114-7, pp. 31-32).

5. *Publication*: SPLC publicly announced DIS's designation as an anti-immigrant hate group on February 10, 2018, when it published the Spring 2018 edition of the Intelligence Report:

The Spring 2018 Intelligence Report neither defined "Anti-Immigrant Hate Group," nor said anything else about DIS. Instead, Shanmugasundaram started working on DIS's "Extremist Profile." Over the next few months, several analysts, supervisors, and others in SPLC's editorial and IP departments fact-checked, edited, and finalized the profile.[4] SPLC published DIS's extremist profile on the SPLC website around January 7, 2019. Below is the profile's header and introductory paragraph, the latter of which has not changed since it was first published in January 2019:



**DUSTIN INMAN SOCIETY**

SPLC DESIGNATED HATE GROUP

**FOUNDED:** 2003
**LOCATION:** Marietta, Georgia

Share

**The Dustin Inman Society, led by D.A. King, poses as an organization concerned about immigration issues, yet focuses on vilifying all immigrants.**

The Dustin Inman Society is a Georgia-based anti-immigrant hate group founded and led by activist D.A. King. The Southern Poverty Law Center lists it as an anti-immigrant hate group because it denigrates immigrants and supports efforts to make the lives of immigrants so hard that they leave on their own—a tactic known as "attrition through enforcement." Despite his regular demonization of immigrants, King finds allies in the Georgia State Legislature and has played a significant role in passing anti-immigrant legislation in Georgia for more than a decade. King is also comfortable working with some of the most hardcore elements of the anti-immigrant movement, including white nationalists.

---

[4] SPLC produced about 70 pages of email traffic that demonstrates the number of persons who worked on the DIS profile before its release. *See* (Doc. 115-1, pp. 64-131).

The first link takes the reader to SPLC's frequently asked questions. On that page, SPLC defines "hate group":

# What is a hate group?

The Southern Poverty Law Center defines a hate group as an organization or collection of individuals that – based on its official statements or principles, the statements of its leaders, or its activities – has beliefs or practices that attack or malign an entire class of people, typically for their immutable characteristics. An organization does not need to have engaged in criminal conduct or have followed their speech with actual unlawful action to be labeled a hate group. We do not list individuals as hate groups, only organizations.

Hate groups vilify others because of their race, religion, ethnicity, sexual orientation or gender identity – prejudices that strike at the heart of our democratic values and fracture society along its most fragile fault lines.

The FBI uses similar criteria in defining the bias motivation of a hate crime:

[A] *criminal offense against a person or property motivated in whole or in part by an offender's bias against a race, religion, disability, sexual orientation, ethnicity, gender, or gender identity.*

We define a "group" as an entity that has a process through which followers identify themselves as being part of the group. This may involve donating, paying membership dues or participating in activities such as meetings and rallies. Individual chapters of a larger organization are each counted separately, because the number indicates reach and organizing activity.

The link to "anti-immigrant" takes you to a page that starts with this header:

**Anti-immigrant hate groups are the most extreme of the hundreds of nativist and vigilante groups that have proliferated since the late 1990s, when anti-immigrant xenophobia began to rise to levels not seen in the U.S. since the 1920s.**

Turning back to the DIS extremist profile, after the brief introduction, the profile lists six quotes from King and a quote from a DIS board member:

# In their own words

"I was taught that we have an American culture to which immigrants will assimilate, and I am incredibly resentful that's not what's happening anymore." — King, 2013.

"[The march was composed of] mostly Hispanic demonstrators. … I got the sense that I had left the country of my birth and been transported to some Mexican village, completely taken over by an angry, barely restrained mob. … My first act on a safe return home was to take a shower." — King in a 2010 blog entry on the anti-immigrant hate website VDARE about his experience at a March for Dignity.

"King has described the United States as a country 'being invaded and colonized,' and its 'way of life' destroyed with the 'Hispandering' of his state, which he has taken to calling 'Georgiafornia.'" — King, quoted by the Anti-Defamation League in 2008.

"[Undocumented immigrants are] not here to mow your lawn – they're here to blow up your buildings and kill your children, and you, and me." — King, at a Newton County, Georgia, Republican Party meeting in April 2007.

"We have become sadly acquainted with the absolute and brazen disregard for the law that comes from the third world horde that is allowed to swarm over our border with Mexico. … It is clear that when the mostly Mexican mob illegally 'migrates' into our nation, it brings with it the culture of lawlessness and chaos that is responsible for the very conditions that they flee in the rapidly deteriorating example of Democracy without the rule of law that is Mexico." — King, in a blog in July 2004.

"Must the United States silently suffer the incursion of one million people a year because they are brown?" — King, May 2004.

"Damned right. I hate 'em all – negroes, wasps, s—-, eskimos, jews, honkies, krauts, ruskies, ethopians, pakis, hunkies, pollocks and marxists; there are way too many of them. I'm all for trout, elephants, bacteria, whales, wolves, birds, parrot fish, deciduous foliage and mollusks. Time to rebalance the planet, bleeding heart liberals be damned." — Fred Elbel, board of advisors and webmaster, 2004.

Later in the profile, SPLC lists several of King's social media posts and re-posts. These include:

- Posting a graphic with the phrase: "VIVA ZERO TOLERANCE! *America First*! … Deport illegal alien families together."
- Retweeting the statement: "Friendly reminder that Muslims murder gay people."
- Retweeting these statements from Voice of Europe's Twitter / X account: "The beautiful Italy is rapidly being Islamised. This looks more like Tehran or Kabul," and "Import the Third World, become the Third World: this is Paris!"

The profile also presents SPLC's historical "Background" of DIS that, among other things, recounts:

- King has focused on immigration issues since at least the 1990s when he worked for the Georgia Coalition for Immigration Reduction;
- King said that his focus heightened after the terrorist attacks on September 11, 2001;
- King had to deplete his savings account, refinance his home, and sell his grandmother's stock to keep DIS afloat;
- DIS accepted $5,000 from "John Tanton's foundation U.S. Inc." in 2007;
- King then "set up a scheme" that allowed persons to make tax-deductible donations to DIS through U.S. Inc.;
- Tanton's organization FAIR listed King as a Georgia contact for many years;
- King said that he was "very proud that John Tanton is a personal friend and a personal hero;" and,
- King and DIS board member Fred Elbel have written for Tanton's journal, The Social Contract, and King has spoken multiple times at the The Social Contract Press's Writer's Workshop, which SPLC describes as "an annual gathering of white nationalists and the anti-immigrant lobby."

Finally, the profile traces many of DIS's activities, including:

- In 2005, King paid 14 homeless persons to hold signs against "illegal immigration" outside the Georgia State Capitol;
- In 2005, King organized rallies against legislation that favored undocumented immigrants. King invited speakers and groups that SPLC also declared "anti-immigrant";
- In 2006, King wrote an article for VDARE, a group SPLC designates as a white nationalist hate group. In it, King said his "impulse to reach out and personally deport these Third World invaders was nearly uncontrollable";
- In 2006, King took four state legislators to the Mexican border;
- In 2007, King organized a rally in Washington D.C. as part of a series of events titled "Hold Their Feet to the Fire"; and,
- In 2007-08, King supported the "287(g) program," which SPLC describes as "allow[ing] state or local police to enter into an agreement with Immigration Customs Enforcement (ICE) to enforce federal law";
- In 2011, King helped write and support H.B. 87, which (a) allowed law enforcement officials to stop and ask for identification from "suspicious" person, (b) made it illegal to harbor undocumented immigrants, and (c) required E-Verify for all businesses with more than 10 employees;
- King filed more than 30 complaints with Georgia's Immigration Enforcement Review Board, a board created by H.B. 87. As SPLC put it, "King has essentially used IERB as his personal, publicly funded investigative agency"; and,
- King pushed H.B. 452, which required the publication of undocumented immigrants' criminal data. The bill passed in 2017.

6. *Editing the profile*: As mentioned in footnote 1, Plaintiffs' only dispute with SPLC's statements of undisputed facts concerns how often SPLC edited the DIS extremist profile (*i.e.*, Fact #39). Plaintiffs cite SPLC's responses to interrogatories as the undisputed fact, and the court accepts this assertion because Plaintiffs are the nonmoving parties and SPLC does not contest its own interrogatory response in its reply brief. According to the response (doc. 122-1, pp. 2-8), SPLC updated the links contained in the DIS extremist profile

several times since it was published in 2018 but did not change the substantive content. In other words, in the reader's eyes, the DIS Profile says the same thing today as it did when SPLC first published it.

## B. The Litigation

Plaintiffs asked SPLC to remove the designation and extremist profile. SPLC refused, so Plaintiffs sued SPLC twice. This is the second lawsuit. Because the first lawsuit factors into the parties' arguments about statute of limitations, the court details both cases. But first, the court details an Eleventh Circuit decision on a similar claim against SPLC that factors heavily in both of Plaintiffs' cases against SPLC.

**1. *Coral Ridge* (2021)**: DIS is not the first group to take offense to SPLC's hate group designation. Coral Ridge Ministries is a Christian media corporation. Based on its religious theology, Coral Ridge opposes homosexual conduct. SPLC designated Coral Ridge as an "anti-LGBTQ hate group," making Coral Ridge ineligible to receive a charitable portion of sales on Amazon through the AmazonSmile website. So Coral Ridge sued SPLC for defamation and Amazon for religious discrimination under Title II of the Civil Rights Act. The claim against Amazon is irrelevant here, so the court mentions it no more. But Coral Ridge's claim against SPLC is nearly identical to Plaintiffs' claim here.

This court (Judge Thompson) dismissed Coral Ridge's defamation claim against SPLC for two reasons, both stemming from the Supreme Court's First Amendment decisions involving public figures, *see New York Times v. Sullivan*, 376 U.S. 254 (1964): (1) Coral Ridge could not prove that its hate group designation was false because the term "'hate group' has a highly debatable and ambiguous meaning" and (2) Coral Ridge pleaded no facts that would prove SPLC subjectively doubted the validity of its designation, meaning that Coral Ridge could not prove actual malice. *See Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.,* 406 F.Supp.3d 1258, 1275-80 (ALMD Sept. 19, 2019).

The Eleventh Circuit affirmed in a published opinion. *See Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*, 6 F.4th 1247 (11th Cir. 2021). The Circuit Court chose not to decide whether this court rightly found that Coral Ridge failed to plead facts that could prove SPLC's "hate group" designation

was false because, in the Circuit's view, "[t]here is a fair debate about whether the term hate group is definable in such a way that it is provable as false." *Id.* at 1252, n.7. The Circuit Court instead affirmed the court's finding that Coral Ridge failed to plead facts that would prove actual malice. First, the Circuit Court agreed that Coral Ridge failed to plead facts that would allow a fact finder "to infer that SPLC doubted the veracity of its own definition of the term" hate group. *Id.* at 1252-53. Second, the Court found that Coral Ridge failed to plead facts "that would allow us to infer that SPLC seriously doubted the accuracy of designating Coral Ridge a hate group." *Id.*

**2. *Plaintiffs' first lawsuit***: Plaintiffs first sued SPLC in state court on February 18, 2020—*i.e.*, about two years after SPLC first designated DIS as an anti-immigrant hate group and one year before the Eleventh Circuit decided *Coral Ridge*. SPLC removed the case to this court two days later. *See King v. SPLC*, ALMD Case No. 2:20-cv-120-ECM ("*King I*"), (Doc. 1). Plaintiffs amended their complaint and pleaded four substantive claims:

- o <u>Count 1</u>: SPLC defamed DIS when it labeled DIS an anti-immigrant hate group in SPLC's annual Intelligence Report in February 2018, 2019, and 2020;
- o <u>Count 2</u>: SPLC defamed DIS when it labeled DIS an anti-immigrant hate group in SPLC's annual Intelligence Report and on its Hate Map in February 2019;
- o <u>Count 3</u>: SPLC defamed King when it labeled DIS an anti-immigrant hate group in SPLC's Intelligence Report in February 2019 and on its Hate Map in March 2018, 2019, and 2020; and,
- o <u>Count 4</u>: SPLC defamed King when it said that King leads an anti-immigrant hate group that "focuses on vilifying all immigrants" in the Extremist Profile.

*King I*, (doc. 3). Counts 5 and 6 sought punitive damages and injunctive relief respectively. *Id.*

In their "Facts" section, Plaintiffs alleged that SPLC did not designate DIS an "anti-immigrant hate group" until 2018, when SPLC decided to go head-to-head against DIS in lobbying Georgia lawmakers. According to

Plaintiffs, SPLC decided that deeming DIS a hate group would make it harder for lawmakers to side with DIS against SPLC. Within their counts, Plaintiffs alluded to these facts when pleading actual malice: "Defendant SPLC acted with malice in publishing libelous material intended to damage the reputation of Plaintiff DIS and neutralize the ability of Plaintiff DIS to pursue its mission." *King I*, (doc. 3, ¶¶ 29, 34); *see also id.* (¶¶ 39, 44) (similar cursory language about malice against D.A. King).

SPLC moved to dismiss the amended complaint, arguing in part that Plaintiffs' pleaded facts would not prove actual malice. *King I*, (doc. 10). The Eleventh Circuit decided *Coral Ridge* while SPLC's motion was pending. And this court (Judge Marks) followed *Coral Ridge* in finding that, even if true, Plaintiffs' pleaded facts did not allow "the court 'to infer that SPLC seriously doubted the accuracy of designating [DIS] a hate group.'" *King I*, (doc. 19, p. 10) quoting *Coral Ridge*, 6 F.4th at 1253. The court thus dismissed Plaintiffs' claims without prejudice and entered judgment. *King I*, (doc. 19, pp. 10-11).

   **3. *Plaintiffs' second lawsuit***: Plaintiffs neither asked the court to let them amend their complaint, nor did they appeal the Rule 12 dismissal.[5] Plaintiffs instead filed this second lawsuit on April 27, 2022—more than four years after SPLC first designated DIS an anti-immigrant hate group and more than three years after SPLC published DIS's extremist profile. (Doc. 1).

   Plaintiffs pleaded more facts in their second complaint. *Id.* Plaintiffs again pleaded that SPLC did not designate DIS as a hate group "as late as October 2017." *Id.* ¶ 14; *see also* ¶¶ 17-23. Plaintiffs acknowledged that, in October 2017, Beirich told the AJC that SPLC would "take a serious look at King's outfit as possibly a hate group" after learning from the AJC that DIS received donations through U.S. Inc. *Id.* ¶ 15. But Plaintiffs alleged that DIS's ties to U.S. Inc. did not cause DIS to suddenly fit within the "hate group" definition (¶ 16), and SPLC did not reweigh its hate group criteria against the

---

[5] At the end of its *King I* opinion, this court quoted the Circuit Court's statement that dismissal for failure to plead actual malice "should be without prejudice and the [Plaintiffs] should have the opportunity to amend [their] complaint[.]" *See King v. SPLC*, ALMD Case No. 2:20-cv-120-ECM, (Doc. 19, p. 10) quoting *Michel v. NYP Holdings*, 816 F.3d 686, 706 (11th Cir. 2016). Under Rule 59(e), Plaintiffs had 28 days to ask the court to alter its judgment and allow the amendment called for by *Michel*. Plaintiffs could have also filed a Rule 60(b) motion for relief from judgment. But Plaintiffs instead filed a new case on Day 29.

facts about DIS (¶¶ 22, 44). Beirich's statement about Tanton was therefore merely pretext for SPLC's true motives: To (a) give SPLC a leg up against DIS in 2018 when lobbying Georgia lawmakers against a pro-enforcement bill in the Georgia General Assembly (¶¶ 24, 53, 55), and (b) to raise money by claiming that the number of hate groups is on the rise (¶¶ 52, 54-55).

Based on these facts, Plaintiffs pleaded four counts:

- o <u>Count 1</u>: SPLC defamed DIS when it labeled DIS an anti-immigrant hate group in SPLC's annual Intelligence Report in February 2018, 2019, 2020, and 2021;
- o <u>Count 2</u>: SPLC defamed DIS when it labeled DIS an anti-immigrant hate group in SPLC's annual Intelligence Report and on its Hate Map in February 2019, 2020, and 2021;
- o <u>Count 3</u>: SPLC defamed King when it said King leads an anti-immigrant hate group in SPLC's Intelligence Report in February 2019 and on its Hate Map in 2018, 2019, 2020, and 2021;
- o <u>Count 4</u>: SPLC defamed King when it said in the DIS Extremist Profile that King leads an anti-immigrant hate group that "focuses on vilifying all immigrants."

(Doc. 1, ¶¶ 56-75). Plaintiffs again pleaded Counts 5 and 6 to seek punitive damages and injunctive relief respectively. *Id.* ¶¶ 76-85.

**4. *Rule 12 opinion***: SPLC moved to dismiss these claims as time-barred, barred by issue preclusion, and deficiently pleaded. (Doc. 10). The court (Judge Watkins) addressed the issues in that order.

a. *Statute of Limitations*: The court held that because Alabama is the forum state, Alabama law governs timeliness issues, meaning that Alabama's 2-year statute of limitations and equitable tolling principles apply. (Doc. 22, pp. 17-20). Because the Hate Map and Intelligence Report are annual publications, the court speculated that claims based on SPLC's 2018, 2019, and 2020 designations would be timed barred absent tolling but the 2021 designation would not. (Doc. 22, p. 21). And the court rejected Plaintiffs' tolling arguments under state and federal law. (Doc. 22, pp. 26-32).

But the court refused to dismiss any claims as time-barred because, as it relates to the Extremist Profile, the court could not answer at the pleadings stage (a) whether SPLC had meaningfully altered the Extremist Profile since first publishing it, and (b) how Alabama courts would apply the single-publication rule to the internet-based Extremist Profile. (Doc. 22, pp. 21-25). The court thus held the question open so that the parties could "establish a robust factual record" on the republication issue. (Doc. 22, p. 25).

b. *Issue preclusion*: The court similarly deferred ruling on SPLC's argument that Judge Marks's opinion about actual malice in *King I* precluded Plaintiffs from proving actual malice for the same defamatory statements in *King II*. (Doc. 22, pp. 32-33).

c. *Merits*: Finally, the court found that Plaintiffs had pleaded enough facts that, if proved true, might prove actual malice. The court broke SPLC's statements into three parts: (a) designating DIS as a "hate group" generally, (b) designating DIS as an "anti-immigrant hate group" specifically, and (c) the Extremist Profile's statement that DIS "vilifies all immigrants."

SPLC argued that Plaintiffs could not prove actual malice for any statement for two reasons: (a) none of the statements could be proved false and, even if Plaintiffs could prove a statement was false, (b) SPLC did not know that the statement was false and did not act with reckless disregard about the statement's truth when SPLC made the statement.

The court started with the two statements that mention "immigrants." First, the court determined that saying DIS was "anti-immigrant" and "vilified all immigrants" was not just political rhetoric; it was a fact statement that could be verified as true or false. (Doc. 22, pp. 37-38). The court distinguished SPLC from political pundits who are often deemed to speak rhetorically rather than factually by noting that SPLC raises funds by holding itself out as the "premier" investigator of hate group activities that "offers expert analysis to the media and public" while publishing "investigative reports." (Doc. 22, p. 38).

Second, the court found that Plaintiffs might prove that SPLC knew its immigrant-related statements were false. The court started by accepting Plaintiffs' premise that the term "immigrant" is defined by federal law and the Department of Homeland Security, which limits the word to "any person

lawfully in the United States who is not a U.S. Citizen, U.S. National, or person admitted under a nonimmigrant category as defined by the Immigration and Nationality Act (INA) section 101(a)(15). (Doc. 22, p. 48) (quoting DHS's online glossary). The same DHS glossary uses the term "alien" to describe "a person who is not a citizen or national of the United States" because that is the term used by Title 8 of the U.S. Code. (*Id.*) (quoting 8 U.S.C. § 1101(a)(15)).

Under Plaintiffs' premise that "immigrant" refers only to "a person who has a lawful right to be in the country" (doc. 22, p. 48), the court held that a combination of these pleaded facts might lead to a finding that SPLC's attorneys knew they were making false statements about DIS when they allowed SPLC to label DIS an "anti-immigrant hate group" and said DIS "vilifies all immigrants" in the DIS Extremist Profile:

1. SPLC willingly ignored that King's adopted sister was an immigrant and DIS had immigrants on its board;
2. SPLC willingly ignored that DIS lobbied against *illegal* immigration, not *all* immigration;
3. In 2018, SPLC registered lobbyists to fight against a DIS-sponsored, pro-enforcement bill in the Georgia legislature and thought that labeling DIS as a hate group would give the SPLC lobbyists an advantage;
4. SPLC knew about DIS's ties to John Tanton before 2018 but willingly turned a blind eye to those ties until it became politically expedient to use them against DIS in 2018; and,
5. SPLC conducted a less rigorous investigation into DIS because SPLC had already decided to make the designation for political reasons.

(Doc. 22, pp. 49-54). Because the court decided that Plaintiffs could proceed to discovery on their immigrant-based defamation claims, the court deferred ruling on whether Plaintiffs sufficiently pleaded actual malice for its claim that SPLC wrongly named DIS a "hate group" generally. (*Id.*, p. 54-55).

Discovery has since ended, and SPLC asks for summary judgment on all claims for essentially the same reasons it raised at the Rule 12 stage.

## II.

## STANDARDS OF REVIEW

Before the court can tackle the merits, it must first decide the open choice of law question and lay out the resulting standards of review. As explained below, the court finds:

1.  Alabama law governs SPLC's statute of limitations defense;

2.  Georgia law governs substantive issues, including most elements of Plaintiffs' defamation claims and the substitution of deceased parties;

3.  Federal First Amendment caselaw governs Plaintiffs' burden to prove that DIS acted with actual malice; and,

4.  Federal Rule of Civil Procedure 56 governs whether SPLC is entitled to summary judgment.

1. *Statute of limitations*: A federal court sitting in diversity applies the choice-of-law rules of the state in which it sits. *See Rosa & Raymond Parks Inst. for Self Dev. v. Target Corp.*, 812 F.3d 824, 829 (11th Cir. 2016). This court sits in Alabama, so it applies Alabama's choice of law rules. Alabama law looks to the place of injury to determine substantive rights, and the place of the forum to determine procedural rights. *See Middleton v. Caterpillar Indus., Inc.*, 979 So. 2d 53, 57 (Ala. 2007). "[I]n most instances, statutes of limitations are procedural matters." *Precision Gear Co. v. Cont'l Motors, Inc.*, 135 So. 3d 953, 957 (Ala. 2013). So Alabama law (*i.e.*, forum state law) governs all statute of limitation issues, including the limitation period length and whether the "single publication rule" for defamation claims applies.

2. *Substantive state law*: The law of the state where Plaintiffs were injured provides the substantive law that applies to their defamation claims. *See Ex parte U.S. Bank Nat'l Ass'n*, 148 So. 3d 1060, 1069 (Ala. 2014). And whether Alabama or Georgia law applies matters here because under Georgia law, King's defamation claims survive his death, but under Alabama law, King's death extinguished any claims for reputational harm. *Compare* Ala. Code § 6-5-462 ("[A]ll personal claims upon which an action has been filed,

except for injuries to the reputation, survive in favor of and against personal representatives[.]"); *with* Ga. Code Ann. § 9-2-41 ("No action for a tort shall abate by the death of either party, where the wrongdoer received any benefit from the tort complained of[.]").

Under Alabama's choice of law approach, the place of injury is "the state where the last event necessary to make an actor liable for an alleged tort takes place." *See Ex parte U.S. Bank Nat'l Ass'n*, 148 So. 3d at 1070 (quoting Restatement (First) of Conflict of Laws § 377 (1934)). In Alabama, "the injury to the plaintiff's reputation occurs and the cause of action [for defamation] is completed" upon publication of the allegedly defamatory statement. *See Poff v. Hayes*, 763 So. 2d 234, 242 (Ala. 2000).

Plaintiffs assert that Alabama is the place of publication because SPLC is an Alabama citizen that publishes its website in Alabama. The court disagrees. A defamatory statement is published when it is communicated "to some third person or persons." *See Brackin v. Trimmier Law Firm*, 897 So. 2d 207, 220 (Ala. 2004); *see also Hoover v. Tuttle*, 611 So. 2d 290, 293 (Ala. 1992) (Plaintiff shows "that [an] allegedly defamatory matter was published, by proof that the defamatory matter was communicated to someone other than himself."). Thus, in defamation cases, "the place of wrong is where the defamatory statement is communicated," *i.e.*, where it is received and viewed by a third party. Restatement (First) of Conflict of Laws § 377 note 5; *Nunes v. Cable News Network, Inc.*, 31 F.4th 135, 142 (2d. Cir. 2022) (applying lex loci delicti under Virginia law and finding that place of wrong is the state in which the allegedly defamatory message was viewed). The place of hearing or viewing is not necessarily the state in which the message was prepared or broadcast. *See* Restatement (First) of Conflict of Laws § 377, illus. 7 ("A, broadcasting in state X, slanders B. B is well and favorably known in state Y and the broadcast is heard there by many people conversant with B's good repute. The place of wrong is Y."). So while the Alabama Supreme Court has yet to address this issue, the court is confident that if confronted with a scenario in which SPLC prepared and made allegedly defamatory statements in Alabama but those statements were only heard in Georgia, the Alabama courts would apply Georgia law to Plaintiffs' defamation claims.

But the answer is not so simple. Because SPLC published its statements about DIS on the internet, those statements could have been viewed in *every* state, not just Georgia or Alabama. Most lex loci delicti jurisdictions confronted with this issue have held that for multistate defamation claims, the law of the state where the plaintiff incurs the greatest reputational injury should apply. *See Nunes*, 31 F.4th 143–44 (collecting cases); *Donald J. Trump for President, Inc. v. CNN Broad., Inc.*, 500 F. Supp. 3d 1349, 1354 (N.D. Ga. 2020) ("The place of the wrong is not where the allegedly defamatory statement was issued but rather where Plaintiff was injured, that is, its domicile."). The court predicts that the Alabama state courts would follow the lead of these jurisdictions. Alabama applies the traditional choice of law approach because it views the more modern approaches as having failed to provide "certainty or uniformity to the law." *See Fitts v. Minn. Min. & Mfg. Co.*, 581 So. 2d 819, 823 (Ala. 1991). And applying the law of the state where the plaintiff's reputational injury was the greatest creates the type of predictable, certain, and uniform rule that the Alabama courts have endorsed. It is also the approach followed by the Restatement (First) of Conflict of Laws, which Alabama courts look to in determining choice of law issues. *See* Restatement (First) of Conflict of Laws § 377 note 5, illus. 7 (focusing on where allegedly defamatory content was received and harm to the plaintiff's reputation occurred). The court will thus apply the substantive law of the state where Plaintiffs suffered the greatest reputational injury to their defamation claims.

Courts presume "that a plaintiff suffers the brunt of [reputational] injury in their home state." *Nunes*, 31 F.4th at 143. Georgia is Plaintiffs' home state, and King and DIS focused their advocacy efforts on Georgia citizens and legislators. The court thus finds that Plaintiffs suffered their greatest reputational harm in Georgia. As a result, the court will apply the substantive law of Georgia to Plaintiffs' defamation claims.

Because Georgia law applies, the court **GRANTS** Plaintiffs' motion to substitute the Estate of Donald A. King in place of former Plaintiff Donald A. King (doc. 119).

3. *First Amendment*: While Georgia law applies to the traditional state elements of Plaintiffs' defamation claims, "the First Amendment imposes additional limitations" (*i.e.*, the actual malice requirement) in cases involving public figures. *See Coral Ridge*, 6 F.4th at 1252. Plaintiffs concede they are public figures. So even though Georgia law applies to most elements of Plaintiffs' defamation claims, *federal* precedent governs the substantive question at hand: Can Plaintiffs prove that SPLC acted with actual malice?

4. *Summary judgment*: Federal law also governs the standard for deciding SPLC's motion for summary judgment. *See* Fed. R. Civ. P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). Because Plaintiffs would have to prove actual malice by clear and convincing evidence at trial, to avoid summary judgment, they must produce enough evidence to allow a reasonable juror to find actual malice by clear and convincing evidence. *Anderson*, 477 U.S. at 248, 255. In determining whether Plaintiffs meet that burden, the court views the facts and draws all reasonable inferences in the light most favorable to Plaintiffs as the non-moving party. *See Cuesta v. Sch. Bd. of Miami-Dade Cty.*, 285 F.3d 962, 966 (11th Cir. 2002).

## III.

## STATUTE OF LIMITATIONS

The court previously held that Alabama's two-year statute of limitations applies to Plaintiffs' claims (doc. 22, pp. 17-19), and that the clock started to run when SPLC published the allegedly defamatory statements (*id.*, pp. 19-20). The court also held that neither state law equitable tolling nor 28 U.S.C. § 1367(d) apply to toll any of Plaintiffs' limitation periods. (*Id.*, pp. 27-32). Neither party challenges these rulings here, so the court applies them again as it resolves the questions it left open pending discovery. As explained below, once the dust settles, only two parts of Plaintiffs' claims are not time-barred: Plaintiffs' claim that redesignating DIS as a "hate group" generally, and as an "anti-immigrant hate group" specifically, in Spring 2021 defamed DIS.

## A. Designations as "Hate Group" and "Anti-Immigrant Hate Group"

Under Alabama law, the two-year statute of limitations for libel and slander "runs from the date of publication—that is the date on which the injury

to the plaintiff's reputation occurs and the cause of action is completed." *Poff*, 763 So. 2d at 242. "Moreover, every distinct publication of libelous or slanderous material gives rise to a separate cause of action, even if the material communicated by each publication relates to the same matter as the previous publication." *Id*.

As explained, SPLC updates the online Hate Map each year, and SPLC includes the updated list of designated hate groups in the Spring edition of the Intelligence Report.[6] Once SPLC designates a group as a hate group, SPLC looks for new information about the group to determine whether to re-designate the group on the next year's Hate Map. (*See* doc. 116, undisputed facts # 41-45). It is undisputed that SPLC reviewed its DIS designations each year from 2019 through 2021 before re-designating DIS as an anti-immigrant hate group. (*Id*.). Applying Alabama law, *see Poff supra*, that means SPLC made distinct statements that gave rise to separate causes of action when it published the Hate Maps and Intelligence Reports in Spring 2018, 2019, 2020, and 2021.

In all four counts, Plaintiffs allege that SPLC defamed DIS and King each time it published the online and print designations in Spring 2018, 2019, 2020, and 2021. Plaintiffs filed this lawsuit on April 27, 2022. (Doc. 1). Because this date is more than two years after SPLC published the 2018, 2019, and 2020 editions of the Hate Map and Intelligence Report, all claims arising from the 2018-2020 editions are time barred unless the claims were tolled. But the court rejected Plaintiffs' state and federal tolling arguments in its Rule 12 opinion (*see* doc. 22, pp. 27), and Plaintiffs offer no argument why the court previously erred in their Rule 56 briefing. The court therefore adopts its previous finding that tolling is unavailable. (*Id*.).

Together, these findings require the court to **GRANT** SPLC's motion to dismiss all claims stemming from the "hate group" and "anti-immigrant hate group" designations in the 2018, 2019, and 2020 editions of the Hate Map and Intelligence Report because each is time barred. Plaintiffs' claims that stem from the Spring 2021 Hate Map and Intelligence Report are not time barred.

---

[6] As explained in footnote 10, it appears that SPLC stopped publishing the "Intelligence Report" and shifted to "The Year in Hate and Extremism" before the Spring 2020 and 2021 issues. Unless otherwise noted, the court uses the term "Intelligence Report" to refer to the printed version of the Hate Map.

## B. Extremist Profile: "focuses on vilifying all immigrants"

In Count 4, Plaintiffs allege that SPLC defamed King when it wrote this introduction to the DIS Extremist Profile:

> The Dustin Inman Society, led by D.A. King, poses as an organization concerned about immigration issues, yet focuses on vilifying all immigrants.

SPLC published this statement on its website "on or around January 7, 2019." (Doc. 116, undisputed fact #36). Because SPLC made this statement more than two years before Plaintiffs filed this lawsuit, SPLC argues that King's claim is time barred.[7] As explained in the court's Rule 12 opinion, whether SPLC is right depends on how Alabama courts would apply Alabama's "single-publication rule" to internet posts. (*See* doc. 22, pp. 21-25).

1. *Background*: As a refresher, Alabama law generally says that "every distinct publication of libelous or slanderous material gives rise to a separate cause of action, even if the material communicated by each publication relates to the same matter as the previous publications." *Poff*, 763 So. 2d at 242 citing *Age-Herald Publ'g Co. v. Waterman*, 66 So. 16, 18 (Ala. 1913). But there is an exception called the "single-publication" rule: "'repetition or republication of an identical libel and slander is not a new cause of action for which a separate suit may be maintained, but is merely an aggravation of the pre-existing cause[.]'" *Poff*, 763 So. 2d at 242, n.5 quoting *Age-Herald Publ'g Co. v. Huddleston*, 92 So. 193, 197 (Ala. 1921). Important here, "the exception enunciated in *Age-Herald Publ'g Co.* only applies to situations where subsequent acts of defamation are ***verbatim republications*** of previously made libelous or slanderous statements." *Id.* (emphasis added).

The court emphasized the "verbatim republication" requirement because it is one of two reasons the court postponed ruling on SPLC's invocation of the exception at the Rule 12 stage. To support its Rule 12 motion, SPLC submitted an attorney's declaration that SPLC had not altered the introductory sentence

---

[7] Read plainly, the Extremist Profile's introductory statement says that DIS, not King, "poses as an organization concerned about immigration issues, yet focuses on vilifying all immigrants." Yet Count 4 alleges that the Extremist Profile's introductory statement defames King not DIS, and there is no corresponding claim that alleges the statement defames DIS. So the court treats Count 4 as raising a claim for King alone, despite the statement being directed at DIS, not King.

since first publishing it. (*See* doc. 10-1, ¶ 5). Rather than take counsel's statement at face value, the court allowed the case to enter discovery to see whether Plaintiffs could prove that SPLC had edited the Extremist Profile between January 2019 and Plaintiffs' filing date. (Doc. 22, p. 22). The second reason the court declined to rule on the exception was to allow the Alabama Supreme Court more time to decide a case that applied the single publication rule to internet posts (*id.*, pp. 22-23); otherwise, this court would have to guess how the state court would decide the issue. (*Id.*) citing *State Farm Mut. Auto Ins. Co. v. Duckworth*, 648 F.3d 1216, 1224 (11th Cir. 2011) (requiring federal courts to anticipate how state courts would rule on a state law issue).

Discovery has ended, and the Supreme Court of Alabama did not address this issue in the meantime. So the court starts by surmising what rule the state's high court would apply here, *see Duckworth, supra*, then applies the undisputed facts to that rule.

2. *Divination*: The court expects that the Supreme Court of Alabama would apply the single-publication rule to internet posts just as it applies the rule to newspapers for two reasons. First, when the state supreme court first articulated that "repetition or republication of the identical libel" by newspapers does not create a new cause of action, it was looking at the common law decisions of other state courts. *See Age-Herald Pub. Co,* 92 So. at 196-97. As both parties acknowledge, every court to address the subject applies this rule to internet posts. *See, e.g.*, *Pippen v. NBCUniversal Media, LLC,* 734 F.3d 610 (7th Cir. 2013) (anticipating Illinois state courts would apply the rule); *In re Phila. Newspapers*, 690 F.3d 161 (3d Cir. 2012) (anticipating the same for Pennsylvania courts); *Nationwide Bi-weekly Admin. v. Belo Corp.*, 512 F.3d 137 (5th Cir. 2007) (anticipating the same for Texas courts). If Alabama followed the common law trend to adopt the single publication rule for newspapers, then the court expects Alabama would follow the common law trend to apply the rule to internet posts.

Second, the Alabama Supreme Court has said that the rule is "generally applicable only to newspapers **and similar media**." *Poff*, 763 So. 2d at 242, n.5 (emphasis added). This court expects that Alabama courts would deem internet posts to be "similar media" to newspaper articles because the point of the rule applies equally. When first describing the single-publication rule, the

state supreme court noted that the rule protected newspapers from perpetual lawsuits when the newspaper printed the same words on multiple papers and sent them to multiple locations. *See Age-Herald Pub. Co,* 92 So. at 196-97. While a newspaper article's viewership might expand as new eyes viewed individually-printed papers, the words never change, so the claimant's injury is the same. *Id.* Thus, a fresh viewing of the same words in a different location "is not a new cause of action for which a separate suit may be maintained, but merely an aggravation of the pre-existing cause[.]" *Id.* Unedited internet posts work the same way: they project the same words to viewers across many locations. Applying *Age-Herald*, fresh eyes reading the same words on the same website would not cause a new injury; it would re-aggravate the same injury.

For both reasons, the court finds that the Supreme Court of Alabama would apply the single-publication rule to King's defamation claim like this: King's claim accrued on the date SPLC first posted the DIS Extremist Profile on its website, and the two-year statute of limitation did not re-set for a new cause of action as long as the DIS Extremist Profile maintained "the identical libel." *Poff*, 763 So. 2d at 242, n.5

3. *Application*: King's claim is time-barred because the introductory sentence from the DIS Extremist Profile presented "the identical libel" more than two years before King filed this case. *Id.* In Count 4, King alleged that only the Profile's introductory sentence was defamatory: "The Dustin Inman Society, led by D.A. King, poses as an organization concerned about immigration issues, yet focuses on vilifying all immigrants." (Doc. 1, ¶ 73). It is undisputed that SPLC has not edited this sentence since first posting it on the SPLC website on or about January 7, 2019. So if the introductory sentence defamed King, King's cause of action accrued on January 7, 2019, *Age-Herald Pub. Co.*, 92 So. at 196-97, which is more than two years before King filed this second lawsuit on April 27, 2022. (Doc. 1).

King tries to avoid this outcome by noting that SPLC (a) removed a racial slur from a different paragraph of the Profile in 2020 and (b) updated six of the hyperlinks embedded within the DIS Extremist Profile, none of which

appeared in the introductory sentence, between 2019 and 2022.[8] But these edits are red herrings because none changed the allegedly defamatory words (*i.e.,* "yet vilifies all immigrants") or the place where readers could find them (*i.e.*, SPLC's website). In fact, with one exception (redacting a racial slur), SPLC hasn't changed *any* words in the DIS Profile—much less the allegedly defamatory words—since 2019.

Putting it in the state supreme courts' words: the Profile's introductory sentence presented the "identical libel" every day between the Profile's publishing and King's second lawsuit. *Poff*, 763 So. 2d at 242, n.5 quoting *Age-Herald Pub. Co,* 92 So. at 196-97. As a result, King had to file his claim targeting the introductory sentence within two years (*i.e.*, by January 7, 2021), then argue that the continued publication of that sentence aggravated his damages. *See Age-Herald*, *supra*. King apparently knew about this deadline, as he timely added this claim to the amended complaint in his original lawsuit. *See King I*, (doc. 3, ¶ 43). As the court noted in its Rule 12 opinion, King could have saved this claim from being time-barred by filing a Rule 59(e) motion after the court dismissed Plaintiffs' amended complaint under Rule 12. (*See* doc. 22, p. 30). But Plaintiffs instead chose to file a new lawsuit, outside the statute of limitations. That choice doomed King's claim under the statute of limitations.[9]

—

To sum up, only Plaintiffs' claims that SPLC's re-designation of DIS as an anti-immigrant hate group in Spring 2021 survive Alabama's two-year statute of limitation. The court **GRANTS** SPLC's motion to dismiss all other counts as time-barred.

---

[8] King points to SPLC's responses to interrogatories to assert that SPLC changed 10 hyperlinks, but that document shows that four of the 10 changes happened after King filed this lawsuit, meaning that those four cannot help his statute of limitation argument. (*See* doc. 122-1, pp. 3-8).

[9] Because Count IV is time-barred, the court does not address its merits. That said, the court's decision that Plaintiffs cannot prove actual malice when SPLC labels DIS an "anti-immigrant" hate group, *see infra* Part V(A), also explains why King cannot prove actual malice for SPLC's statement that DIS "focuses on vilifying all immigrants." King admitted in his deposition that "once people start calling illegal border crossers immigrants . . . they can call groups like his anti-immigrant." (Doc. 114-1, p. 42). Further, saying that DIS vilifies "all" immigrants instead of a certain category or percentage of immigrants is non-actionable rhetorical hyperbole. *See Horsley v. Rivera*, 292 F.3d 695, 702 (11th Cir. 2002) (the use of "loose, figurative language that no reasonable person would believe presented facts" rather than a "literal assertion" is not actionable under the First Amendment).

# IV.

## D.A. KING

As explained, Plaintiffs' only timely claim is that SPLC defamed both DIS and D.A. King when SPLC re-designated DIS as an anti-immigrant hate group in Spring 2021. But SPLC argues that it did not call D.A. King "anti-immigrant" on the online or print version of the 2020 Hate Map that it released in Spring 2021. SPLC didn't mention King at all. And because SPLC didn't make a statement about King in Spring 2021, SPLC argues that King cannot prove defamation stemming from any statements SPLC made in Spring 2021. The court agrees.

In print, SPLC re-designated DIS as an anti-immigrant hate group in "The Year in Hate and Extremism 2020"[10]:



---

[10] The parties say that the Hate Map was reprinted annually in the "Intelligence Report," but neither produces a 2021 version of the Intelligence Report. Instead, it appears that SPLC started publishing the Hate Map in "The Year in Hate and Extremism," rather than the "Intelligence Report," in 2020. *See* SPLC Reports, available at https://www.splcenter.org/resources/reports/. The court took this screenshot from the Year in Hate published during the period not barred by the statute of limitations.

King's name is not mentioned alongside DIS, nor anywhere else in the written report. Nor does SPLC mention King alongside DIS on the online version of the Hate Map:



Neither mention of DIS on the online map is hyperlinked to an article or other writing that would associate King with DIS. And SPLC expressly notes online that it does not list individuals as a hate group:

## What is a hate group?

The Southern Poverty Law Center defines a hate group as an organization or collection of individuals that – based on its official statements or principles, the statements of its leaders, or its activities – has beliefs or practices that attack or malign an entire class of people, typically for their immutable characteristics. An organization does not need to have engaged in criminal conduct or have followed their speech with actual unlawful action to be labeled a hate group. We do not list individuals as hate groups, only organizations.

In short, a reader of either the online or printed version of SPLC's 2020 Hate Map, both of which SPLC released in Spring 2021, would not have seen D.A. King's name, much less read that King was "anti-immigrant" or the founder of a "hate group." As a result, SPLC's statements in 2021 could not have defamed King. *See NYT v. Sullivan,* 376 U.S. at 288 (challenged statement must be "of and concerning" the plaintiff to defame him). So the court **GRANTS** summary judgment for SPLC on the Estate's claim that the re-designation of DIS in Spring 2021 defamed King.

# V.

## ACTUAL MALICE

That leaves only DIS's claim that SPLC defamed DIS in Spring 2021 when SPLC re-designated DIS as an "anti-immigrant hate group." DIS admits that it is a public figure for First Amendment purposes, so DIS must clear two hurdles to prove its defamation claim: (1) DIS must prove each element of a defamation claim under Georgia law; and, (2) DIS must prove the First Amendment requirements stemming from *New York Times v. Sullivan*, *supra*. *See Coral Ridge*, 6 F.4th at 1251-52. The First Amendment presents three requirements: (1) SPLC's re-designation of DIS as an anti-immigrant hate group in Spring 2021 was "sufficiently factual to be susceptible of being proved true or false"; (2) the re-designation was "actually false"; and, (3) SPLC made the re-designation with "actual malice," meaning that SPLC either (a) knew that DIS was not an anti-immigrant hate group or (b) recklessly disregarded whether DIS was an anti-immigrant hate group.[11] *Id*. at 1252.

While SPLC makes other arguments why the First Amendment requires judgment in its favor, this court follows the Circuit Court's lead in *Coral Ridge* by deciding the case solely on actual malice. For actual malice, it is "essential to proving liability that the plaintiff focus on the conduct and state of mind of the defendants," making "the thoughts and editorial processes of the alleged defamer" critical. *Herbert v. Lando*, 441 U.S. 153, 160 (1979). Despite this "essential" requirement, DIS fails to present any evidence that in Spring 2021, SPLC's decisionmaker Keegan Hankes either (a) knew that re-designating DIS as an anti-immigrant hate group was false or (b) was reckless with the truth when making the decision. Quite the contrary, DIS does not dispute that, after reviewing an updated analysis of DIS's activities, Hankes had no reason to doubt that DIS met SPLC's definition of an anti-immigrant hate group:

---

[11] The court includes the first two First Amendment requirements mentioned in *Coral Ridge* (*i.e.*, ability to prove falsity and falsity) because the Circuit Court mentioned them. But like every state, Georgia requires proof that a statement is false before awarding damages for defamation, and this court questions whether the First Amendment requires a plaintiff to prove the same fact a second time under an elevated standard of proof—*i.e.*, clear and convincing evidence instead of preponderance of the evidence. But the court needn't discuss the point further because it decides the case on actual malice, an element not required by state law.

> 45. Interim Research Director Keegan Hankes approved the re-designations of DIS as a hate group published in 2020 and 2021 based on a research analyst's analysis and report on DIS's activities for the previous years. Hankes never had any reason to doubt DIS met SPLC's definition of an anti-immigrant hate group.

(Doc. 116, p. 23) (Undisputed Fact #45, citations omitted); *see also* (doc. 123, p. 3) ("Plaintiffs do not dispute the facts set forth in the SPLC's statement of facts, except [¶ 39].").

Put in Rule 56 terms, that means there is no genuine dispute on the material facts that, in Spring 2021, (a) Keegan Hankes made an informed decision that DIS still fit within SPLC's definition of an "anti-immigrant hate group," and (b) Hankes never doubted that the label was true. Whether Hankes was right is beside the point; DIS admits that it cannot prove the facts needed for actual malice: knowledge of falsity, serious doubt about the truth, or reckless disregard of the truth. As a result, Rule 56(a) requires the court to grant summary judgment on Plaintiffs' only claim that is not time-barred.

The court could end its opinion here. But the court goes on to explain what changed between the court denying SPLC's motion to dismiss on actual malice grounds and the court granting SPLC's motion for summary judgment on the same actual malice arguments.[12] The court divides its discussion as it did at the Rule 12 stage: The court starts with the specific "anti-immigrant" tag, then moves to the general "hate group" tag.

## A. "Anti-immigrant"

At the Rule 12 stage, the parties disagreed about the meaning of the term 'anti-immigrant'; was it limited to persons who migrated to the United States legally or did it include any person who migrated into the United States, legally or not? Because it was dealing with a Rule 12 motion, the court assumed as it must that DIS could prove its allegation that SPLC knew that "under federal

---

[12] From here, the court explains how discovery failed to support the pleaded facts that the court opined *might* establish actual malice if proved. But there is another change worth mentioning: the court's ruling in Part III that all of DIS's claims except the 2021 re-designation are time-barred removes the need to decide whether SPLC wrote the DIS Extremist Profile with actual malice.

law, an immigrant is a person who has a lawful right to be in the United States," yet still labeled DIS as "anti-immigrant" so that readers would believe that DIS was "an entity that hates non-citizens (or nationals) who are lawfully in the United States and hates immigrants who have become citizens." (Doc. 22, pp. 48-49). The court opined that DIS might prove SPLC knew or should have known this impression was false because some DIS board members were "legal immigrants" and D.A. King's sister was a "legal immigrant." (*Id.*, p. 49). Plus, the court opined that DIS might prove that SPLC knew or should have known that DIS openly advocated for "legal" immigration; its fight was against *illegal* migration. (*Id.*). And DIS might prove that SPLC decided not to make this distinction, and decided not to investigate DIS before attaching the anti-immigrant label, because SPLC needed to tear down DIS to bolster its new lobbying efforts before the Georgia legislature. (*Id.*, pp. 50-54).

Now that discovery has ended, DIS presents no evidence to support any of these facts that could have pushed this case to a jury. As explained below, DIS now acknowledges that SPLC investigated DIS once it learned about DIS's ties to John Tanton; DIS acknowledges that SPLC uses the term "immigrant" to include persons who enter the United States illegally; and King testified that one could label DIS "anti-immigrant" under SPLC's definition of the term. The court starts by defining terms, then moves to the investigation.

1. *Defining "anti-immigrant"*: DIS no longer argues that SPLC intended to convey that DIS was against *legal* immigrants. Undisputed evidence shows that SPLC uses the term "immigrant" in its common, broader sense—*i.e.*, ***any*** person "who comes to a country to take up permanent residence." Immigrant, Merriam-Webster.com Dictionary (last checked January 6, 2026); *see also* Emigrant, Oxford English Dictionary, oed.com, ("A person who leaves their own country or region to settle permanently in another.") (last checked January 6, 2026). DIS therefore acknowledges in its opposition to SPLC's Rule 56 motion that, when SPLC calls a group anti-immigrant, "the term 'anti-immigrant' connotes statements or positions that reflect a racial or nativist opposition to people who are immigrants to the United States, ==whether legal or not=="." (Doc. 123, p. 31) (highlight added). DIS has thus broadened what it believes a reasonable reader would understand SPLC's use of "anti-immigrant" to mean: "The phrase 'anti-immigrant' has a very specific meaning: it indicates that one is opposed to the introduction of all foreign-born people to this

country." (Doc. 123, p. 9). And DIS accepts that, when judging its defamation claim, we must assume a reasonable reader would define "anti-immigrant hate group" as SPLC defines it. (Doc. 123, pp. 29-30).

2. *Is DIS "anti-immigrant"*: Accepting SPLC's broad definition of the term "anti-immigrant" dooms DIS's case for actual malice. Once you accept that SPLC uses the term "anti-immigrant" to include opposition to persons who migrate into the United States illegally, with the intent to stay in the United States illegally, then SPLC has facts that support its decision to designate DIS as "anti-immigrant"—a fact King acknowledged before and during this lawsuit.

As SPLC documented in the 2018 Extremist Profile, King called illegal immigrants "crimigrants," and King and a DIS advisor (Fred Elbel) made public statements that SPLC could have reasonably perceived as espousing an anti-immigrant, pro-nativist viewpoint, including:

- <u>King</u>: "Must the United States silently suffer the incursion of one million people a year because they are brown?"
- <u>King</u>: "For me, while standing a few feet away from group after group, the impulse to reach out and personally deport these Third World invaders was nearly uncontrollable."
- <u>King</u>: "[The march was composed of] mostly Hispanic demonstrators. . . . I got the sense that I had left the country of my birth and been transported to some Mexican village, completely taken over by an angry, barely restrained mob. . . . My first act on a safe return home was to take a shower."
- <u>Elbel</u>: "Damned right. I hate 'em all – negroes, wasps, s—-, eskimos, jews, honkies, krauts, ruskies, ethopians, pakis, hunkies, pollocks and marxists; there are way too many of them. I'm all for trout, elephants, bacteria, whales, wolves, birds, parrot fish, deciduous foliage and mollusks. Time to rebalance the planet, bleeding heart liberals be damned."

DIS and King also advocated for state legislation that, under SPLC's definition of immigrant, SPLC could have reasonably perceived as espousing an anti-immigrant, pro-nativist viewpoint, including H.B. 87, which made it illegal for

33

a person to "harbor" undocumented migrants and made E-Verify mandatory for businesses with more than 10 employees.

DIS does not dispute that King and Elbel made these and similar statements about persons who enter the country illegally, nor does DIS dispute that it advocates enforcement of immigration laws and limiting migration into the United States. And King admitted to the Atlanta-Journal Constitution in 2005 that "once people start calling illegal border crossers 'immigrants,'" then "they can call groups like his 'anti-immigrant.'" (Doc. 133-1, p. 3). When asked about this quote during his deposition, King affirmed the sentiment:

> Q:  The next paragraph says: D.A. King of Marietta, who runs a website called The American Resistance, and then it gives a URL, said it is all part of the language question. Once people start calling illegal border crossers immigrants he said, they can call groups like his anti-immigrant. Do you recall saying that?
>
> A.  I don't recall.
>
> Q.  Does that sound like you?
>
> A.  It does.
>
> Q.  Would you agree with that?
>
> A.  I do.
>
> Q.  Are you aware that the Southern Poverty Law Center does call people who cross the border illegally immigrants?
>
> A.  I am.

(Doc. 114-1, p. 42).

In short, Plaintiffs now concede two things: (1) when SPLC says DIS is "anti-immigrant," SPLC means that DIS opposes the illegal migration of non-citizens into the country, and (2) DIS fits SPLC's definition. And once DIS concedes that designating DIS as "anti-immigrant" was true from SPLC's point of view, then DIS cannot prove actual malice because DIS cannot prove that

SPLC's decisionmaker knew or should have known that re-designating DIS as "anti-immigrant" in 2021 was false.

3. *Shifting motive*: At the Rule 12 stage, DIS alleged that SPLC made up the justification that it labeled DIS as "anti-immigrant" in 2018 because SPLC learned of DIS's ties to John Tanton in 2017. Instead, SPLC designated DIS as "anti-immigrant" to tear down DIS before the Georgia Legislature because SPLC recently decided to start lobbying the legislature. As it must, the court accepted that "a reasonable factfinder could conclude that Beirich's public statement in 2017 was not true," (doc. 22, p. 52), and that publicly lying about SPLC's motive could add to DIS's evidence of actual malice. *Id*.

DIS has since abandoned this theory. DIS no longer disputes that SPLC first learned about DIS's ties with the Tanton Network from an AJC reporter (*see* Undisputed Facts # 8-12, 23-27), and that SPLC vowed to investigate DIS before deciding whether this new information warranted elevating DIS from a "nativist extremist group" to an "anti-immigrant hate group." (*See* Undisputed Facts # 27-28). Nor does DIS dispute that SPLC conducted a months-long investigation involving multiple SPLC employees that ultimately resulted in the original 2018 designation. (*See* Undisputed Facts # 28-32). Nor, as noted, does DIS dispute that SPLC investigated DIS's activities from 2018 to 2020, and Keegan Hankes used that information to re-designate DIS as an "anti-immigrant hate group" in Spring 2021. (*See* Undisputed Fact # 45).

Having pivoted away from the definition and motivation-based theories that helped it survive SPLC's Rule 12 motion, DIS now hangs its actual malice hat on proving to a jury that, in 2018, SPLC knew that DIS did not share the same views as John Tanton, yet designated DIS as an "anti-immigrant hate group" anyway because SPLC was at war with Tanton and "the Plaintiffs were mere collateral damage." (Doc. 123, pp. 41-42). But this argument doesn't help DIS survive summary judgment because proving a statement was made with "'evil intent or a motive arising from spite or ill will'" does not prove actual malice. *Dershowitz v. CNN, Inc.*, 153 F.4th 1189, 1193 (11th Cir. 2025) quoting *Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 510 (1991). "Speakers' feelings about their subjects are irrelevant—all that matters are the speakers' subjective beliefs about the truth of their own statements." *Id*.

Let's assume that DIS could prove that SPLC knew that DIS dissociated from John Tanton and his network before SPLC investigated DIS in 2017-18. Proving that SPLC's investigation *stemmed* from a bad motive does nothing to disprove the *result* of SPLC's investigation. As detailed, SPLC's investigation— wrongly motivated or not—revealed statements and activities from King and others related to DIS that convinced SPLC's decisionmaker that DIS held nativist beliefs that caused DIS to oppose and denigrate persons who migrated into the United States illegally. These statements and activities, which DIS does not dispute, along with DIS's financial ties to the Tanton Network, which DIS does not dispute, formed the basis of SPLC's original designation in 2018 and its re-designation in 2021. (*See* Undisputed Facts # 31, 45). Because "all that matters are the speakers' subjective beliefs about the truth of their own statements," not their intent or motive, *Dershowitz*, 153 F. 4th at 1193, DIS's argument for actual malice cannot prove actual malice.

—

To sum up, DIS cannot prove the alleged facts that led the court to deny SPLC's Rule 12 motion, nor does DIS dispute the facts that doom its claim that the 2021 re-designation was made with actual malice:

1. When SPLC labels a group "anti-immigrant," SPLC is referring to negative actions and feelings toward persons who entered the United States illegally with an intent to stay in the United States illegally; and,

2. SPLC knew that DIS's founder and members openly opposed and denigrated persons who entered the United States illegally with an intent to stay in the United States illegally.

Because the undisputed facts show that SPLC's decisionmakers subjectively believed that DIS was "anti-immigrant" under SPLC's definition, and SPLC's decisionmakers based their belief on facts that DIS admits are true, DIS cannot prove actual malice stemming from its receipt of the "anti-immigrant" label. *See Dershowitz*, 153 F. 4th at 1193 ("Speakers' feelings about their subjects are irrelevant—all that matters are the speakers' subjective beliefs about the truth of their own statements.").

**B. DIS was a "hate group"**

DIS fares no better if you remove the qualifier "anti-immigrant" and focus on calling DIS a "hate group" generally. At all relevant times, SPLC has defined "hate group" like this:

# What is a hate group?

The Southern Poverty Law Center defines a hate group as an organization or collection of individuals that – based on its official statements or principles, the statements of its leaders, or its activities – has beliefs or practices that attack or malign an entire class of people, typically for their immutable characteristics. An organization does not need to have engaged in criminal conduct or have followed their speech with actual unlawful action to be labeled a hate group. We do not list individuals as hate groups, only organizations.

The Eleventh Circuit dealt with this definition of "hate group" in *Coral Ridge* when it affirmed the district court's granting of SPLC's Rule 12 motion to dismiss. *See Coral Ridge*, 6 F.4th at 1250, n.1. Coral Ridge argued to the Circuit that it could prove actual malice stemming from SPLC's application of the "hate group" label on two grounds. First, Coral Ridge argued that SPLC's definition was "so far removed from the commonly understood meaning of the term" that using it was "intentionally false and deceptive." *Id.* at 1252. The Circuit Court rejected this argument because (a) SPLC published its definition of a hate group, so "it is hard to see how SPLC's use of the term would be misleading," *id.* at 1253, and (b) Coral Ridge failed to plead facts that would prove SPLC doubted the veracity of its definition. *Id.* at 1252. Here, DIS produces no facts that would prove SPLC doubted the same definition of "hate group." And SPLC published its definition, so readers of the Hate Map and Intelligence Report knew what SPLC meant. So this court follows *Coral Ridge* by finding that SPLC's definition of "hate group" cannot prove actual malice.

Second, the Eleventh Circuit found that Coral Ridge failed to plead facts that would prove "that SPLC seriously doubted the accuracy of designating Coral Ridge a hate group." *Id.* at 1253. That ruling was case-specific, so it does not bind the court here. That said, the same statement can be made here. Again, DIS does not dispute that Keegan Hankes "never had any reason to

doubt DIS met SPLC's definition of an anti-immigrant hate group" when Hankes approved the re-designation in Spring 2021. (Undisputed Fact #45). Nor does DIS dispute that Hankes' decision was "based on a research analyst's analysis and report on DIS's activities for the previous years." *Id.*

In fact, DIS presents ***no*** evidence about Hankes' state of mind when he approved the re-designation. Neither party produced a deposition of Hankes, so it seems Hankes was not questioned about his state of mind when approving the re-designation. Instead, SPLC presents a declaration from Hankes, which says only this about the 2021 re-designation decision:

> 10.    In my capacity as Interim Research Director, I reviewed and approved recommendations for which hate groups should continue to be designated as hate groups for the 2019 Hate Map and *Intelligence Report* published in early 2020 and for the 2020 Hate Map and *Intelligence Report* published in early 2021.
>
> 11.    At no time did I have any reason to doubt that Dustin Inman Society met the Intelligence Project's definition of an anti-immigrant hate group for the 2020 or 2021 re-designation.
>
> I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.
>
> Dated:    5/19/2025
>
> Keegan Hankes

(Doc. 114-15, p. 4). DIS does not challenge this declaration, nor does it dispute SPLC's statement of facts based on it. *See* (Undisputed Fact #45).

Because the Eleventh Circuit has tacitly affirmed SPLC's use of its "hate group" definition, and DIS presents no evidence that would allow a reasonable juror to find that Hankes doubted the veracity of re-designating DIS as a hate group under SPLC's definition, the court must grant summary judgment.

—

In sum, DIS is not entitled to trial because DIS does not dispute the facts. DIS instead presents the same legal gripe as Coral Ridge: SPLC hides behind First Amendment precedent to stretch the meaning of common words like "hate" and common phrases like "anti-immigrant" and "anti-LGBTQ" to unfairly (if not falsely) demonize groups they disagree with politically. And SPLC raises millions of dollars doing so, often at the maligned group's expense.

DIS may be right, and it may be able to convince a reasonable juror that, under state law, SPLC defamed DIS in the eyes of a reasonable reader. But federal common law looks beyond the impact of a speaker's words and into the speaker's state of mind. *See Dershowitz*, 153 F.4th at 1193 ("all that matters are the speakers' subjective beliefs about the truth of their own statements"). As *Coral Ridge* teaches, the First Amendment allows SPLC to craft and apply its own definitions, perhaps even unfair ones, as long as ***SPLC*** reasonably believed its definitions and resulting statements were accurate when SPLC made them. Because DIS does not dispute that SPLC believed its definitions were true, and DIS does not dispute that SPLC believed its re-designation of DIS as a hate group was true, the court must find that the First Amendment protects SPLC's re-designation of DIS—even if DIS could prove SPLC acted with a bad motive or evil intent when it designated or re-designated DIS as a hate group. The court will therefore **GRANT** summary judgment for SPLC on DIS's claims stemming from the Spring 2021 redesignation.

## CONCLUSION

For these reasons, the court **GRANTS** SPLC's motion for summary judgment on all counts (doc. 113).

**Done** and **Ordered** on January 7, 2026.

_____
**COREY L. MAZE**
UNITED STATES DISTRICT JUDGE